# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| CLEAN AIR COUNCIL, GARY ADVOCATES FOR RESPONSIBLE DEVELOPMENT, HOOSIER ENVIRONMENTAL COUNCIL, JUST TRANSITION NORTHWEST INDIANA, and SIERRA CLUB,<br><br>*Petitioners*,<br><br>v.<br><br>U.S. ENVIRONMENTAL PROTECTION AGENCY and LEE ZELDIN, Administrator, U.S. Environmental Protection Agency,<br><br>*Respondents*. | Case No. 25-1163 |

## PETITION FOR REVIEW

Pursuant to Clean Air Act § 307(b)(1), 42 U.S.C. § 7607(b)(1), Rule 15 of the Federal Rules of Appellate Procedure, and D.C. Circuit Rule 15, Clean Air Council, Gary Advocates for Responsible Development, Hoosier Environmental Council, Just Transition Northwest Indiana, and Sierra Club hereby petition this Court for review of the final action taken by Respondents U.S. Environmental Protection Agency and Administrator Lee Zeldin in the Federal Register notice published at 90 Fed. Reg. 29,485 (July 3, 2025) and titled "National Emission Standards for Hazardous Air Pollutants: Integrated Iron and Steel Manufacturing

Facilities Technology Review: Interim Final Rule" (Attachment 1).

Dated:      July 28, 2025      Respectfully submitted,

*/s/ Adrienne Y. Lee*
Adrienne Y. Lee
James S. Pew
Earthjustice
1001 G Street, NW
Suite 1000
Washington, DC 20001
(202) 667-4500
alee@earthjustice.org
jpew@earthjustice.org

*Counsel for Petitioners
Clean Air Council, Gary Advocates
for Responsible Development,
Hoosier Environmental Council,
Just Transition Northwest Indiana,
and Sierra Club*

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| CLEAN AIR COUNCIL, GARY ADVOCATES FOR RESPONSIBLE DEVELOPMENT, HOOSIER ENVIRONMENTAL COUNCIL, JUST TRANSITION NORTHWEST INDIANA, and SIERRA CLUB,<br><br>*Petitioners*,<br><br>v.<br><br>U.S. ENVIRONMENTAL PROTECTION AGENCY and LEE ZELDIN, Administrator, U.S. Environmental Protection Agency,<br><br>*Respondents*. | Case No. 25-1163 |

## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Clean Air Council, Gary Advocates for Responsible Development, Hoosier Environmental Council, Just Transition Northwest Indiana, and Sierra Club make the following disclosures:

**Clean Air Council**

<u>Non-Governmental Corporate Party to this Action</u>: Clean Air Council ("CAC").

<u>Parent Corporations</u>: None.

<u>Publicly Held Company that Owns 10% or More of Party's Stock</u>: None.

Party's General Nature and Purpose: CAC is a nonprofit corporation organized and existing under the laws of the Commonwealth of Pennsylvania. As an environmental health advocacy organization, CAC is focused on protecting people's health from the harmful impacts of pollution.

**Gary Advocates for Responsible Development**

Non-Governmental Corporate Party to this Action: Gary Advocates for Responsible Development ("GARD").

Parent Corporations: None.

Publicly Held Company that Owns 10% or More of Party's Stock: None.

Party's General Nature and Purpose: GARD is a nonprofit corporation organized and existing under the laws of the State of Indiana. GARD is dedicated to promoting economic development in the City of Gary that prioritizes environmental sustainability.

**Hoosier Environmental Council**

Non-Governmental Corporate Party to this Action: Hoosier Environmental Council ("HEC").

Parent Corporations: None.

Publicly Held Company that Owns 10% or More of Party's Stock: None.

Party's General Nature and Purpose: HEC is a nonprofit corporation organized and existing under the laws of the State of Indiana. HEC is Indiana's largest

environmental public policy organization, working to improve people's health, the economy, and the environment for forty years, through education, technical assistance, and advocacy.

### Just Transition Northwest Indiana

<u>Non-Governmental Corporate Party to this Action</u>: Just Transition Northwest Indiana.

<u>Parent Corporations</u>: None.

<u>Publicly Held Company that Owns 10% or More of Party's Stock</u>: None.

<u>Party's General Nature and Purpose</u>: JTNWI is a nonprofit corporation organized and existing under the laws of the State of Indiana. JTNWI educates and organizes Northwest Indiana communities and workers to support a just transition to a regenerative economy that protects the environment, climate, and future generations.

### Sierra Club

<u>Non-Governmental Corporate Party to this Action</u>: Sierra Club.

<u>Parent Corporations</u>: None.

<u>Publicly Held Company that Owns 10% or More of Party's Stock</u>: None.

<u>Party's General Nature and Purpose</u>: Sierra Club is a nonprofit corporation organized and existing under the laws of the State of California, dedicated to the protection and enjoyment of the environment.

Dated:     July 28, 2025            Respectfully submitted,

*/s/ Adrienne Y. Lee*
Adrienne Y. Lee
James S. Pew
Earthjustice
1001 G Street NW, Suite 1000
Washington, DC 20001
(202) 667-4500
alee@earthjustice.org
jpew@earthjustice.org

*Counsel for Petitioners Clean Air Council, Gary Advocates for Responsible Development, Hoosier Environmental Council, Just Transition Northwest Indiana, and Sierra Club*

# CERTIFICATE OF SERVICE

I hereby certify that I have served the foregoing **Petition for Review** and **Rule 26.1 Disclosure Statement** on Respondents by sending a copy via First-Class Mail to each of the following addresses on this 28th day of July, 2025.

