<u>**ORAL ARGUMENT NOT YET SCHEDULED**</u>

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

No. 25-1163

CLEAN AIR COUNCIL, *et al.*,
*Petitioners*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*,
*Respondents*.

Petition for Review of Final Administrative Action of the
United States Environmental Protection Agency

**MOTION FOR SUMMARY VACATUR OR,
IN THE ALTERNATIVE, A STAY PENDING JUDICIAL REVIEW**

Adrienne Y. Lee
James S. Pew
Earthjustice
1001 G Street, NW, Suite 1000
Washington, D.C. 20001
(202) 667-4500
alee@earthjustice.org
jpew@earthjustice.org

*Counsel for Clean Air Council, Gary
Advocates for Responsible Development,
Hoosier Environmental Council, Just
Transition Northwest Indiana, and Sierra Club*

**DATED: July 30, 2025**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... ii

INTRODUCTION ..............................................................................1

BACKGROUND ................................................................................1

   I.    PROCEDURAL HISTORY .......................................................1

   II.   STATUTORY BACKGROUND ...............................................5

STANDARD OF REVIEW ..................................................................6

STANDING .......................................................................................7

ARGUMENT .....................................................................................9

   I.    EPA'S INTERIM FINAL RULE IS UNLAWFUL AND MUST BE SUMMARILY VACATED...................................................9

   II.   ALTERNATIVELY, PETITIONERS ARE ENTITLED TO A JUDICIAL STAY. ...............................................................12

       A.   Petitioners are likely to succeed on the merits.................................12

       B.   EPA's delay irreparably harms Petitioners and their members.........18

       C.   The public interest favors a stay and outweighs any countervailing concerns. ..........................................................................20

CONCLUSION...................................................................................23

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT.................24

CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 18.........................25

CIRCUIT RULE 26.1 DISCLOSURE STATEMENT ...........................................26

CERTIFICATE OF PARTIES................................................................27

CERTIFICATE OF SERVICE ...............................................................28

i

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Air All. Houston v. EPA,*
906 F.3d 1049 (D.C. Cir. 2018) ................................................................. 13, 14

*Am. Fed'n of Gov't Emp., AFL-CIO v. Block,*
655 F.2d 1153 (D.C. Cir. 1981) .......................................................................... 11

*Amoco Prod. Co. v. Village of Gambell,*
480 U.S. 531 (1987) ............................................................................................. 19

*Buschmann v. Schweiker,*
676 F.2d 352 (9th Cir. 1982) ............................................................................... 9

*Cascade Broad. Grp. Ltd. v. FCC,*
822 F.2d 1172 (D.C. Cir. 1987) ............................................................................ 7

*Clean Wisconsin v. EPA,*
964 F.3d 1145 (D.C. Cir. 2020) ............................................................................ 9

*Coburn v. McHugh,*
679 F.3d 924 (D.C. Cir. 2012) ............................................................................ 16

*Consumer Energy Council of Am. v. FERC,*
673 F.2d 425 (D.C. Cir. 1982) ............................................................................ 11

*Cuomo v. U.S. Nuclear Regul. Comm'n.,*
772 F.2d 972 (D.C. Cir. 1985) ............................................................................ 20

*Env't Def. Fund, Inc. v. EPA,*
716 F.2d 915 (D.C. Cir. 1983) ..................................................................... 10, 12

*FCC v. Fox Television Stations, Inc.,*
556 U.S. 502 (2009) ..................................................................................... 16, 17

*Friends of the Earth v. Laidlaw Env't Servs.,*
528 U.S. 167 (2000) ............................................................................................. 9

*La. Env't Action Network v. EPA*,
955 F.3d 1088 (D.C. Cir. 2020) ........................................................22

*Mack Trucks v. EPA*,
682 F.3d 87 (D.C. Cir. 2012) ........................................................9, 12

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.
Co.*,
463 U.S. 29 (1983) ........................................................13, 15, 16

*Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*,
53 F.4th 869 (5th Cir. 2022) ........................................................9

*Nat'l Lime Ass'n v. EPA*,
233 F.3d 625 (D.C. Cir. 2000) ........................................................20

*Nken v. Holder*,
556 U.S. 418 (2009) ........................................................7, 12

*NRDC v. EPA*,
489 F.3d 1364 (D.C. Cir. 2007) ........................................................13

*NRDC v. EPA*,
749 F.3d 1055 (D.C. Cir. 2014) ........................................................8

*Pub. Citizen v. Fed. Motor Carrier Safety Admin.*,
374 F.3d 1209 (D.C. Cir. 2004) ........................................................13, 14

*Util. Solid Waste Activities Grp. v. EPA*,
236 F.3d 749 (D.C. Cir. 2001) ........................................................9, 12