>Lee Zeldin
>EPA Headquarters 1101A
>United States Environmental Protection Agency
>William Jefferson Clinton Federal Building
>1200 Pennsylvania Avenue, N.W.
>Washington, D.C. 20460
>
>Pamela J. Bondi
>Attorney General
>U.S. Department of Justice
>950 Pennsylvania Avenue, N.W.
>Washington, D.C. 20530
>
>Correspondence Control Unit Office of
>General Counsel (2311)
>United States Environmental Protection Agency
>William Jefferson Clinton Federal Building
>1200 Pennsylvania Avenue, N.W.
>Washington, D.C. 20460

*/s/ Adrienne Y. Lee*
Adrienne Y. Lee

# ATTACHMENT 1

bears a relationship to other actions undertaken by other agencies relevant to NEPA, *e.g.,* that a set of related actions are all related to one overarching project.

(p) *Scope* consists of the range of actions, alternatives, and effects subject to the Corps legal authority or subject to the Corps control and responsibility that should be considered in an environmental document. This part addresses the considerations for use by District Engineers when determining scope for NEPA compliance in § 333.18 of this part.

(q) *Tiering* when used for the purposes of multi-phased reviews of activities under 33 U.S.C. 408, refers to the coverage of general matters in broader environmental impact statements or environmental assessments (such as a general plan to address a need that identifies different conceptual options) with subsequent narrower or more detailed statements or environmental analyses (such as an analysis of how one of those conceptual options could be implemented at a specific site) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared.

## Subpart H—Severability

### § 333.71 Severability.

The sections of this part are separate and severable from one another. If any section or portion therein is stayed or determined to be invalid, or the applicability of any section to any person or entity is held invalid, it is the Corps' intention that the validity of the remainder of those parts will not be affected. The remaining sections or portions, and all applications thereof, shall continue to be in effect.

Approved by:

**D. Lee Forsgren,**

*Acting Assistant Secretary of the Army (Civil Works).*

[FR Doc. 2025–12360 Filed 7–1–25; 2:30 pm]

**BILLING CODE 3720–58–P**

# POSTAL SERVICE

## 39 CFR Part 955

## Rules of Practice Before the Postal Service Board of Contract Appeals; Corrections

**AGENCY:** Postal Service.
**ACTION:** Correcting amendments.

**SUMMARY:** On June 18, 2025, the Postal Service amended the rules of practice that govern all proceedings before the Postal Service Board of Contract Appeals. That document inadvertently misnumbered a paragraph. This document corrects the error.

**DATES:** Effective July 3, 2025.

**ADDRESSES:** Postal Service Judicial Officer Department, 2101 Wilson Boulevard, Suite 600, Arlington, VA 22201–3078.

**FOR FURTHER INFORMATION CONTACT:** Staff Counsel Sheena Allen at (240) 636–4158.

**SUPPLEMENTARY INFORMATION:** The final rule published on June 18, 2025, at 90 FR 25895, regarding amendments to the rules of practice that govern all proceedings before the Postal Service Board of Contract Appeals, contains an error. It inadvertently added the subparagraph number ''(ii)'' twice for § 955.29(c)(1). The Postal Service makes this change below to correct the error.

## List of Subjects in 39 CFR Part 955

Administrative practice and procedure, Contract disputes, Postal Service.

Accordingly, for the reasons stated, 39 CFR part 955 is corrected by making the following correcting amendments:

## PART 955—RULES OF PRACTICE BEFORE THE POSTAL SERVICE BOARD OF CONTRACT APPEALS

■ 1. The authority citation for part 955 continues to read as follows:

**Authority:** 39 U.S.C. 204, 401; 41 U.S.C. 7101–7109.

■ 2. In § 955.29, amend paragraph (c)(1) to read as follows:

### § 955.29 (Rule 29) Subpoenas.

\* \* \* \* \*

(c) *Requests for subpoenas.* (1) A request for a subpoena must normally be filed at least:

(i) 15 days before the scheduled deposition of a witness or production by a witness or custodian of documents, electronically stored information, and tangible things;

(ii) 30 days before a scheduled hearing; or

(iii) Notwithstanding paragraphs (c)(1)(i) and (ii) of this section, the Board may honor requests for subpoenas not made within these time limits.

\* \* \* \* \*

**Kevin Rayburn,**

*Attorney, Ethics and Legal Compliance.*

[FR Doc. 2025–12411 Filed 7–2–25; 8:45 am]

**BILLING CODE P**

# ENVIRONMENTAL PROTECTION AGENCY

## 40 CFR Part 63

[EPA–HQ–OAR–2002–0083; FRL–5919.4–03–OAR]

## National Emission Standards for Hazardous Air Pollutants: Integrated Iron and Steel Manufacturing Facilities Technology Review: Interim Final Rule

**AGENCY:** Environmental Protection Agency (EPA).
**ACTION:** Interim final rule; request for comment.

**SUMMARY:** The U.S. Environmental Protection Agency (EPA) is taking interim final action on the National Emission Standards for Hazardous Air Pollutants (NESHAP) for Integrated Iron and Steel Manufacturing Facilities to revise certain compliance deadlines for standards finalized in 2024. Specifically, the EPA is revising certain compliance deadlines in the 2024 rule to April 3, 2027, in light of serious concerns that facilities will be unable to comply with the relevant requirements by the existing deadlines.

**DATES:** This interim final rule is effective on July 2, 2025. Comments on this rule must be received on or before August 1, 2025.

**ADDRESSES:** You may send comments, identified by Docket ID No. EPA–HQ–OAR–2002–0083 by any of the following methods:

• *Federal eRulemaking Portal: https://www.regulations.gov* (our preferred method). Follow the online instructions for submitting comments.

• *Email: a-and-r-docket@epa.gov.* Include Docket ID No. EPA–HQ–OAR–2002–0083 in the subject line of the message.

• *Fax:* (202) 566–9744. Attention Docket ID No. EPA–HQ–OAR–2002–0083.

• *Mail:* U.S. Environmental Protection Agency, EPA Docket Center, Docket ID No. EPA–HQ–OAR–2002–0083, Mail Code 28221T, 1200 Pennsylvania Avenue NW, Washington, DC 20460.