**STATUTES**

5 U.S.C. § 553(b)(A), (B) ........................................................5, 6

5 U.S.C. § 553(b)(B) ........................................................10

5 U.S.C. § 706(2)(A), (C) ........................................................6

42 U.S.C. § 7412(i)(3) ........................................................14

42 U.S.C. § 7412(d), (e)(1)(E) ........................................................20

42 U.S.C. § 7607(d)(1)(V) ........................................................5

42 U.S.C. § 7607(d)(1)(C) ....................................................5

42 U.S.C. § 7607(d)(3) ........................................................5

42 U.S.C. § 7607(d)(6)(A) ...................................................5

42 U.S.C. § 7607(d)(6)(B) ...................................................5

42 U.S.C. § 7607(d)(7)(B) ..................................................13

42 U.S.C. § 7607(d)(9)(A), (C)............................................6

**FEDERAL REGISTER NOTICES**

89 Fed. Reg. 23,294 (Apr. 3, 2024) ......................................1, 2, 8, 18, 21

90 Fed. Reg. 14,207 (Mar. 31, 2025)...................................................3, 4

90 Fed. Reg. 29,485 (July 3, 2025)........................... 1, 4, 10, 11, 13, 14, 15, 16, 17

Pursuant to Federal Rule of Appellate Procedure 27 and Rule 18, and D.C. Circuit Rules 27 and 18, Clean Air Council, Gary Advocates for Responsible Development, Hoosier Environmental Council, Just Transition Northwest Indiana, and Sierra Club (collectively, "Petitioners") move for summary disposition and vacatur, or in the alternative, a stay pending judicial review, of the final action taken at 90 Fed. Reg. 29,485 (July 3, 2025), entitled "National Emission Standards for Hazardous Air Pollutants: Integrated Iron and Steel Manufacturing Facilities Technology Review: Interim Final Rule" ("IFR"), attached as Exh. 1.

## INTRODUCTION

The IFR delays until 2027 several compliance deadlines for steel mills air toxics standards that were finalized in 2024. 90 Fed. Reg. at 29,489. EPA issued the IFR without notice or prior opportunity for public comment, in violation of the Clean Air Act's notice-and-comment rulemaking requirements, which are set out at 42 U.S.C. § 7607(d)(1)-(7). *Id*. It is harming Petitioners' members by depriving them of protection against toxic pollution that the 2024 Rule was promulgated to prevent and will continue to do so until it is either vacated or stayed.

## BACKGROUND

### I.     Procedural History

On April 3, 2024, EPA promulgated the 2024 Rule, which established long-overdue emission standards for previously unregulated hazardous air pollutants and

1

emission sources at steel mills. *See* National Emission Standards for Hazardous Air Pollutants: Integrated Iron and Steel Manufacturing Facilities Technology Review, 89 Fed. Reg. 23,294 (Apr. 3, 2024) ("2024 Rule" or "Rule"), attached as Exh. 2. According to EPA, the 8 currently operating steel mills collectively emit almost 600 tons of hazardous air pollution every year.[1] Much of this pollution consists of metals, such as arsenic and lead, which are not only highly toxic but also persistent, building up in the environment over time. EPA projects that the 2024 Rule's new limits will reduce steel mills' fugitive hazardous air pollutant metals by 64 tons per year. 89 Fed. Reg. at 23,314. EPA estimates that annualized compliance costs over the period 2026-2035 will be minimal, less than 1 percent of the annual revenue for the two steel mill parent companies, which each reported more than $20 billion in revenue in 2021. *Id.* at 23,315.

The two steel companies, Cleveland-Cliffs Inc. and U.S. Steel Corporation, petitioned for review of the 2024 Rule and moved to stay the Rule pending judicial

---

[1] EPA, *Summary of Integrated Iron and Steel Point Source Emissions Estimates for Risk and Technology Review* ("Emissions Summary"), at 7 tbl. 4 (May 1, 2019 (revised Sept. 15, 2021)), EPA-HQ-OAR-2002-0083-1458 (point-source emissions), attached as Exh. 3; EPA, *Unmeasured Fugitive and Intermittent Particulate Emissions and Cost Impacts for Iron and Steel Facilities under 40 C.F.R. Part 63, Subpart FFFFF* ("UFIP Memo"), at 8 (Feb. 22, 2024), EPA-HQ-OAR-2002-0083-1974 (non-point-source emissions), attached as Exh. 4.

review.[2] *See* Case No. 24-1170, Doc. Nos. 2062303 (June 28, 2024), 2063048 (July 3, 2024). This Court denied those motions. *See* Case No. 24-1170, Doc. No. 2081727 (Oct. 24, 2024). Industry Petitioners jointly petitioned for rehearing en banc of the order denying their motions for a stay. Case No. 24-1170, Doc. No. 2088478 (Dec. 9, 2024). This Court denied that motion as well. Case No. 24-1170, Doc. No. 2093681 (Jan. 13, 2025). The three petitions for review of the 2024 Rule have since been consolidated with petitions for review of the 2020 version of the Rule and held in abeyance pending Agency reconsideration. Case No. 20-1254, Doc. No. 2118141 (May 29, 2025).