• *Hand/Courier Delivery:* EPA Docket Center, WJC West Building, Room 3334, 1301 Constitution Avenue NW, Washington, DC 20004. The Docket Center's hours of operation are 8:30 a.m.–4:30 p.m., Monday–Friday (except Federal Holidays).

Comments received may be posted without change to *https://www.regulations.gov,* including any personal information provided. For detailed instructions on sending comments, see the ''Public

Participation'' heading of the General Information section of this document.

**FOR FURTHER INFORMATION CONTACT:** U.S. EPA, Attn: Katie Boaggio, Mail Drop: D243–02, 109 T.W. Alexander Drive, P.O. Box 12055, RTP, North Carolina, 27711; telephone number: (919) 541–2223; email address: *boaggio.katie@epa.gov.*

**SUPPLEMENTARY INFORMATION:**

*Preamble acronyms and abbreviations.* Throughout this document the use of "we," "us," or "our" is intended to refer to the EPA. We use multiple acronyms and terms in this preamble. While this list may not be exhaustive, to ease the reading of this preamble and for reference purposes, the EPA defines the following terms and acronyms here:

APA   Administrative Procedure Act
BF   blast furnace
BOPF   basic oxygen process furnace
CAA   Clean Air Act
CBI   Confidential Business Information
CFR   Code of Federal Regulations
CRA   Congressional Review Act
EPA   Environmental Protection Agency
FR   Federal Register
HAP   hazardous air pollutant(s)
HCl   hydrochloric acid
II&S   Integrated Iron and Steel
MACT   maximum achievable control technology
NESHAP   national emission standards for hazardous air pollutants
NTTAA   National Technology Transfer and Advancement Act
OAQPS   Office of Air Quality Planning and Standards
OMB   Office of Management and Budget
PRA   Paperwork Reduction Act
RFA   Regulatory Flexibility Act
THC   total hydrocarbons
UMRA   Unfunded Mandates Reform Act

*Organization of this document.* The information in this preamble is organized as follows:

I. General Information
 A. Public Participation
 B. Potentially Affected Entities
 C. Statutory Authority
 D. Judicial Review and Administrative Review
II. Regulatory Revisions
 A. Integrated Iron & Steel NESHAP Background and Summary
 B. Petitions for Reconsideration
 C. Compliance Challenges
 D. Specific Regulatory Revisions
III. Rulemaking Procedures
IV. Request for Comment
V. Statutory and Executive Order Reviews
 A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review
 B. Executive Order 14192: Unleashing Prosperity Through Deregulation
 C. Paperwork Reduction Act (PRA)
 D. Regulatory Flexibility Act (RFA)
 E. Unfunded Mandates Reform Act of 1995 (UMRA)
 F. Executive Order 13132: Federalism
 G. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments
 H. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks
 I. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use
 J. National Technology Transfer and Advancement Act (NTTAA) and 1 CFR Part 51
 K. Congressional Review Act (CRA)

## I. General Information

### A. Public Participation

Submit your written comments, identified by Docket ID No. EPA–HQ–OAR–2002–0083, at *https://www.regulations.gov* (our preferred method), or by the other methods identified in the **ADDRESSES** section. Once submitted, comments cannot be edited or removed from the docket. The EPA may publish any comment received to its public docket. Do not submit to the EPA's docket at *https://www.regulations.gov* any information you consider to be Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. This type of information should be submitted as discussed in the *Submitting CBI* section of this document. Multimedia submissions (audio, video, etc.) must be accompanied by a written comment. The written comment is considered the official comment and should include discussion of all points you wish to make. The EPA will generally not consider comments or comment contents located outside of the primary submission (*i.e.,* on the web, cloud, or other file sharing system). Please visit *https://www.epa.gov/dockets/commenting-epa-dockets* for additional submission methods; the full EPA public comment policy; information about CBI or multimedia submissions; and general guidance on making effective comments.

*Submitting CBI.* Do not submit information containing CBI to the EPA through *https://www.regulations.gov.* Clearly mark the part or all the information that you claim to be CBI. For CBI information on any digital storage media that you mail to the EPA, note the docket ID, mark the outside of the digital storage media as CBI, and identify electronically within the digital storage media the specific information that is claimed as CBI. In addition to one complete version of the comments that includes information claimed as CBI, you must submit a copy of the comments that does not contain the information claimed as CBI directly to the public docket through the procedures outlined in the *Public Participation* section of this document. If you submit any digital storage media that does not contain CBI, mark the outside of the digital storage media clearly that it does not contain CBI and note the docket ID. Information not marked as CBI will be included in the public docket and the EPA's electronic public docket without prior notice. Information marked as CBI will not be disclosed except in accordance with procedures set forth in 40 Code of Federal Regulations (CFR) part 2.

Our preferred method to receive CBI is for it to be transmitted electronically using email attachments, File Transfer Protocol (FTP), or other online file sharing services (*e.g.,* Dropbox, OneDrive, Google Drive). Electronic submissions must be transmitted directly to the Office of Air Quality Planning and Standards (OAQPS) CBI Office at the email address *oaqpscbi@epa.gov,* and as described above, should include clear CBI markings and note the docket ID. If assistance is needed with submitting large electronic files that exceed the file size limit for email attachments, and if you do not have your own file sharing service, please email *oaqpscbi@epa.gov* to request a file transfer link. If sending CBI information through the postal service, please send it to the following address: U.S. EPA, Attn: OAQPS Document Control Officer, Mail Drop: C404–02, 109 T.W. Alexander Drive, P.O. Box 12055, RTP, North Carolina 27711, Attention Docket ID No. EPA–HQ–OAR–2002–0083. The mailed CBI material should be double wrapped and clearly marked. Any CBI markings should not show through the outer envelope.