In March 2025, EPA administratively stayed pending reconsideration compliance deadlines for rule provisions that were scheduled to go into effect on April 3, 2025. *See* Partial Administrative Stay of National Emission Standards for Hazardous Air Pollutants: Integrated Iron and Steel Manufacturing Facilities Technology Review, 90 Fed. Reg. 14,207, at 14,207 (Mar. 31, 2025), attached as Exh. 5. These provisions would have required steel mill operators to limit emissions from two nonpoint emission sources: (i) planned openings of blast furnace bleeder valves and (ii) leaks from the bell seal at the top of the blast furnace. EPA's action delayed the deadline for operators to comply with these

---

[2] Petitioners also sought review of the 2024 Rule, seeking to strengthen several of its provisions, but did not seek a stay.

requirements to July 1, 2025. *See id.* at 14,208. Petitioners filed a petition for review of EPA's stay decision, arguing that EPA lacked authority to stay the Rule under Clean Air Act section 307(d)(7)(B) and requesting summary disposition and vacatur. Case No. 25-1128, Doc. Nos. 2116297 (May 16, 2025), 2116373 (May 19, 2025). The petition for review and motion for summary disposition are currently pending before this Court.

Two days after the expiration of the administrative stay, EPA promulgated the IFR, which revises all 2025 and 2026 compliance deadlines in the 2024 Rule to April 3, 2027. EPA did not provide notice or an opportunity to comment on the changed compliance dates, as required by the Clean Air Act, before issuing the interim final rule. 90 Fed. Reg. at 29,489. Instead, EPA claimed that such procedures would be "impracticable" because (1) there are substantive "errors" in the rule that make it difficult for regulated entities to comply with the Rule and (2) there was insufficient time to address these issues with full notice and comment before the administrative stay expired on July 1, 2025. *Id.* Citing this alleged impracticability, EPA invoked the Administrative Procedure Act's ("APA") "good cause" exception to notice and comment rulemaking. *Id.* (citing 5 U.S.C. § 553(b)(B)). EPA acknowledged that modifying the compliance dates would otherwise require notice-and-comment rulemaking pursuant to Clean Air Act section 307(d)(1)(C). 90 Fed. Reg. at 29,489 n.6.

## II.     Statutory Background

The procedures in Clean Air Act section 307(d) govern the "promulgation or revision" of any "emission standard or limitation" under section 112(d) or 112(f). *See* 42 U.S.C. § 7607(d)(1)(C); *see also* § 7607(d)(1)(V) (procedural requirements of the Clean Air act supersede APA procedural requirements unless otherwise specified in the Act). Because the IFR modifies standards or limitations promulgated in the 2024 Rule, EPA must follow section 307(d)'s procedures.

Under the Clean Air Act, rulemakings under section 307(d) must include a "notice of proposed rulemaking" published in the Federal Register, which "shall be accompanied by a statement of its basis and purpose" and must "specify the period available for public comment." 42 U.S.C. § 7607(d)(3). A promulgated rule must be "accompanied by a response to each of the significant comments, criticisms, and new data submitted in written or oral presentations during the comment period." 42 U.S.C. § 7607(d)(6)(B). The promulgated rule must also include "an explanation of the reasons for any major changes in the promulgated rule from the proposed rule." 42 U.S.C. § 7607(d)(6)(A).

Clean Air Act section 307(d) recognizes only two exceptions to the statutory procedural requirements for agency rulemakings, and these exceptions are defined in the APA. 42 U.S.C. § 7607(d)(1)(V) (referencing subsections 553(b)(A), (B) of the APA, 5 U.S.C. § 553(b)(A)-(B)). Thus, EPA may forgo the Clean Air Act's

notice-and-comment rulemaking procedures only (i) when issuing "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice," or (ii) "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(A), (B).

## STANDARD OF REVIEW

The Administrative Procedure Act and Clean Air Act require a court to set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C); 42 U.S.C. § 7607(d)(9)(A), (C).

This Court "encourage[s]" parties to file motions for summary dispositions of a case "where a sound basis exists for summary disposition." U.S. Court of Appeals for the District of Columbia Circuit, *Handbook of Practice and Internal Procedures*, at 36 (Dec. 12, 2024) (https://www.cadc.uscourts.gov/sites/cadc/files/rules-Handbook20241212.pdf). Summary vacatur "will be granted where the merits of the . . . petition for review are so clear that plenary briefing, oral argument, and the traditional collegiality of the decisional process would not affect

[the court's] decision." *Cascade Broad. Grp. Ltd. v. FCC*, 822 F.2d 1172, 1174 (D.C. Cir. 1987) (citation modified).

This Court considers four factors when evaluating applications for a stay: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (citation modified).