### B. Potentially Affected Entities

As defined in the *Initial List of Categories of Sources Under Section 112(c)(1) of the Clean Air Act Amendments of 1990* (see 57 FR 31576; July 16, 1992) and *Documentation for Developing the Initial Source Category List, Final Report* (see EPA–450/3–91–030; July 1992), the Integrated Iron and Steel Manufacturing Facilities source category includes any facility engaged in producing steel from refined iron ore (also known as taconite pellets). These facilities first produce iron from iron ore taconite pellets, sinter, coke, and other raw materials using blast furnaces (BFs), then produce steel from the hot liquid iron produced from the blast furnaces, along with coke, lime, alloys, steel scrap, and other raw materials using

basic oxygen process furnaces (BOPFs). Integrated iron and steel manufacturing includes the following processes: sinter production, iron production, iron preparation (hot metal desulfurization), and steel production. The iron production process includes the production of iron in BFs by the reduction of iron-bearing materials with a very hot gas. The steel production process includes BOPFs and ladle metallurgy operations. The 2022 North American Industry Classification System (NAICS) code for the source category is 331110 for ''Iron and Steel Mills and Ferroalloy Manufacturing.'' The NAICS code serves as a guide for readers outlining the type of entities that this interim final action is likely to affect. Currently there are eight operating facilities in this source category.

The information provided in this section on potentially affected entities is not intended to be exhaustive. If you have questions regarding the applicability of this action to a particular entity, consult the person listed in the **FOR FURTHER INFORMATION CONTACT** section.

*C. Statutory Authority*

Statutory authority to issue the amendments finalized in this action is provided by the same Clean Air Act (CAA) provision that provided authority to issue the regulations being amended: CAA section 112, 42 U.S.C. 7412. Statutory authority for the rulemaking procedures followed in this action is provided by Administrative Procedure Act (APA) section 553(b)(B), 5 U.S.C. 553(b)(B).

*D. Judicial Review and Administrative Review*

Under CAA section 307(b)(1), judicial review of this final action is available only by filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit by September 2, 2025. Under CAA section 307(b)(2), the requirements established by this final rule may not be challenged separately in any civil or criminal proceedings brought by the EPA to enforce the requirements.

## II. Regulatory Revisions

*A. Integrated Iron & Steel NESHAP Background and Summary*

The EPA initially set maximum achievable control technology (MACT) standards for the Integrated Iron and Steel (II&S) Manufacturing Facilities source category on May 20, 2003 (68 FR 27646), codified at 40 CFR part 63, subpart FFFFF, and as part of a residual risk and technology review, finalized amendments to the standards on July 13, 2020 (85 FR 42074). Subsequently, on April 3, 2024, the EPA completed a second technology review under a court-ordered deadline [1] by finalizing amendments to 40 CFR part 63, subpart FFFFF (89 FR 23294). The amendments included: (1) MACT standards to address previously unregulated emissions of hazardous air pollutants (HAP) from the II&S Manufacturing Facilities source category pursuant to our interpretation of *Louisiana Environmental Action Network* v. *EPA,* 955 F.3d 1088 (D.C. Cir. 2020) (''*LEAN*''); and (2) revised emissions standards based on new information regarding developments in practices, processes, and control technologies pursuant to CAA section 112(d)(6).

Relevant to this action, the 2024 rule finalized the following: (1) new MACT standards, in the form of numeric emission limits, for five previously unregulated HAP (carbonyl sulfide, carbon disulfide, mercury, hydrogen chloride (HCl), and hydrogen fluoride) emitted from the sinter plants located at II&S manufacturing facilities; (2) new MACT standards, in the form of opacity limits and work practice standards, for five previously unregulated sources of unmeasured fugitive and intermittent particulate emissions: Unplanned bleeder valve openings, planned bleeder valve openings, beaching, bell leaks, and slag processing, handling and storage; and (3) new MACT standards, in the form of numeric emission limits, for unregulated pollutants from BF stoves and BOPFs: total hydrocarbons (THC) (as a surrogate for non-dioxin and non-furan organic HAP), HCl, and dioxins/furans (D/F); and for unregulated pollutants for BFs: THC (as a surrogate for non-dioxin and non-furan organic HAP) and HCl. Additionally, pursuant to CAA section 112(d)(6), the 2024 rule also finalized: (1) work practice standards for the BOPF shops; (2) a requirement that facilities conduct EPA Method 9 readings two times per month at the BOPF Shop and BF casthouse; (3) a fenceline monitoring requirement for chromium for the stated purpose of ensuring that the work practice standards and opacity limits are achieving the anticipated reductions; and (4) revised standards for D/F and polycyclic aromatic hydrocarbons (PAH) from sinter plants to reflect the installation and operation of activated carbon injection (ACI) technology.

*B. Petitions for Reconsideration*

Following the issuance of the 2024 rule, the EPA was notified by industry parties that there were several errors in the final regulatory text and certain items that the EPA had not properly raised for comment during the proposal. The United States Steel Corp. and Cleveland-Cliffs Inc. submitted administrative petitions for reconsideration on June 3, 2024, detailing those errors, requesting corrections, and expressing concerns regarding the technical feasibility of certain new requirements. The industry parties additionally submitted requests for an administrative stay of the 2024 rule pursuant to CAA section 307(d)(7)(B). Earthjustice on behalf of environmental petitioners challenging the 2020 and 2024 II&S rules [2] also submitted a petition for reconsideration regarding alleged improper notice related to several of the new requirements finalized in the rules.

The Agency responded to the petitions for reconsideration on August 14, 2024, granting discretionary reconsideration of three issues (the numeric emission limit for HCl from BF casthouses and the work practice standards for unplanned bleeder valve openings and beaching) and expressing the intention to issue a correction notice to do the following:

1. clarify that the definition of an ''unplanned bleeder valve opening'' includes only those openings that are not located downstream from a control device (*i.e.,* ''dirty bleeder valve openings'');

2. clarify the timing of planned openings and how they may affect opacity readings;

3. clarify the definition of a ''single bleeder valve opening event;''

4. delete from 40 CFR part 63, subpart FFFFF, Table 2 the emission standard for ''windbox exhaust stream'' for BF casthouses, BF stoves, and BOPF shops because these sources do not have a windbox exhaust stream; and

5. clarify the method that must be used to measure opacity for bell leaks.