## STANDING

Petitioners are national and regional nonprofit groups that advocate for stronger health protections and a cleaner environment for their members and the general public. *See* Brooks, Carey, Fox, Isherwood, and Williams Declarations, attached as Exhs. 6-10. Petitioners' members and their families live, work, and recreate near steel mills, and they are exposed to the toxic pollution these mills emit. *See* Abeyta, Ammons, Ballinger, Peller, and Vallee Declarations, attached as Exhs. 11-15. Consequently, these members are exposed to emissions of toxic pollutants emitted by these facilities, which harm their health, wellbeing, and aesthetic and recreational interests. Petitioners' members who live especially close to steel mills must take numerous precautions to protect themselves from steel mill emissions, including wearing masks, staying indoors with the windows closed, and

even driving to out-of-town locations for relief from polluted air. *See id.* Several of Petitioners' members have underlying health conditions that make them especially sensitive to air pollution. *See* Ammons, Ballinger, and Vallee Declarations. Several members also live with or frequently host young children, who are particularly vulnerable to adverse health effects from exposure to toxic air pollutants. *See* Ammons and Ballinger Declarations.

The 2024 Rule regulates, for the first time, hazardous air pollutant emissions from nonpoint sources, such as leaking valves and steelmaking protocols that periodically result in uncontrolled emissions releases. Hazardous air pollutants emitted by nonpoint sources subject to the Rule include metals such as antimony, arsenic, beryllium, cadmium, cobalt, lead, manganese, mercury, nickel, and selenium. *See* UFIP Memo at 7. EPA projects that the 2024 Rule's new limits on previously unregulated nonpoint sources, when fully implemented, will reduce steel mill emissions by about 64 tons per year of hazardous air pollutant metals, including lead, and about 473 tons per year of $PM_{2.5}$. 89 Fed. Reg. at 23,314.

By delaying pollution reductions that the 2024 Rule requires, the IFR prolongs and exacerbates the harms caused by steel mills' toxic pollution. This Court could remedy those injuries by vacating the IFR. *See NRDC v. EPA*, 749 F.3d 1055, 1062 (D.C. Cir. 2014) (finding standing where environmental groups' members alleged they would be harmed by higher emissions allowed by

affirmative defense provision in challenged air rule); *Clean Wisconsin v. EPA*, 964 F.3d 1145, 1158 (D.C. Cir. 2020) (petitioners are injured by EPA actions that "expose them to higher [pollution] levels."); *Friends of the Earth v. Laidlaw Env't Servs.*, 528 U.S. 167, 183 (2000) (finding standing based on "aesthetic and recreational" injuries).

## ARGUMENT

### I.     EPA's Interim Final Rule is Unlawful and Must Be Summarily Vacated.

This Circuit has "repeatedly made clear that the good cause exception is to be narrowly construed and only reluctantly countenanced." *Mack Trucks v. EPA*, 682 F.3d 87, 93 (D.C. Cir. 2012) (citation modified). "The exception is not an 'escape clause'; its use 'should be limited to emergency situations.'" *Util. Solid Waste Activities Grp. v. EPA*, 236 F.3d 749, 754 (D.C. Cir. 2001) ("*USWAG*") (quoting *Am. Fed'n of Gov't Emp., AFL-CIO v. Block*, 655 F.2d 1153, 1156 (D.C. Cir. 1981)); *Mack Trucks*, 682 F.3d at 93 (similar)[3]. An agency cannot "simply wait until the eve of an administrative deadline then raise up the 'good cause'

---

[3] Other Circuits are in agreement. *See Buschmann v. Schweiker*, 676 F.2d 352, 357 (9th Cir. 1982) ("The good cause exception is essentially an emergency procedure."); *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 883 (5th Cir. 2022) (The APA's good cause exemption "is narrow authority reserved for emergency situations." (citation modified))

banner and promulgate rules without following [statutory] procedures." *Env't Def. Fund, Inc. v. EPA*, 716 F.2d 915, 921 (D.C. Cir. 1983) (citation modified).

Here, EPA claims only that compliance with notice-and-comment requirements is "impracticable, not that it is either "unnecessary" or "contrary to the public interest," 5 U.S.C. § 553(b)(B). 90 Fed. Reg. at 29,489. Further, EPA does not even allege that any emergency exists. *See id.* (no claim of emergency). Rather than attempting to show an emergency of any kind, EPA argues (1) that there are substantive "errors" in the rule that create "compliance challenges," requiring short-term actions and investments by regulated entities and (2) that undertaking notice-and-comment would cause the agency to miss its self-imposed deadline of July 1, 2025, for revising the rule, thereby "throwing regulated parties into immediate non-compliance." *Id.*

EPA had nearly a year to address the alleged compliance challenges it now cites as good cause. The IFR itself makes clear that EPA's belief that there are errors in the 2024 Rule is based on information that the steel industry submitted to EPA no later than June 2024. *See* 90 Fed. Reg. at 29,487-88 (describing issues identified in the industry reconsideration petitions), *id.* at 29,488 (describing reconsideration of those same issues), *id.* at 29,489 (invoking those same issues to justify use of good cause exception). EPA began formally reconsidering many of these issues in August 2024, when it granted the industry reconsideration petitions.