The EPA also committed to continue reviewing additional issues raised in the petitions for reconsideration.

After receiving the EPA's August 14, 2024 response letter, industry petitioners contacted EPA staff to provide additional information regarding the five correction items. These further discussions resulted in a determination by the Agency that some of the corrections and discretionary

---

[1] *See California Communities Against Toxics, et al.* v. *Pruitt,* Case No. 15–512 (D.D.C.), Orders (Feb. 19, 2020; April 14, 2021; Sept. 20, 2023).

[2] Earthjustice is counsel for Clean Air Council, Gary Advocates for Responsible Development, Hoosier Environmental Council, and Sierra Club.

reconsideration items instead warranted mandatory reconsideration under CAA section 307(d)(7)(B).[3]

As a result, on March 5, 2025, the EPA issued a second letter modifying the scope of the already convened discretionary reconsideration proceeding by identifying several items from the petitions for reconsideration as appropriate for mandatory reconsideration based on the criteria in CAA section 307(d)(7)(B): (1) work practice standards for unmeasured fugitive and intermittent particulate from unplanned bleeder valve openings; (2) the opacity limit for planned bleeder valve openings; (3) work practice standards for bell leaks; and (4) the opacity limit for slag processing and handling.[4]

Considering the need for additional time for the EPA's mandatory reconsideration of some aspects of the 2024 rule, on March 31, 2025, we determined that a partial stay of the final rule was necessary and issued the *Partial Administrative Stay of National Emission Standards for Hazardous Air Pollutants: Integrated Iron and Steel Manufacturing Facilities Technology Review,* 90 FR 14207 (March 31, 2025). With that action, the EPA stayed the April 3, 2025, compliance deadlines contained in the 2024 rule until July 1, 2025.

*C. Compliance Challenges*

Most of the items identified for reconsideration in the two response letters have compliance deadlines of April 3, 2025, or April 3, 2026. After further consideration of all the reconsideration issues, the parties' petitions for reconsideration, and further discussion with stakeholders, the EPA has determined to revise the 2025 and 2026 compliance deadlines in the II&S Manufacturing Facilities NESHAP to April 3, 2027, for unplanned bleeder valve openings, planned bleeder valve openings, bell leaks, slag processing and handling, beaching, and BF/BOPF work practices. The revision of these compliance deadlines will avoid documented issues regarding compliance with the 2024 rule with respect to the items being reconsidered and corrected. When the EPA promulgated the standards at issue in this action with compliance deadlines in 2025—opacity standards for planned openings, work practice standards for bell leaks, and the monitoring frequency for BOPF/BF—the EPA concluded that these standards could be met without the need for installation of new control equipment, monitors, or measurement equipment. Therefore, the EPA provided only one year to comply with those standards (*i.e.,* a compliance deadline of April 3, 2025).

However, after promulgation of the 2024 rule, information was provided to the EPA by industry parties in their CAA section 307(d) petitions for administrative reconsideration that facilities may not be able to comply with the standards as written by the April 3, 2025 deadline without clarifications, corrections, or revisions.[5] Additionally, industry petitioners provided new supplemental monitoring data to the EPA to support their petitions for reconsideration. These data demonstrate that it likely will be infeasible for a majority of sources to comply with the 2024 rule's opacity limits for planned bleeder valve openings. The supplemental monitoring was performed by industry to substantiate comments they submitted during the public comment period regarding certain source-by-source operational variabilities. But, because the EPA was under a court-ordered deadline to promulgate the final rule, the Agency did not have time to fully evaluate those comments and underlying data and their implications. Industry was therefore not aware of the need for the supplemental data and explanation of source variability until after the 2024 rule was finalized. These supplemental datasets provided by affected sources to support the industry petitions for reconsideration were not available to the EPA until after the 2024 rule was finalized.

While the EPA concluded there are work practices available to minimize opacity, these new data provide evidence that there is more variability in each source's operations and opacity than we accounted for in developing the final opacity standards. Additionally, for bell leaks, it was brought to the EPA's attention that the 2024 rule's regulatory language setting compliance action levels is inconsistent with what was proposed and needs to be clarified for compliance to be achieved. Finally, for BOPF shops and BF casthouses, through the petitions, the EPA realized there is ambiguity in the regulatory text for the monitoring frequency and location of fugitive emissions that must be addressed to clarify how to demonstrate compliance with these standards.

Likewise, when the EPA promulgated the operational limit for unplanned openings, the opacity limit for slag operations, and the work practice standards for beaching, the EPA had concluded that facilities could comply with these limits in two years, by April 3, 2026, based on the understanding that facilities only had to make relatively moderate changes in equipment or operations to comply with those standards. Those expected changes included installing: (1) stockline monitors to measure material flows in the blast furnaces and/or material sizing equipment or screens to ensure input material was properly sized, to help prevent unplanned openings; (2) fogging and/or water spray equipment to minimize opacity for slag processing operations; and (3) partial enclosures or carbon dioxide suppression to minimize fugitives from beaching. However, based on additional information provided by the petitioners after promulgation of the rule and after further discussions and analyses, the EPA now understands that, in some cases, the equipment and work practices are insufficient or infeasible to meet the standards as currently written. Therefore, some affected sources will likely need more than two years to comply with the standards as finalized.

For unplanned openings, the EPA intended that the finalized standard would only apply to unplanned openings that are not routed to a control device. However, the EPA inadvertently finalized the standard such that it also applies to bleeder valve openings that go through a control device. This technical error will increase the number of unplanned openings that count towards the yearly operational limit, which makes the limit unachievable until a correction is made. For slag handling and processing, new data were provided in the petitions that show higher opacity concentrations than previously known by the EPA for certain specific slag processing and handling activities. For beaching, the EPA failed to adequately consider some feasibility challenges with certain required work practices.