10

*See* August 14, 2024, Letter ("August 2024 Letter"), EPA-HQ-OAR-2002-0083-1991, attached as Exh. 16. Indeed, EPA engaged in "discussions" with regulated parties that lead to this interim final rule. 90 Fed. Reg. at 29,488.

Because EPA had ample time to address the alleged compliance challenges it cites as good cause, it was not impracticable for the Agency to do so through the notice-and-comment rulemaking process. As this Court has already held, an agency cannot claim good cause to avoid notice and comment where it "ha[s] a substantial period of time within which to prepare regulations." *Am. Fed'n of Gov't Emp., AFL-CIO v. Block*, 655 F.2d 1153, 1158 (D.C. Cir. 1981) (summarizing prior cases in which good cause did not exist). Nor does the mere existence of deadlines for agency action constitute good cause. *Id.* "[T]he good cause exception does not apply when an alleged 'emergency' arises as the result of an agency's own delay." *Env't Def. Fund, Inc.*, 716 F.2d at 921.

EPA's attempt to justify forgoing notice and comment due to alleged errors in the 2024 Rules similarly falls short. Even if some defect in the 2024 Rules actually existed, the fact that "regulations were defective does not explain why notice and comment could not be provided." *Consumer Energy Council of Am. v. FERC*, 673 F.2d 425, 448 (D.C. Cir. 1982). Accordingly, it does not show an emergency that justifies bypassing the Clean Air Act's notice-and-comment

requirements. *Id.* ("The fact that [the agency] considered these regulations defective did not imply that an emergency existed").

Here, in the absence of any emergency, EPA "simply wait[ed] until the eve of a[n] . . . administrative deadline, then raise[d] up the 'good cause' banner" to evade the Clean Air Act's notice-and-comment rulemaking requirements. *Env't Def. Fund, Inc.*, 716 F.2d at 921 (quoting *Council of S. Mountains, Inc. v. Donovan*, 653 F.2d 573, 581 (D.C. Cir. 1981)). That unlawful conduct requires vacatur. *See USWAG*, 236 F.3d at 755; *Mack Trucks*, 682 F.3d at 95.

## II.    Alternatively, Petitioners Are Entitled to a Judicial Stay.

To obtain a judicial stay, petitioners must demonstrate: (1) they are likely to succeed on the merits; (2) petitioners will experience irreparable injury in the absence of a stay; (3) a stay will not injure other parties interested in the proceeding; and (4) a stay is in the public interest. *Nken*, 556 U.S. at 434. Here, each of these factors favors a stay.

### A.    Petitioners are likely to succeed on the merits.

1.    As described in Section I, Petitioners are entitled to summary vacatur because they have demonstrated that EPA lacked good cause to bypass the Clean Air Act's notice-and-comment requirements. For this reason alone, they are likely to succeed on the merits that the IFR is unlawful.

Petitioners are also likely to succeed on the merits of their claim that the EPA's IFR is unlawful and arbitrary because EPA based this action on its ongoing reconsideration of the 2024 Rule. The very "[f]irst" reason provided by EPA for utilizing the interim-final-rule procedure is that it "has granted petition for administrative reconsideration of numerous provisions of the 2024 rule." 90 Fed. Reg. at 29,489. Clean Air Act section 307(d)(7)(B), however, specifies that reconsideration "shall not postpone the effectiveness of the rule" except that the "effectiveness of the rule may be stayed during such reconsideration . . . for a period not to exceed three months." 42 U.S.C. § 7607(d)(7)(B); *see Air All. Houston v. EPA*, 906 F.3d 1049, 1060-61 (D.C. Cir. 2018). Congress' decision to create this single exception makes clear that Congress did not intend to create others. *See NRDC v. EPA*, 489 F.3d 1364, 1374 (D.C. Cir. 2007) ("Where Congress explicitly enumerates certain exceptions . . . additional exceptions are not to be implied.").

Thus, EPA's reliance on reconsideration proceedings to also justify a compliance date extension – which is in substance a second and longer stay – is reliance on a "factor[] which Congress has not intended it to consider." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Likewise, EPA ignores a factor Congress *did* intend the Agency to consider. "[B]y definition," a "statutorily mandated factor" such as

section 307(d)(7)(B)'s express prohibition on postponing compliance pending reconsideration except for a single three-month stay "is an important aspect of any issue before an administrative agency, as it is for Congress in the first instance to define the appropriate scope of an agency's mission." *Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1216 (D.C. Cir. 2004).

2.     The IFR's new compliance deadlines for the 2024 Rule violate Clean Air Act section 112(i)(3), which requires EPA to set deadlines that "provide for compliance as expeditiously as practicable" (but no later than three years after a rule's effective date). 42 U.S.C. § 7412(i)(3). The IFR never mentions, let alone applies, this statutory requirement. 90 Fed. Reg. at 29,488-90 (failure to cite § 7412(i)(3) or reference the "as expeditiously as practicable" standard). EPA's failure to set deadlines that even purport to "provide for compliance as expeditiously as practicable, 42 U.S.C. § 7412(i)(3), is unlawful.