Furthermore, the EPA recognizes that additional corrections, clarifications, and/or revisions to these standards are needed, and such changes cannot be made without an opportunity for notice and comment.

---

[3] Under CAA section 307(d)(7)(B), 42 U.S.C. 7607(d)(7)(B), the Administrator shall convene a proceeding for reconsideration of a rule when the person raising an objection to a rule can demonstrate: (1) that it was either impractical to raise the objection during the period for public comment or that the grounds for the objection arose after the period for public comment; and (2) that the objection is of central relevance to the outcome of the rule.

[4] Copies of both EPA response letters are included in Docket ID No. EPA–HQ–OAR–2002–0083.

[5] The CAA section 307(d) petitions for administrative review of the 2024 rule are available in the docket for this action.

For all the foregoing reasons, the EPA is revising the 2025 and 2026 compliance deadlines for the standards described above to April 3, 2027, to allow sufficient time to address the issues discussed above and to allow sufficient time for compliance in light of the new data and information presented to the Agency. For consistency, even though there is no operational deadline that applies to fenceline monitoring currently, we are also revising the deadline for fenceline monitoring to 1 year after promulgation of the test method or April 3, 2027, whichever is later.

*D. Specific Regulatory Revisions*

The regulatory revisions to 40 CFR part 63, subpart FFFFF in this action are amending 40 CFR 63.7783 by revising paragraph (g), adding paragraph (h), and amending 40 CFR 63.7792 by revising paragraph (a) to revise the relevant compliance deadlines associated with the standards in this rule to April 3, 2027.

### III. Rulemaking Procedures

As noted in section I.C. of this preamble, the EPA's authority for the rulemaking procedures followed in this action is provided by APA section 553, 5 U.S.C. 553.[6] In general, an agency issuing a rule under the procedures in APA section 553 must provide prior notice and an opportunity for public comment, but APA section 553(b)(B) includes an exemption from notice-and-comment requirements "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons, therefore, in the rule issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." This action is being issued without prior notice or opportunity for public comment because the EPA finds that the APA "good cause" exemption from notice-and-comment requirements applies here.

For the reasons described in detail in Section II above, notice-and-comment is impracticable here. First, the EPA has granted petitions for administrative reconsideration of numerous provisions of the 2024 rule and has committed to develop a rulemaking that will be subject to notice-and-comment. See 90 FR 14207, 14208 (March 31, 2025). The reconsideration action is needed because the EPA recognizes that procedural and drafting errors made in the rulemaking process in addition to information that was not submitted by the regulated parties until after the close of the comment period for the proposed rule led the EPA to promulgate regulations that pose compliance challenges that must be resolved before regulated parties will be able to comply with many provisions of the 2024 rule. Because the existing compliance deadlines require action by facilities in the short-term, including investment decisions and modifications to equipment and operating procedures with a significant lead time, revising the compliance dates through prior notice and comment procedures would be impracticable. Second, on March 31, 2025, the EPA issued an administrative stay of the 2025 deadlines contained in the 2024 rule until July 1, 2025 (90 FR 14207; March 31, 2025). If the EPA were to evaluate comments on this action before finalizing it, it is highly likely that the Agency would miss the July 1, 2025, deadline to revise the 2025 compliance deadlines, thereby potentially throwing regulated parties into immediate non-compliance with regulatory requirements that will most likely be revised during the reconsideration rulemaking process. Prior notice and comment procedures are impracticable on this basis as well.

The EPA is also making this rule effective immediately as "a substantive rule which grants or recognizes an exemption or relieves a restriction" under APA section 553(d)(1). This action relieves restrictions by revising the 2024 rule's 2025 and 2026 compliance deadlines.

### IV. Request for Comment

As explained in section III of this document, the EPA finds good cause to take this interim final action without prior notice or opportunity for public comment. However, the EPA is requesting comment on the revised compliance dates described in this rule. The EPA is not reopening for comment any provisions of the 2024 rule other than the specific provisions and compliance dates that are expressly amended in this interim final rule.

### V. Statutory and Executive Order Reviews

Additional information about these statutes and executive orders can be found at *https://www.epa.gov/laws-regulations/laws-and-executive-orders.*

*A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review*

This is a significant regulatory action under Executive Order section 3(f)(1) that was submitted to the Office of Management and Budget (OMB) for review. Any changes made in response to OMB recommendations have been documented in the docket. The EPA prepared a regulatory impact analysis (RIA) of the potential costs and benefits associated with this action. This analysis, *Regulatory Impact Analysis for the National Emission Standard for Hazardous Air Pollutants: Integrated Iron and Steel Manufacturing Facilities Technology Review: Interim Final Rule,* is consistent with Executive Order 12866 and is available in the docket. The RIA analyzes impacts over the period 2025 to 2035 to replicate the analytical timeframe used in the RIA for the 2024 final rule. This interim final action is not based on the estimated costs or benefits presented in the RIA, but rather is based on concerns regarding the technical feasibility of certain regulatory requirements.

Under the 2024 rule, II&S manufacturing facilities must perform required work practices or meet a specified opacity or operational limit (or both) for each UFIP emissions source. Revising the compliance deadlines for these sources allows affected facilities to defer capital investment and avoid operating and maintenance (O&M) costs over the period during which compliance is no longer required. The compliance cost savings estimated by this analysis represent these avoided O&M costs and deferred capital investment costs.

Under this interim final rule, the 2024 rule would no longer reduce emissions of HAP from UFIP emissions sources over the period April 3, 2025, through April 3, 2027, as projected in the RIA for the 2024 rule.[7] The potential benefits from these reductions of HAP were not monetized in that RIA and potential benefit impacts associated with HAP emissions changes due to this interim final rule were not monetized. The interim final rule is also expected to affect emissions of unregulated pollutants such as $PM_{2.5}$. The methodology for estimating these emission changes and monetizing the associated benefit impacts is described

---

[6] Under CAA section 307(d)(1)(C), the EPA's promulgation or revision of any standard of performance under CAA section 112 would normally be subject to the rulemaking procedural requirements of CAA section 307(d), including notice-and-comment procedures, but CAA section 307(d) does not apply "in the case of any rule or circumstance referred to in subparagraphs (A) or (B) of [APA section 553(b)]."