3.     The compliance dates are also arbitrary and capricious. EPA has an obligation to "justif[y] [each compliance date] in terms of '*assuring compliance* as expeditiously as practicable,'" *Air All. Houston*, 906 F.3d at 1067 (emphasis in original) (interpreting analogous provision of § 7412 which mandates deadlines that "assure[] compliance as expeditiously as practicable"). The Agency's explanatory focus must be on the soonest practicable date "for regulated parties *to comply with the rule expeditiously* — not for the agency to engage in the

14

regulatory process." *Id.* (emphasis in original). Here, by neglecting to acknowledge or apply the statutory test for setting compliance deadlines, EPA ignored a "statutorily mandated factor," and thus "failed to take account of this statutory limit on its authority, making the agency's reasoning arbitrary and capricious." *Pub. Citizen*, 374 F.3d at 1216 (citation modified); *State Farm*, 463 U.S. at 43 (agency action is arbitrary and capricious where it "entirely failed to consider an important aspect of the problem").

The IFR confirms that ensuring compliance as expeditiously as practicable was not something EPA even considered in delaying the compliance dates. For example, for fenceline monitoring, EPA states that it is revising the compliance deadline for "consistency" with the other standards. 90 Fed. Reg. at 29,489. In other words, having granted an extension until April 2027 for a number of standards, EPA altered the fenceline monitoring compliance date irrespective of whether the existing date was impracticable. For the other deadlines, there is nothing in the IFR that suggests that EPA considered whether more expeditious compliance than the three-year statutory maximum was viable for any of the individual requirements. Instead, EPA concluded that an April 2027 deadline would be "sufficient time for compliance," without analyzing whether sources could comply more expeditiously. *See* 90 Fed. Reg. at 29,489.

Moreover, EPA's discussion of the basis for the new compliance deadlines fails to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (citation modified). For example, EPA justifies extending compliance deadlines for three Rule provisions based on unspecified "additional information provided by the petitioners after promulgation of the rule and after further discussions and analyses." 90 Fed. Reg. at 29,488. EPA never indicates what this additional information is or how it supports the Agency's decision. These generic and conclusory statements do not enable judicial review of EPA's decision. *Coburn v. McHugh*, 679 F.3d 924, 934 (D.C. Cir. 2012) ("At the very least, the [agency] must provide an explanation that will enable the court to evaluate the agency's rationale at the time of decision." (citation modified)).

Further, EPA previously rejected many of the arguments on which it now bases its decision to delay the compliance dates, and the Agency provides no explanation for its reversal. "[A] reasoned explanation is needed for disregarding facts and circumstances that underlay . . . [a] prior policy." *FCC v. Fox Television Stations, Inc.,* 556 U.S. 502, 516 (2009). That explanation appears nowhere in the IFR.

For example, EPA claims that new data showing higher opacity concentrations for slag processing and handling necessitates reconsideration of the

opacity limit for these activities. 90 Fed. Reg. at 29,488. The data may post-date the comment period, but the fact that opacity measurements at some facilities have exceeded the limit at times was known to EPA during the rulemaking process. *See* EPA, *Response to Comments* ("RTC"), EPA-HQ-OAR-2002-0083-1976, at 94-95, attached as Exh. 17 (excerpted). EPA nonetheless concluded that because "300+ readings of opacity data collected from the 2022 section 114 collection requests," show "most opacity readings . . . done at slag processing in 2022 were below 10 percent," the 10 percent opacity limit could be maintained safely. *Id.*

Similarly, regarding its change in position regarding the viability of the 10 percent opacity limit, EPA says only that it is "based on additional information provided by the petitioners after promulgation of the rule" and "further discussions and analyses." 90 Fed. Reg. at 29,488. Despite having previously considered and rejected the very argument that now forms the basis for extending the deadlines, EPA offers no explanation of what the new data shows or why it caused EPA to reverse its prior conclusion.

In short, EPA's new compliance deadlines "rest[] upon factual findings that contradict those which underlay its prior" deadline and EPA has not provided a "reasoned explanation . . . for disregarding facts and circumstances" that supported the prior deadline. *Fox Television Stations, Inc.*, 556 U.S. at 516.

**B.      EPA's delay irreparably harms Petitioners and their members.**

Each day the IFR is in effect exposes Petitioners and their members to excess toxic air pollution from steel mills that would otherwise be eliminated by the 2024 Rule.