[7] "Regulatory Impact Analysis for the Final National Emission Standards for Hazardous Air Pollutants: Integrated Iron and Steel Manufacturing Facilities Technology Review" (Ref. EPA–452/R–24–012). Docket ID No. EPA–HQ–OAR–2002–0083–1977.

in the RIA for this action and the RIA for the 2024 rule. The estimated changes to emissions caused by this interim final rule are expected to be zero for the remainder of the analytical timeframe covered by the RIA.

Table 1 summarizes the estimated changes to compliance costs and emissions associated with this interim final action from 2025–2035. Costs are measured in 2024 dollars discounted to 2025. Emissions changes are measured in short tons. This table presents the present values (PV) and equivalent annualized values (EAV) of these estimated impacts discounted using social discount rates of both three and seven percent, in accordance with OMB Circular A–4. The EAV figures are annualized over 11 years to reflect the length of the timeframe used in the analysis. The EPA estimates that the interim final rule will result in annualized compliance cost savings of $0.4 million using a 3% social discount rate and $0.5 million using a 7% social discount rate. The EPA also estimates that the interim final rule will lead to HAP emissions increases of 120 tons from 2025 through 2027, when the provisions of the 2024 Final Rule are scheduled to go into effect. Changes to emissions from 2028 through 2035 are expected to be zero. The full benefit-cost analysis, which is contained in the RIA for this rulemaking, is consistent with Executive Order 12866 and is available in the docket.

TABLE 1—SUMMARY OF COMPLIANCE COST SAVINGS, AND EMISSIONS CHANGES FOR THE INTERIM FINAL RULE, DISCOUNTED TO 2025 (MILLIONS OF 2024 DOLLARS), 2025–2035

|  | 3 Percent discount rate | | 7 Percent discount rate | |
| --- | --- | --- | --- | --- |
|  | PV | EAV | PV | EAV |
| Compliance Cost Savings | $3.3 | $0.4 | $3.5 | $0.5 |
| Emissions Increases HAP (Tons) | 2025–2035 120 | | | |

**Note:** Estimates are rounded to two significant figures.

*B. Executive Order 14192: Unleashing Prosperity Through Deregulation*

This action is considered an Executive Order 14192 deregulatory action. The EPA estimates that the interim final rule will result in compliance cost savings of $3.3 million in present value ($0.4 million EAV) using a 3% social discount rate and $3.5 million in present value ($0.5 million EAV) using a 7% social discount rate from 2025–2035. Details on the estimated compliance cost savings of this final rule can be found in EPA's analysis of the potential costs and benefits associated with this action. This analysis is contained in the RIA, which is available in the docket.

*C. Paperwork Reduction Act (PRA)*

This action does not impose any new information collection burden under the PRA. The OMB has previously approved the information collection activities that apply to the II&S facilities affected by this action and has assigned OMB control number 2060–0517. This action does not change the information collection requirements.

*D. Regulatory Flexibility Act (RFA)*

I certify that this action will not have a significant economic impact on a substantial number of small entities under the RFA. This action will not impose any requirements on small entities. The Agency confirmed through responses to a CAA section 114 information request that there are only eight integrated iron and steel manufacturing facilities currently operating in the United States and that these plants are owned by two parent companies that do not meet the definition of small businesses, as defined by the U.S. Small Business Administration.

*E. Unfunded Mandates Reform Act of 1995 (UMRA)*

This action does not contain an unfunded mandate of $100 million or more as described in UMRA, 2 U.S.C. 1531–1538, and does not significantly or uniquely affect small governments. The action imposes no enforceable duty on any state, local or tribal governments or the private sector.

*F. Executive Order 13132: Federalism*

This action does not have federalism implications. It will not have substantial direct effects on the states, on the relationship between the national government and the states, or on the distribution of power and responsibilities among the various levels of government.

*G. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments*

This action does not have Tribal implications as specified in Executive Order 13175. This rule will implement revisions to the compliance dates for certain provisions. Thus, Executive Order 13175 does not apply to this action.

*H. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks*

Executive Order 13045 directs Federal agencies to include an evaluation of the health and safety effects of the planned regulation on children in Federal health and safety standards and explain why the regulation is preferable to potentially effective and reasonably feasible alternatives. This action is not subject to Executive Order 13045 because the EPA does not believe the environmental health or safety risks addressed by this action present a disproportionate risk to children.

*I. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use*

This action is not subject to Executive Order 13211, because it is not likely to have a significant adverse effect on the supply, distribution, or use of energy. We have concluded that this action is not likely to have any adverse energy effects because it contains no regulatory requirements that will have an adverse impact on productivity, competition, or prices in the energy sector.

*J. National Technology Transfer and Advancement Act (NTTAA) and 1 CFR Part 51*

This action does not involve technical standards.

*K. Congressional Review Act (CRA)*

This action is subject to the Congressional Review Act (CRA), 5

U.S.C. 801–808, and the EPA will submit a rule report to each House of the Congress and to the Comptroller General of the United States. This rule has been determined to meet the criteria at 5 U.S.C. 804(2) and so would normally be subject to a 60-day delayed effective date under the CRA (5 U.S.C. 801(a)(3)). However, CRA allows the issuing agency to make such rules effective sooner if the agency makes a good cause finding that notice and comment rulemaking procedures are impracticable, unnecessary or contrary to the public interest (5 U.S.C. 808(2)). The EPA has made a good cause finding for this rule as discussed in Part III, including the basis for that finding.

## List of Subjects in 40 CFR Part 63

Environmental protection, Administrative practice and procedures, Air pollution control, Hazardous substances, Reporting and recordkeeping requirements.