Absent EPA's unlawful conduct, steel mills would be required to comply with the 2024 Rule's new standards for planned bleeder valve openings and bell leaks, two significant sources of nonpoint source emissions. EPA estimates that these emission sources contribute 86.9 tons per year of hazardous air pollutants. *See* UFIP Memo at 8. The Rule's new controls for these emission sources would have resulted in an average 27 percent reduction in hazardous air pollutant emissions for planned openings and a 42 percent reduction for bell leaks, resulting in a total reduction of 31.41 tons per year. *See id.* at 15 (quantifying projected emissions reductions from planned openings and bell leaks alone). This means that the IFR delays nearly half the total amount of hazardous air pollutant reduction that EPA estimates for the entire Rule. 89 Fed. Reg. at 23,314.

Exposures to the hazardous air pollutants emitted by steel mills can cause cancer, developmental damage to babies and infants, and other serious health harms. Exposure to lead, for example, can cause adverse effects on the central nervous system, kidney function, the immune system, reproductive and

developmental systems, and the cardiovascular system.[4] Infants and young children are especially sensitive to lead exposures, which can contribute to behavioral problems, learning deficits, and lowered IQ.[5]

Once exposure to these hazardous air pollutants has occurred, it cannot be undone. In addition, because metals emitted into the air from steel mills are eventually deposited into the communities where Petitioners' members live, work and recreate, they will contaminate soil, water and food for decades to come. *See* EPA, *Residual Risk Assessment for the Integrated Iron and Steel Manufacturing Source Category in Support of the 2020 Risk and Technology Review Final Rule*, at 42-52 (Feb. 2020), EPA-HQ-OAR-2002-0083-1083, attached as Exh. 18 (excerpted). "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987).

Further, by prolonging and increasing the toxic emissions from steel mills, the IFR robs Petitioners' members of their daily enjoyment of their lives and

---

[4] EPA, *Basic Information about Lead Air Pollution* (Last updated on July 18, 2025), https://www.epa.gov/lead-air-pollution/basic-information-about-lead-air-pollution.

[5] *Id.*

activities in their own homes and communities, a loss that is permanent in nature. *See* Abeyta, Ammons, Ballinger, Peller, and Vallee Declarations.

For these reasons, the IFR is currently causing irreparable harm to Petitioners' members and will continue causing such harm unless the IFR is stayed.

### C. The public interest favors a stay and outweighs any countervailing concerns.

The public has a strong interest in finally getting the level of protection from steel mills' toxic emissions that Congress intended — and required — EPA to put in place almost 25 years ago. 42 U.S.C. § 7412(d), (e)(1)(E); *Nat'l Lime Ass'n v. EPA*, 233 F.3d 625, 634 (D.C. Cir. 2000). Here, the public benefits of the 2024 Rule outweigh both EPA's interest in delaying steel companies' obligation to comply with a rule that has been in effect for more than a year and steel companies' interest in avoiding compliance.

Congress's decision to enact the Clean Air Act Amendments of 1990 and require the maximum achievable degree of reduction for all the pollutants that it listed as hazardous reflects Congress's decision about what is in the public interest. *See Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 978 (D.C. Cir. 1985). EPA expects the 2024 Rule's reductions of hazardous air pollutants and $PM_{2.5}$ to result in monetized health benefits exceeding $200 million a year. *See* EPA, *Regulatory Impact Analysis for the National Emission Standard for Hazardous Air Pollutants: Integrated Iron and Steel Manufacturing Facilities Technology*

*Review: Interim Final Rule* ("RIA"), at 1 (June 2025), EPA-HQ-OAR-2002-0083-1995, attached as Exh. 19. For individuals living near steel mills, especially small children, the impact of these projected health benefits from emission reductions is significant.

On the other hand, a stay would not injure EPA, which is free to continue with its reconsideration of the 2024 Rule while steel mill operators comply with the Rule as scheduled.

The impact of a stay on regulated industry would also be minimal. None of the Rule provisions being delayed by the IFR require steel mills to permanently install pollution control devices or make structural modifications to their facilities. On the contrary, compliance with these requirements involves adopting practices that are already in use within the industry to minimize emissions from various steelmaking processes. *See generally* UFIP Memo. According to EPA's own analysis, a stay of the IFR would cause the steel industry to forgo vanishingly small cost savings—a mere fraction of a fraction of a percent of the annual revenue of the two steel companies that own all currently operating steel mills (0.0013% for U.S. Steel and 0.0014% for Cleveland-Cliffs). *See* RIA at 23. In fact, the total annual compliance costs of the 2024 Rule, when fully implemented, would be a mere 0.02 percent of the steel companies' annual revenue. *See* 89 Fed. Reg. at 23,315. Therefore, a stay of the IFR, which would allow the Rule's 2025 and 2026

compliance deadlines to go into effect, would have at most a negligible financial impact on the integrated iron and steel industry.