### Lee Zeldin,
*Administrator.*

For the reasons stated in the preamble, the Environmental Protection Agency amends part 63 of title 40, chapter I, of the Code of Federal Regulations as follows:

## PART 63—NATIONAL EMISSION STANDARDS FOR HAZARDOUS AIR POLLUTANTS FOR SOURCE CATEGORIES

■ 1. The authority citation for part 63 continues to read as follows:

**Authority:** 42 U.S.C. 7401 et seq.

## Subpart FFFFF—National Emission Standards for Hazardous Air Pollutants for Integrated Iron and Steel Manufacturing Facilities

■ 2. Amend § 63.7783 by revising paragraph (g) and adding paragraph (h) to read as follows:

### § 63.7783 When do I have to comply with this subpart?

\* \* \* \* \*

(g) If you have an affected source for which construction or reconstruction commenced on or before July 31, 2023, each sinter plant windbox, BF casthouse, BF stove, primary emission control system for a BOPF, and fugitive and intermittent particulate source at your facility must be in compliance with the applicable emission limits in table 1 to this subpart through performance testing under § 63.7825 and work practice standards in § 63.7793 by April 3, 2027.

(h) Affected sources that commence construction or reconstruction after July 31, 2023, must be in compliance with provisions in this subpart through performance testing by April 3, 2024 or upon startup, whichever is later.

■ 3. Amend § 63.7792 by revising paragraph (a) introductory text to read as follows:

### § 63.7792 What fenceline monitoring requirements must I meet?

\* \* \* \* \*

(a) Beginning either 1 year after promulgation of the test method for fenceline sampling of metals applicable to this subpart or April 3, 2027, whichever is later, the owner or operator must conduct sampling along the facility property boundary and analyze the samples in accordance with the method and paragraphs (a)(1) through (3) of this section.

\* \* \* \* \*

[FR Doc. 2025–12407 Filed 7–1–25; 11:15 am]
**BILLING CODE 6560–50–P**

---

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 300

[EPA–HQ–OLEM–2024–0374, EPA–HQ–OLEM–2024–0375, EPA–HQ–OLEM–2024–0377; FRL–12162–02–OLEM]

### National Priorities List

**AGENCY:** Environmental Protection Agency (EPA).
**ACTION:** Final rule.

**SUMMARY:** The Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (''CERCLA'' or ''the Act''), as amended, requires that the National Oil and Hazardous Substances Pollution Contingency Plan (''NCP'') include a list of national priorities among the known releases or threatened releases of hazardous substances, pollutants or contaminants throughout the United States. The National Priorities List (''NPL'') constitutes this list. The NPL is intended primarily to guide the Environmental Protection Agency (''the EPA'' or ''the agency'') in determining which sites warrant further investigation. These further investigations will allow the EPA to assess the nature and extent of public health and environmental risks associated with the site and to determine what CERCLA-financed remedial action(s), if any, may be appropriate. This rule adds three sites to the General Superfund section of the NPL.

**DATES:** The rule is effective on August 4, 2025.

**ADDRESSES:** Contact information for the EPA Headquarters:

• Docket Coordinator, Headquarters; U.S. Environmental Protection Agency; CERCLA Docket Office; 1301 Constitution Avenue NW; William Jefferson Clinton Building West, Room 3334, Washington, DC 20004, telephone number: (202) 566–1744.

**FOR FURTHER INFORMATION CONTACT:** Vanessa Van Note, U.S. Environmental Protection Agency, Site Assessment and Remedy Decisions Branch, Assessment and Remediation Division, Office of Superfund Remediation and Technology Innovation (Mail Code 5203T), 1200 Pennsylvania Avenue NW, Washington, DC 20460, telephone number: (202) 564–4830, email address: *vannote.vanessa@epa.gov.*

The contact information for the regional dockets is as follows:

• Mandy Liao, Region 1 (CT, ME, MA, NH, RI, VT), U.S. EPA, Superfund and Emergency Management Division, 5 Post Office Square, Suite 100, Boston, MA 02109–3912; telephone number: (617) 918–1036.

• James Desir, Region 2 (NJ, NY, PR, VI), U.S. EPA, 290 Broadway, New York, NY 10007–1866; telephone number: (212) 637–4342.

• Nancy Shannon, Region 3 (DE, DC, MD, PA, VA, WV), U.S. EPA, 4 Penn Center, 1600 John F. Kennedy Boulevard, Mail code 3SD12, Philadelphia, PA 19103; telephone number: (215) 814–3175.

• Sandra Bramble, Region 4 (AL, FL, GA, KY, MS, NC, SC, TN), U.S. EPA, 61 Forsyth Street SW, Mail code 9T25, Atlanta, GA 30303; telephone number: (404) 562–8926.

• Jessica Wheatley, Region 5 (IL, IN, MI, MN, OH, WI), U.S. EPA Superfund Records Officer, MI–10J, Metcalfe Federal Building, 77 West Jackson Boulevard, Chicago, IL 60604; telephone number: (312) 353–8559

• Steve Cowan, Region 6 (AR, LA, NM, OK, TX), U.S. EPA, 1201 Elm Street, Suite 500, Mail code SEDA, Dallas, TX 75270; telephone number: (214) 665–3149.

• Kumud Pyakuryal, Region 7 (IA, KS, MO, NE), U.S. EPA, 11201 Renner Blvd., Mail code SUPRSTAR, Lenexa, KS 66219; telephone number: (913) 551–7956.

• Ryan Dunham, Region 8 (CO, MT, ND, SD, UT, WY), U.S. EPA, 1595 Wynkoop Street, Mail code 8SEMD–EMB, Denver, CO 80202–1129; telephone number: (303) 312–6627.

• Leslie Ramirez, Region 9 (AZ, CA, HI, NV, AS, GU, MP), U.S. EPA, 75 Hawthorne Street, Mail code SFD–8–4, San Francisco, CA 94105; telephone number: (415) 972–3978.