The 2024 Rule was the product of a three-year rulemaking process[6] and was based on data steel companies themselves submitted to EPA both before and during the public comment period. *See* EPA, *Point Source Data Summary for Integrated Iron and Steel Facilities under. 40 C.F.R Part 63, Subpart FFFFF* (Jan. 17, 2024), EPA-HQ-OAR-2002-0083-1953, attached as Exh. 20. Steel companies have had more than a year to plan for compliance with the Rule's opacity limits and work practice requirements, including an additional 89 days of preparation time beyond the original compliance date of April 3, 2025, due to EPA's administrative stay of the Rule. Notwithstanding the temporary reprieve from the Agency, steel mill operators could have and should have been making every effort to begin complying with the 2024 Rule as scheduled, especially after this Court denied a bid by the steel companies to stay the Rule, *see* Case No. 24-1170, Doc. No. 2081727 (Oct. 24, 2024). There is no inequity in requiring regulated entities to comply with regulatory requirements that were enacted with full notice and

---

[6] The 2024 Rule is the outcome of EPA's effort to revise a 2020 final rule to conform with the D.C. Circuit's April 2020 decision in *La. Env't Action Network v. EPA ("LEAN")*, 955 F.3d 1088 (D.C. Cir. 2020). *See* Joint Motion to Extend Deadline, *California Communities Against Toxics v. Pruitt*, No. 1:15-cv-00512 (D.D.C. Apr. 13, 2021); Order, *id.* (D.D.C. Apr. 14, 2021).

opportunity for public comment, and a generous fifteen-month compliance window.

In sum, the balance of equities of the parties and the public interest weigh in favor of a judicial stay of the IFR.

## CONCLUSION

For the reasons set forth above, Petitioners respectfully ask that the Court grant their motion for summary disposition and vacate EPA's unlawful IFR. In the alternative, the Court should grant the motion for a stay of the IFR pending judicial review.

Dated: July 30, 2025

Respectfully submitted,

*/s/ Adrienne Y. Lee*
Adrienne Y. Lee
James S. Pew
Earthjustice
1001 G Street, NW, Suite 1000
Washington, D.C. 20001
(202) 667-4500
alee@earthjustice.org
jpew@earthjustice.org

*Counsel for Clean Air Council, Gary Advocates for Responsible Development, Hoosier Environmental Council, Just Transition Northwest Indiana, and Sierra Club*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), counsel hereby certifies that the foregoing Motion of Clean Air Council, Gary Advocates for Responsible Development, Hoosier Environmental Council, Just Transition Northwest Indiana, and Sierra Club for Summary Disposition and Vacatur contains 5,109 words, as counted by counsel's word processing system, and thus complies with the 5,200-word limit. *See* Fed. R. App. P. 27(d)(2)(A).

Further, this document complies with the typeface and type-style requirements of the Federal Rules of Appellate Procedure, 32(a)(5) and (a)(6), because this document has been prepared in a proportionally spaced typeface using **Microsoft Word for Microsoft 365** using **size 14 Times New Roman** font.

Dated: July 30, 2025

*/s/ Adrienne Y. Lee*
Adrienne Y. Lee

**CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 18**

Pursuant to Federal Rule of Appellate Procedure 18 and D.C. Circuit Rule 18, Movants Clean Air Council, Gary Advocates for Responsible Development, Hoosier Environmental Council, Just Transition Northwest Indiana, and Sierra Club certify that on July 25, 2025, they submitted to EPA a Petition for a Stay of the final action entitled "National Emission Standards for Hazardous Air Pollutants: Integrated Iron and Steel Manufacturing Facilities Technology Review: Interim Final Rule," 90 Fed. Reg. 29,485 (July 3, 2025). As of this filing, EPA has not acknowledged receipt of the Petition or otherwise responded.

Dated: July 30, 2025

*/s/ Adrienne Y. Lee*
Adrienne Y. Lee

**CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure and D.C. Circuit Rule 26.1,

Movants Clean Air Council, Gary Advocates for Responsible Development,

Hoosier Environmental Council, Just Transition Northwest Indiana, and Sierra

Club state that they are non-profit environmental organizations without any parent

corporation or stock.

Dated: July 30, 2025

*/s/ Adrienne Y. Lee*
Adrienne Y. Lee

# CERTIFICATE OF PARTIES

Pursuant to D.C. Circuit Rules 27(a)(4) and 28(a)(1)(A), I certify that the parties to this case are set forth below.

<u>Petitioners</u>: Petitioners in this case are Clean Air Council, Gary Advocates for Responsible Development, Hoosier Environmental Council, Just Transition Northwest Indiana, and Sierra Club.

<u>Respondents</u>: Respondents in this case are the United States Environmental Protection Agency ("EPA") and Lee Zeldin, in his official capacity as Administrator of the EPA.

<u>Intervenors</u>: None at present.

<u>Amici Curiae</u>: None at present.

Dated: July 30, 2025

<u>*/s/ Adrienne Y. Lee*</u>
Adrienne Y. Lee

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of July, 2025, I filed the foregoing

motion on Respondents with the Court's CMS/ECF system, which will notify each

party.

Dated: July 30, 2025

*/s/ Adrienne Y. Lee*
Adrienne Y. Lee