## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| CLEAN AIR COUNCIL, *et al.*, | Case No. 25-1163 |
| Petitioners | |
| v. | |
| UNITED STATES EVIRONMENTAL PROTECTION AGENCY, *et al.*, | |
| Respondents. | |

## MOVANT-INTERVENORS' OPPOSITION TO
## PETITIONERS' MOTION FOR SUMMARY VACATUR

Movant-Intervenors American Iron and Steel Institute ("AISI"), Cleveland-Cliffs Inc. ("Cliffs") and United States Steel Corporation ("USS") (collectively "Movant-Intervenors") oppose Petitioners' motion for summary vacatur. ECF#2127933 (July 30, 2025) ("Motion").

In 2024, the United States Environmental Protection Agency ("EPA") issued regulations for the integrated iron and steel ("IIS") industry that violated basic principles of administrative rigor and fairness. 89 Fed. Reg. 23,294 (April 3, 2024) ("IIS Rule" or "Rule"). Paying little attention to public input, EPA rushed out a rule with numerous factual errors and unsound assumptions. The result is a rule that is unsafe and impracticable and has impossible deadlines.

By August 2024, EPA had already granted reconsideration on three provisions and identified additional errors and ambiguities that required correction. EPA identified other problems with the Rule over the following months as it conducted a rigorous and expanding reconsideration. The issues EPA identified, however, were with the substantive requirements and language in the Rule, not the compliance schedules, which EPA continued to defend over Movant-Intervenors' vigorous objections.

Only by July 2025 did EPA finally concede that the IIS Rule's compliance schedules were untenable. This finding is well supported by the voluminous record that has been developed prior to and since publication of the IIS Rule. But by July 2025, looming deadlines required EPA to act immediately. Some deadlines were set for that same week. Others were a year out but commanded immediate attention given the significant design, engineering, installation, testing, and other work that EPA had not anticipated or factored into its prior deadlines, but now recognized were necessary under the IIS Rule. EPA therefore issued an interim final rule amending these most pressing deadlines. 90 Fed. Reg. 29,485 (July 3, 2025) ("IFR"). Petitioners now seek summary vacatur of the IFR, or its stay.

Petitioners fail to justify summary vacatur substantively and procedurally. EPA's IFR was an appropriate use of the interim final rulemaking process and is supported by the record. Petitioners' use of summary disposition is not. At a

minimum, this Court should have the benefit of full briefing and argument before addressing this issue of first impression.

Petitioners' alternative motion for stay is likewise meritless. A stay is not supported or in the public interest.

## I. EPA's Interim Final Rule was Proper

### A. EPA Had Good Cause to Issue the Interim Final Rule.

The Administrative Procedure Act ("APA") provides that the general notice-and-comment rulemaking requirements do not apply "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. §553(b)(B). This exception allows EPA to act quickly, without notice-and-comment procedures.

As this Court has held, the "'good cause' inquiry is inevitably fact- or context-dependent." *Mid-Tex Elec. Co-Op., Inc. v. FERC*, 822 F.2d 1123, 1132 (D.C. Cir. 1987). This Court has found, for example, that "good cause" existed to defer implementing a mine safety requirement when the agency acted diligently to implement it but determined less than a month before the deadline that the requirement could not be feasibly met. *Council of Southern Mountains, Inc. v. Donovan*, 653 F.2d 573, 582 (D.C. Cir. 1981). Similarly, "good cause" was found when an agency worked diligently to implement a rule but determined with less than

90 days remaining that it might need to be redrafted. *Petry v. Block*, 737 F.2d 1193, 1201 (D.C. Cir. 1984). And when emergency regulations were needed to avoid "economic harm and disruption" to an industry and its customers, "good cause" was found. *Am. Fed'n of Gov't Emp., AFL-CIO v. Block*, 655 F.2d 1153, 1157 (D.C. Cir. 1981).

Courts have also considered whether an agency rule is "temporally limited [in] scope." *Mid-Tex Elec. Co-Op., Inc. v. FERC*, 822 F.2d at 1132 ("we have consistently recognized that a rule's temporally limited scope is among the key considerations in evaluating an agency's 'good cause' claim."); *see also Natl. Fed. of Federal Empl. v. Devine*, 671 F.2d 607, 612 (D.C. Cir. 1982) ("the agency intended its action to be temporary"). And they have also considered whether an agency was accepting comments on an interim rule and whether the agency was making meaningful efforts to finalize a rule that would be subject to notice and comment under the APA. *See, e.g., Coalition for Parity, Inc. v. Sebelius*, 709 F.Supp.2d 10 (D.D.C. 2010) (finding "good cause" based on the totality of the circumstances, including the "interim" nature of the rule, the fact that the agency took comments for three months on the interim final rule, and the agency's efforts to work towards issuance of a final rule).

Here, EPA explicitly issued the required notice. *See* 90 Fed. Reg. at 29,489 ("EPA finds that the APA 'good cause' exemption from notice-and-comment

requirements applies here.").  EPA justified its finding by citing multiple errors in the record that rendered deadlines set to take effect as early as that week impractical, making it "highly likely that the Agency would miss" the deadline if it took notice and comment before finalizing the IFR.  90 Fed. Reg. at 29,489.[1]  These errors were identified through diligent attempts to implement the IIS Rule.  As EPA states, it first granted reconsideration in August 2024, just two months after petitions for reconsideration were submitted.  Motion at 10.  But this was only for specific issues not including the compliance schedules in the Rule.  *See* 90 Fed. Reg. at 29,487.  EPA continued to oppose stay of the Rule.  *See* Opposition to Motions for Stay, ECF#2070301, *Cleveland-Cliffs Inc. v. EPA*, Case No. 24-1171 (D.C. Cir. Aug. 15, 2024).  After identifying further errors and ambiguities, EPA granted a second reconsideration on March 5, 2025.  90 Fed. Reg. at 29,487-88.  This reconsideration identified additional issues for which reconsideration was statutorily mandatory, but again, not the compliance schedules in the Rule.  EPA granted a 90-day stay of the Rule to reconsider these "aspects of the 2024 rule." *Id.* at 29,488.  EPA was therefore pursuing a number of technical and legal evaluations of the Rule since its promulgation, but despite consistent objection from Movant-Intervenors, EPA did not correct its findings with respect to the deadlines amended by the IFR until July

_____

[1] Petitioners call this a "self-imposed" deadline.  Motion at 10.  Not so.  EPA is referring to the initial compliance deadlines for the IIS Rule.  90 Fed. Reg. 29,488.

2025, when it finally concluded that "in light of serious concerns that facilities will be unable to comply with the relevant requirements by the existing deadlines," *id*. at 29,485, amendment was necessary to comply with EPA's statutory duty to impose deadlines that are "as expeditiously as practicable." 42 U.S.C. §7412(i)(3).

Specifically, EPA had based several deadlines on the assumption that "standards could be met without the need for installation of new control equipment, monitors, or measurement equipment" or that facilities "only had to make relatively moderate changes." 90 Fed. Reg. at 29,488. The IFR amends these deadlines because EPA can no longer support those assumptions. *See id.* at 29,488 ("data demonstrate that it likely will be infeasible for a majority of sources to comply with the 2024 rule's opacity limits for planned bleeder valve openings"); *id.* (bleeder limit "unachievable until a correction is made"); *id.* (EPA "failed to adequately consider some feasibility challenges" for beaching requirements). EPA was therefore justified in concluding that amendment was needed to "allow sufficient time for compliance." *Id.* at 29,489.

Further, the IFR is explicitly needed to avoid "throwing regulated parties into immediate non-compliance with regulatory requirements," causing significant safety issues and economic harm and disruption to the entire integrated iron- and steel-making industry. *Id.* at 29,489. It is "critically important the [IIS] industry be well understood and considered before taking an action that puts the industry at risk,

impacting local, regional and national economies and national security interests." Cliffs Petition, EPA-HQ-OAR-2002-0083-1989, p.40 ("Cliffs Petition"). The vital role of steel cannot be overstated. It is essential to the nation's economy, security, and physical infrastructure. Without the IFR, the IIS industry would need to immediately invest to develop novel control technologies that have never been demonstrated domestically or internationally in the industry, and if feasible, invest in operational modifications and control technology in order to meet the impending compliance deadlines. *See id.*

There is also "potential for significant adverse consequences from implementing the [2024] Rule, including requirements that create safety risks for employees and the general public, requirements that may increase [hazardous air pollutant ("HAP")] emissions, and provisions that in general interrupt operations and waste resources without resulting in environmental benefit." USS Petition, EPA-HQ-OAR-2002-0083-1988, p.22 ("USS Petition"). EPA therefore correctly concluded that "[t]he revision of these compliance deadlines will avoid documented issues regarding compliance with the 2024 rule" while complying with the statutory requirement that implementation be as expeditiously as practicable. 90 Fed. Reg. at 29,488.

Indeed, the fact that these requirements will "most likely be revised during the reconsideration rulemaking process" only underscores the lack of harm from

amendment and that "the public interest" supports the good cause exception here. 5 U.S.C. §553(b)(B). There is no need to inflict unsafe operating conditions and wide-spread economic chaos on an entire industry to implement requirements that are based on factual and typographical errors, unsound data, and unwarranted assumptions, particularly when they impose requirements that have never made sense to the regulated community and that now make no sense to the regulator either.

The IFR is also temporary in scope. EPA immediately opened public comment on the amended deadlines in the IFR. 90 Fed. Reg. at 29,485. That deadline has since been extended to accommodate Petitioners' request for a public hearing, which EPA has already held. 90 Fed. Reg. 39,333 (Aug. 15, 2025) (extending public comment for hearing); EPA-HQ-OAR-2002-0083-1998 (request for public hearing submitted by counsel for Petitioners). EPA has stated it is "committed to develop a rulemaking" after the IFR notice-and-comment process is complete. 90 Fed. Reg. at 29,489.

The IFR is the product of diligent assessment by the Agency to address issues that arose too late for EPA to engage in public comment and hearings while avoiding significant and wide-spread safety and economic harms. EPA therefore correctly asserted "good cause" for the IFR under 5 U.S.C. §553(b)(B).

## B.    Summary Vacatur is Improper

Summary vacatur is not the proper procedure for resolving this case. Petitioners selectively quote this Court's Handbook to imply summary vacatur is routine. The Handbook makes clear, however, "[s]ummary reversal is rarely granted." Handbook at 36; *see also Sills v. Federal Bureau of Prisons*, 761 F.2d 792, 793 (D.C. Cir. 1985) ("a party bears a heavy burden of showing that summary disposition is appropriate."). It is appropriate only when the merits are "so clear, plenary briefing, oral argument, and the traditional collegiality of the decisional process would not affect [the Court's] decision." *Sills*, 761 F.2d at 793-94. In *Sills*, for example, summary reversal was issued because this Court found there was "nothing that could be brought before this court by the appellee which could affect the need to order the complaint reinstated." *Id*. at 794.

Here, Petitioners' argument turns on whether EPA had "good cause" to defer public comment under 5 U.S.C. § 553(b)(B). Motion at 9-12. This is inherently a factual question, as Petitioners' own case states. *Mack Trucks v. EPA,* 682 F.3d 87, 93 (D.C. Cir. 2012) ("Our inquiry into impracticability 'is inevitably fact- or context-dependent[.]'") (quoting *Mid-Tex*, 822 F.2d at 1132). Unsurprisingly, none of Petitioners' cases on this issue is itself a ruling on summary disposition; they are all decisions issued after briefing and oral argument, as should be done here.

Further, to seek summary disposition for lack of notice, Petitioners must show they were not personally served notice under 5 U.S.C. §553(b). *See Mack Trucks*, 682 F.3d at 91, n.4. In *Mack Trucks*, for example, the petitioners included affidavits stating that their discussions with EPA did not include notice of the interim final rule. *Id.* The Motion includes no such assertion, creating a factual question that bars resolution on summary disposition.

Petitioners concede EPA may issue an interim final rule "for good cause" when it "'incorporates the finding and a brief statement of reasons therefor in the rules issued.'" Motion at 6 (quoting 5 U.S.C. §553(b)(B)). Petitioners do not argue EPA failed to make a good cause finding or incorporate it in the IFR, nor can they. 90 Fed. Reg. at 29,489. Petitioners' only argument, therefore, is that what EPA considers "good" cause is not good enough. As discussed in Section I.A above, it is good enough, but even if this Court were inclined to disagree, this inquiry is so fact- and record-based that "plenary briefing, oral argument, and the traditional collegiality of the decisional process" will help this Court evaluate the record, and therefore summary vacatur is inappropriate.

## II.    A Stay of the IFR Is Not Supported

Petitioners have not made out a case for stay. A stay "is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)

(emphasis in original). Petitioners must establish that: (1) they are likely to succeed on the merits; (2) they will be imminently and irreparably injured absent a stay; (3) a stay will not injure other parties, and (4) a stay would be consistent with the public interest. *Nken v. Holder*, 556 U.S. 418, 434 (2009). Where, as here, "the Government is the opposing party," the final two factors merge. *Id*. at 436.

## A. Petitioners are Unlikely to Succeed on the Merits

Petitioners are not entitled to a stay because they have failed to show a likelihood of success on the merits. This factor requires a showing of more than a "mere possibility of relief," *id.* at 434; it requires "clear and convincing evidence." *Id.* at 432. Petitioners have not fulfilled this burden because their argument centers around the unsupported contention that EPA's use of the IFR was unlawful.

First, the IFR is a lawful process that may be implemented when the totality of the circumstances supports a finding that good cause exists to issue an IFR. *See*, *supra*, Section I.A. EPA has shown good cause here. Due to the errors EPA acknowledged in the final regulatory text and new data presented, EPA ultimately determined "facilities may not be able to comply with the standards as written" and adjusted impending compliance deadlines to that which it determined to be as expeditiously as practicable as required by 42 U.S.C. §7412(i)(3). *See* 89 Fed. Reg. at 29,488. EPA acted consistent with its past practice in issuing an interim final rule to address infeasible and fast-approaching compliance deadlines. For instance, EPA

published an IFR for the *Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards; Response to Judicial Stays of SIP Disapproval Action for Certain States*, 88 Fed. Reg. 49295, 49299 (July 31, 2023), explaining that following notice-and-comment procedures would be impracticable "because such procedures would require more time than is available" because "[t]he earliest stay order to which EPA must respond in this action was issued on May 1, 2023, just over three months before the Good Neighbor Plan's upcoming effective date on August 4, 2023, which is the date by which this action responding to the stay order must be effective."[2] *Id.* The IFR also reasonably extends fenceline monitoring requirements, which were implemented specifically to evaluate the performance of the work practices and opacity standards the IFR finds cannot be practicably implemented in less than three years. *See* 89 Fed. Reg. at 23,295 (fenceline monitoring adopted to "help ensure the work practices and opacity limits are achieving the anticipated reductions").

Second, the IFR's compliance deadlines do not violate CAA §112(i)(3) and EPA's revision of the compliance deadlines is appropriately justified. Petitioners

---

[2] *See also*, Interim Final Rule, *Perfluoroalkyl and Polyfluoroalkyl Substances (PFAS) Data Reporting and Recordkeeping Under the Toxic Substances Control Act (TSCA)*; Change to Submission Period, 90 Fed. Reg. 20236 (May 13, 2025); Interim Final Rule, *Phasedown of Hydrofluorocarbons: Technology Transitions Program and Light Commercial Air Condition and Heat Pump Sector*, 88 Fed. Reg. 88826 (Dec. 26, 2023).

assert that the IFR does not consider whether the deadlines provide for compliance as "expeditiously as practicable." *See* Motion at 19. Petitioners further allege that EPA unlawfully based the IFR on its ongoing reconsideration of the 2024 Rule. *See* Motion at 13. This is not so. The IFR appropriately recognizes the 2025 and 2026 deadlines are infeasible and therefore are not "as expeditiously as practicable" as required by the Clean Air Act. 42 U.S.C. §7412(i)(3). The fact that these requirements will "most likely be revised during the reconsideration rulemaking process" is not the basis for the IFR; it simply underscored the need to amend the associated compliance deadlines, which were not as expeditiously as practicable based on EPA's erroneous assumptions.

As the IFR states, in the 2024 Rule EPA incorrectly assumed "standards could be met without the need for installation of new control equipment, monitors, or measurement equipment." 90 Fed. Reg. at 29,488. EPA also failed to account for emissions variability in interpreting opacity-limit data and greatly overestimated the effect that certain work practices have on emissions. *See* Cliffs Petition at 24-25; USS Petition at 12. As EPA states, "these new data provide evidence that there is more variability in each source's operations and opacity than we accounted for in developing the final opacity standards." 90 Fed. Reg. at 29,488. In fact, the planned bleeder valve standards cannot be met by even the best performing sources using the existing control methods EPA assumed. *See* Cliffs Petition at 12; USS Petition at

13.  EPA therefore correctly concluded that "[t]he revision of these compliance deadlines will avoid documented issues regarding compliance with the 2024 rule" while complying with the statutory requirement that implementation be as expeditiously as practicable.  90 Fed. Reg. at 29,488.

These same facts show why this case is nothing like *Air All. Houston v. EPA*, 906 F.3d 1049 (D.C. Cir. 2018).  There, the "only justification" EPA offered was that amendment "allow[ed] the Agency time to consider petitions for reconsideration" and "take further regulatory action, as appropriate." *Id.* at 1060-61 (quotations omitted).  Further, this Court found EPA had "merely reference[d] arguments" against its promulgated rule "without standing behind any of them." *Id.* at 1064. Here, EPA is amending the deadlines in the 2024 Rule to reflect acknowledged errors that directly bear on the feasibility of the deadlines for multiple requirements in the Rule.  The IFR is also not a "wholesale" extension of the compliance requirements in the 2024 Rule. *Id.* at 1067.  EPA is specifically addressing only the requirements implicated by those acknowledged errors.  The IFR's targeted approach to amending deadlines it can no longer support is consistent with both the Clean Air Act and this Court's precedent.

Finally, Petitioners' argument that the IFR is unlawful because EPA "chang[ed] its position" and the new compliance deadlines "rest[] upon factual findings that contradict those which underlay its prior deadline" cannot stand. *See*

Motion at 22. If EPA relies on unreliable data or receives updated information, it must be allowed to amend its reasoning and the deadlines it imposes. *See, e.g., Ne. Maryland Waste Disposal Auth. v. EPA*, 358 F.3d 936, 952-53 (D.C. Cir. 2004). USS and Cliffs consistently argued that EPA must address the issues with the Rule "before facilities are forced to commit substantial resources to installing and implementing controls to meet the Rule." USS Petition at 21. As further noted, "there is a potential for significant adverse consequences from implementing the Rule, including requirements that create safety risks for employees and the general public, requirements that may increase HAP emissions, and provisions that in general interrupt operations and waste resources without resulting in environmental benefit." USS Petition at 22. The Rule's infeasible compliance requirements and unsupportable deadlines would substantially affect local, regional, and national economies and national security interests. Cliffs Petition at 41-43.

EPA ultimately agreed that immediate actions would be required to meet the 2025 and 2026 compliance deadlines based on the updated information it received. In the IFR, EPA recognized "that there were several errors in the final regulatory text and certain items that EPA had not properly raised for comment during the proposal." 90 Fed. Reg. at 29,487. The Agency noted that "[t]he revision of these compliance deadlines will avoid documented issues regarding compliance with the 2024 rule with respect to the items being reconsidered and corrected." *Id.* at 29,488.

Addressing the aforementioned issues with the 2024 Rule will require a separate proposed rule with an opportunity for comment; however, in the meantime, EPA lawfully revised the 2025 and 2026 compliance deadlines "to allow sufficient time to address the issues discussed above and to allow sufficient time for compliance." *Id.* at 29,489.

### B. Petitioners Face No Imminent and Irreparable Injury

Petitioners have also failed to carry their burden that imminent and irreparable harm will result to them from the IFR. Such a burden must be "certain and great," demonstrating a "'clear and present' need for equitable relief to prevent irreparable harm." (quoting *Ashland Oil, Inc. v. FTC,* 409 F. Supp. 297, 307 (D.D.C.), *aff'd*, 548 F.2d 977 (D.C. Cir. 1976) (citations and internal quotations omitted)). Harm should be evaluated in terms of its "substantiality, likelihood of occurrence, and adequacy of proof." *Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 977 (D.C. Cir. 1985). Petitioners claim of alleged harm to their represented constituents heavily relies on anecdotal statements from residents and generic references to environmental injury and is contrary to EPA's own conservative modeling which demonstrates that risk from IIS sources is acceptable with an ample margin of safety given the controls that are already in place at the facilities. *See* 89 Fed. Reg. at 23,298-99. EPA itself admitted this detailed low-risk modeling is "likely [a] conservative (upper-end) estimate[]." 85 Fed. Reg. 42,074, 42,083. The only data

cited by Petitioners—EPA's estimated reduction of 31.41 tons of emissions per year from the 2024 Rule for certain sources that Petitioners allege would instead be emitted during the IFR period—is sourced from the 2024 UFIP Memo, which continues to overestimate emissions. *See* EPA-QP-OAR-2002-0083-1974 (Feb. 22, 2024) ("UFIP Memo"). Industry's estimates for these same sources is only 0.13 tons per year, and 0.35 tons per year from *all* so-called "UFIP" sources. *See* Declaration of Adrian Remsberg, Jr., ¶11.a, Table 1 (Exhibit A).

Ambient fenceline air monitoring data for HAPs collected since 2017 near IIS facilities pursuant to State regulations confirm "actual concentration levels of HAPs in ambient air are a fraction of the EPA risk reference threshold concentrations." *Id.* at ¶16. This supports the conclusion that an ample margin of safety continues to exist from the IIS sector. *See id.* at ¶¶16-17; Figures 1-3. Petitioners cannot simply rely on overinflated emissions estimates from a cost-benefit assessment, and unsupported, generalized claims to suggest irreparable harm while ignoring EPA's conclusion in 2020 and 2024 that an ample margin of safety to public health exists from the current operation of IIS sources (s*ee* 85 Fed. Reg. at 42,074) and without the new limits in the 2024 Rule for which compliance deadlines have been extended by the IFR.

To the contrary, it is Movant-Intervenors who stand to face imminent and irreparable harm if the IFR is stayed by requiring implementation of standards that would result in a danger to worker safety and are proven to be technically and economically infeasible. For example, under CAA §112(r)'s General Duty Clause, Movant-Intervenors must act to "design and maintain a safe facility." Unplanned bleeder valve openings are designed to meet this express requirement and Congressional intent by preventing catastrophic explosions and resulting harm to worker and public safety. EPA expressly acknowledged the 2024 Rule contained errors in the implementation of unplanned opening limits, and as a result, granted mandatory reconsideration. *See* 90 Fed. Reg. at 29,489. Even EPA's best performing sources cannot meet the limit, and thus would be forced to operate in non-compliance to protect their workers, a clear source of imminent irreparable harm to Movant-Intervenors.

Petitioners likewise egregiously misstate the extent of economic harm to Movant-Intervenors from attempting to implement technically infeasible control measures within the short compliance deadlines addressed by the IFR. Petitioners rely on the erroneous determination that adequate controls to meet the 2024 Rule already exist – which EPA acknowledges to be incorrect in the IFR – and that "a stay of the IFR would cause the steel industry to forgo a vanishingly small cost savings." Motion at 21. Movant-Intervenors have already demonstrated multiple

times that capital investment in the 2024 Rule control measures would cost at least $3.2 billion and have the potential to affect an industry upon which millions of jobs directly and indirectly depend. *See* Cliffs Petition at 52; USS Petition at 25. The costs and economic factors at stake are "actual and not theoretical" and harm is expected to occur at a time definite with a "'clear and present' need for equitable relief to prevent irreparable harm" to Movant-Intervenors. *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (March 29, 1985) (internal citations and quotations omitted).

Such substantiation of irreparable harm to Movant-Intervenors has been provided during the public comment process and in subsequent petitions for administrative reconsiderations that directly support the need for the IFR. As thoroughly detailed in USS and Cliffs' Petitions, the compliance deadlines that have been extended in the IFR would be impossible to meet within the original timeframes. Forcing industry to implement these standards on an unachievable timeline would undoubtedly cause irreparable harm by forcing Movant-Intervenors to expend exorbitant amounts of money in the fool's errand of attempting to achieve unachievable standards and by risking the repercussions of noncompliance. The IFR is necessary to avoid these imminent and irreparable harms to Movant-Intervenors. And Petitioners have failed to show any "actual and not theoretical" harm that is expected to occur with a "'clear and present' need for equitable relief to prevent irreparable harm" that would justify staying the IFR.

### C. The Public Interest Weighs Against a Stay

Public interest and the resulting harm to others also weighs heavily against the stay requested by Petitioners. As the Supreme Court explained, "harm to the opposing party and the public interest, merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418 at 420. Evaluation of the public interest is necessarily multi-factored as, the "public interest may, of course, have many faces," including fostering competition, preventing waste, preserving economic vitality of public services, and expediting administrative or judicial action. *Cuomo*, 772 F.2d. at 978 (citing *Virginia Petroleum Jobbers Assoc. v. FPC*, 259 F.2d 921, 925 (D.C. Cir. 1958)).

Petitioners' position that public interest supports a stay of the IFR could not be further from the truth. First, Petitioners claim that a stay of the IFR would ensure the public benefits from substantial emission decreases under the 2024 Rule is based on EPA's admittedly inflated emission estimates and ignores EPA's determination that the IIS source category represents an ample margin of safety to public health under current operating conditions, even without implementation of the 2024 Rule requirements. Second, Petitioners claim that the impact of a stay, and thus implementation of the 2024 Rule, would be a minimal burden on Movant-Intervenors is based on the dispelled notion that no new technology would be required to comply. To the contrary, the unsafe and costly measures that would be

required to pursue novel and technically infeasible control technologies absent the IFR would hamper the critical domestic iron and steel industry, which provides over $520 billion in economic output and directly and indirectly supports millions of jobs. *See* USS Petition at 25.

Staying the IFR and forcing immediate compliance with the 2024 Rule could also lead to other negative unintended consequences including increased waste disposal, increased energy usage for unnecessary control measures, and negative impacts on green infrastructure. *See* Cliffs Petition at 43. Further, "there is a potential for significant adverse consequences from implementing the [2024] Rule, including requirements that create safety risks for employees and the general public, requirements that may increase HAP emissions, and provisions that in general interrupt operations and waste resources without resulting in environmental benefit." USS Petition at 22.

The public interest supports pursuing a path consistent with the purpose of the CAA, which is to "protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C §7401(b)(1). EPA protects and enhances air quality by relying on sound science, accurate data, and a rational connection between the facts found and the choices EPA has made. The IFR is necessary to provide EPA the time necessary to evaluate new data, correct its errors, and ensure compliance deadlines

are as expeditious as practicable. And the domestic iron and steel industry provides critical raw materials for national security, public health, and the "productive capacity of [the nation's] population." The public interest supports a path that ensures the critical domestic steel industry is not harmed by compliance deadlines that are infeasible and therefore are not "as expeditiously as practicable" as required by the CAA.

Petitioners have failed to meet all four prongs of the standard for a stay of the IFR, and the request for stay should be denied.

## CONCLUSION

For the foregoing reasons, Movant-Intervenors respectfully request that Petitioners' Motion be denied.

Dated: September 8, 2025                    Respectfully submitted,

/s/*John D. Lazzaretti*
John D. Lazzaretti (OH 0080780)
SQUIRE PATTON BOGGS (US) LLP
1000 Key Tower, 127 Public Square
Cleveland, Ohio 44114
Telephone: (216) 479-8500
Facsimile: (216) 479-8780
john.lazzaretti@squirepb.com

*Counsel for Movant-Intervenor*
*United States Steel Corporation*

/s/*Lianne Mantione*
Lianne Mantione (OH 0077057)
Douglas McWilliams
SQUIRE PATTON BOGGS (US) LLP
1000 Key Tower, 127 Public Square
Cleveland, Ohio 44114
Telephone: (216) 479-8500
Facsimile: (216) 479-8780
lianne.mantione@squirepb.com

*Counsel for Movant-Intervenor*
*Cleveland-Cliffs Inc. and*
*American Iron and Steel Institute*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this motion complies with the requirements of Fed. R. App. P. 27(d)(2)(A) because it contains 4,897 words according to the count of Microsoft Word, excluding parts of the motion exempted by Fed. R. App. P. 32(f), and is therefore within the word limit of 5,200 words.

I further certify that this motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this motion was prepared in Microsoft Word with the proportionally spaced typeface of Times New Roman 14-point.

/s/ *John D. Lazzaretti*
John D. Lazzaretti

*Counsel for Movant-Intervenor*
*United States Steel Corporation*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on September 8, 2025, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/*John D. Lazzaretti*
John D. Lazzaretti

*Counsel for Movant-Intervenor*
*United States Steel Corporation*

# Exhibit A

IN THE UNITED STATES CIRCUIT COURT

FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| CLEAN AIR COUNCIL, *et al.*,<br><br>　　　　　　Petitioners<br>　　v.<br><br>UNITED STATES EVIRONMENTAL<br>PROTECTION AGENCY, *et al.*,<br><br>　　　　　Respondents. | Case No. 25-1163 |

**EXHIBIT A**
**DECLARATION OF ADRIAN "MIKE" REMSBERG, JR.**
**TRINITY CONSULTANTS, INC.**

1. My name is Adrian "Mike" Remsberg, Jr.  I am a consulting engineer for Trinity Consultants, Inc. (Trinity) and serve as a Divisional President.

2. I hold a degree in Chemical Engineering, and as a consulting engineer, I am an expert in Clean Air Act (CAA) compliance solutions including for National Emissions Standard for Hazardous Air Pollutants (NESHAP) standards and industrial air pollution control.

3. I have 35 years of experience with steel manufacturing and numerous other heavy industries in estimating, identifying, and scoping air pollution controls, and ensuring sources comply with NESHAPs.

4. Trinity is a leading national provider of CAA compliance services to regulated sources where I work with a team of more than 600 consulting engineering and

science professionals.  Trinity has provided CAA compliance solutions to regulated entities for more than 50 years.

5. On July 31, 2023, the US Environmental Protection Agency (EPA) proposed amendments to the *National Emissions Standard for Hazardous Air Pollutants: Integrated Iron and Steel Manufacturing Facilities Technology Review* (89 FR 23294), commonly referred as the "II&S MACT".

6. On April 3, 2024, the EPA promulgated final amendments to the *National Emissions Standard for Hazardous Air Pollutants: Integrated Iron and Steel Manufacturing Facilities Technology Review* (89 FR 23294) ("2024 Rule"). Subsequent efforts by Industry to stay or reconsider the final rule have occurred and remain ongoing in various states of discussion.

7. On June 18, 2024, and September 19, 2024, I provided declarations related to these matters that I hereby incorporate by reference.  Nevertheless, the scope of this declaration focuses on the claims made by EPA in the final amendments to the *National Emissions Standard for Hazardous Air Pollutants: Integrated Iron and Steel Manufacturing Facilities Technology Review: Interim Final Rule* (see 90 FR 29485) – referred to herein as the "IFR".

8. On July 3, 2025, the EPA promulgated the IFR.  In this action, the EPA is taking steps to revise certain compliance deadlines for standards finalized in the 2024 Rule.

9. The EPA IFR revises certain compliance deadlines in the 2024 Rule by extending them to April 3, 2027.  EPA considered this action in light of serious concerns that facilities will be unable to comply with the relevant requirements by the existing deadlines: "*the EPA has determined to revise the 2025 and 2026 compliance deadlines in the II&S Manufacturing Facilities NESHAP to April 3, 2027, for unplanned bleeder valve openings, planned bleeder valve openings, bell leaks, slag processing and handling, beaching, and BF/BOPF work practices.*" (*emphasis added*).  These activities have been commonly referred to

in this rulemaking as new "UFIP" sources.[1]  EPA commonly promulgates amended NESHAPs where newly regulated existing sources are afforded a 3-year compliance schedule as is contemplated in the IFR.

10. The EPA, in support of the IFR, prepared the following document: *Regulatory Impact Analysis for the National Emission Standard for Hazardous Air Pollutants: Integrated Iron and Steel Manufacturing Facilities Technology Review: Interim Final Rule, June 2025* – herein referred to as the RIA.[2]  In this document, EPA provides emissions estimates related to the impact of deferring the compliance dates for new UFIP sources as allowed under the CAA.

11. As Industry has commented on repeatedly in the rulemaking record, EPA has based their emissions estimates from UFIP sources on erroneous information and calculations that overstate emissions before and after controls throughout the rulemaking process; these errors persist in the IFR RIA.  At no time in the rulemaking process has EPA properly addressed or corrected the UFIP emissions errors identified by Industry, thus leading to the propagation of overestimates in the IFR RIA.  Below, I have summarized the main issues Industry have previously raised that demonstrate EPA's continued drastic overestimation of emissions from UFIP sources.

   a. Industry Comments[3] on the July 2023 II&S MACT proposed rule documented numerous deficiencies in EPA's point source and UFIP emissions estimates.[4]  Overall, these deficiencies materially overstate HAP emissions, and they also overstate HAPs that will be reduced by the rulemaking.  Table 1 below summarizes the differences in emissions estimates between EPA, EPA's estimates when material errors are corrected, and Industry's emission estimates from UFIP sources provided with Industry

---

[1] Prior to the April 3, 2024 final rule, fugitive emissions from BF Casthouses and BOF Shops were previously regulated.

[2] See Docket ID EPA-HQ-OAR-2002-0083-1995.

[3] See Section II of Comments of the American Iron and Steel Institute and United States Steel Corporation, Docket ID EPA-HQ-OAR-2002-0083-1606 (Sept. 29, 2023) ("Industry Comments"), pp. II-15 through II-21.

[4] See Appendix A *Memorandum from Mike Remsberg and Ronald Hawks, Trinity Consultants, to AISI, Cleveland Cliffs and U. S. Steel, Industry UFIP Memorandum – II&S MACT Proposed Rule* (Sept. 28, 2023).   Docket ID EPA-HQ-OAR-2002-0083-1608.

Comments on the proposed rule.[5] EPA elected to not substantively correct these deficiencies in the final rulemaking record. Nevertheless, despite relying on overstated HAP emissions estimates in the risk modeling performed for the sector, EPA still concluded that there is an ample margin of safety from HAP emissions from this sector.

**Table 1. Comparison of UFIP Emissions Estimates for HAPs from Industry Comments on Proposed Rulemaking [a,b]**

| UFIP SOURCE | EPA Base Case | | Corrected EPA | | Industry | |
|---|---|---|---|---|---|---|
| | Before Control | Reduced | Before Control | Reduced | Before Control | Reduced |
| BF Unplanned Openings | 2.11 | 0.50 | 0.79 | 0.19 | 0.55 | 0.12 |
| BF Planned Openings | 1.61 | 0.41 | 0.60 | 0.15 | 0.32 | 0.08 |
| BF Bell Leaks | 75.75 | 30.71 | 1.04 | 0.42 | 0.09 | 0.05 |
| BF Iron Beaching | 0.02 | 0.00 | 0.01 | 0.00 | 0.01 | 0.00 |
| Slag Handling & Storage | 29.62 | 7.35 | 3.66 | 0.91 | 0.45 | 0.10 |
| *New UFIP Sources* | *109.12* | *38.97* | *6.10* | *1.67* | *1.43* | *0.35* |

[a] "Base Case" are EPA's values from Document ID EPA-HQ-OAR-2002-0083-1446. "Corrected EPA" revises the Base Case for material errors. "Industry" relies on EFs believed to be most representative of UFIP Sources.

[b] Emissions are in units of tons per year. "Before control" means emissions estimates that take into account existing work practices. "Reduced" means the amount of HAP estimated to be reduced by the proposed rulemaking.

b. Industry Comments[6] on the July 2023 II&S MACT proposed rule also documented numerous deficiencies in EPA's point source and UFIP emissions estimates for particulate matter (PM) and fine particulate matter ($PM_{2.5}$).[7] Overall, these deficiencies materially overstate PM and $PM_{2.5}$ emissions which contribute to the overestimate of HAPs that will be reduced

[5] See Table 2.1 of Appendix A *Memorandum from Mike Remsberg and Ronald Hawks, Trinity Consultants, to AISI, Cleveland Cliffs and U. S. Steel, Industry UFIP Memorandum – II&S MACT Proposed Rule* (Sept. 28, 2023). Docket ID EPA-HQ-OAR-2002-0083-1608. (Data only presented here for new UFIP sources subject to IFR.)

[6] See Section II of Comments of the American Iron and Steel Institute and United States Steel Corporation, Docket ID EPA-HQ-OAR-2002-0083-1606 (Sept. 29, 2023) ("Industry Comments"), pp. II-15 through II-21.

[7] See Appendix A *Memorandum from Mike Remsberg and Ronald Hawks, Trinity Consultants, to AISI, Cleveland Cliffs and U. S. Steel, Industry UFIP Memorandum – II&S MACT Proposed Rule* (Sept. 28, 2023). Docket ID EPA-HQ-OAR-2002-0083-1608.

by the rulemaking.  Table 2 below summarizes the differences in emissions estimates between EPA's estimates, EPA's estimates when material errors are corrected, and Industry's emission estimates from UFIP sources provided with Industry Comments on the proposed rule.[8]  EPA elected to not substantively correct these deficiencies in the final rulemaking record. Nevertheless, despite relying on overstated HAP emissions estimates in the risk modeling performed for the sector, EPA still concluded there is an ample margin of safety from HAP emissions from this sector.

**Table 2. Comparison of UFIP Emissions Estimates for PM and $PM_{2.5}$ from Industry Comments on Proposed Rulemaking**

| UFIP SOURCE | *Base Case (tpy except % data)* | | | | |
|---|---|---|---|---|---|
| | **PM Before Control** | **PM Reduced** | **$PM_{2.5}$/PM Ration** | **$PM_{2.5}$ Before Control** | **$PM_{2.5}$ Reduced** |
| BF Unplanned Openings | 57.10 | 13.53 | 22% | 12.64 | 3.00 |
| BF Planned Openings | 43.54 | 10.97 | 23% | 9.90 | 2.49 |
| BF Bell Leaks | 2,047.40 | 830.01 | 23% | 468.68 | 190.00 |
| BF Iron Beaching | 0.58 | 0.09 | 33% | 0.19 | 0.03 |
| Slag Handling & Storage | 871.07 | 216.21 | 20% | 170.25 | 42.26 |
| *New UFIP Sources* | *3,019.69* | *1,070.82* | | *661.67* | *237.78* |
| **UFIP SOURCE** | *Scenario 1 - Corrected EPA (tpy except % data)* | | | | |
| BF Unplanned Openings | 57.10 | 13.53 | 22% | 12.64 | 3.00 |
| BF Planned Openings | 43.54 | 10.97 | 23% | 9.90 | 2.49 |
| BF Bell Leaks | 75.60 | 30.65 | 23% | 17.31 | 7.02 |
| BF Iron Beaching | 0.58 | 0.09 | 33% | 0.19 | 0.03 |
| Slag Handling & Storage | 871.07 | 216.21 | 20% | 170.25 | 42.26 |
| *New UFIP Sources* | *1,047.89* | *271.46* | | *210.29* | *54.80* |
| **UFIP SOURCE** | *Scenario 2 – Industry (tpy except % data)* | | | | |
| BF Unplanned Openings | 39.94 | 8.86 | 1% | 0.40 | 0.09 |
| BF Planned Openings | 23.36 | 5.89 | 1% | 0.23 | 0.06 |
| BF Bell Leaks | 6.86 | 3.36 | 5% | 0.34 | 0.17 |
| BF Iron Beaching | 0.93 | 0.12 | 11% | 0.10 | 0.01 |
| Slag Handling & Storage | 107.36 | 24.41 | 18% | 19.00 | 4.32 |
| *New UFIP Sources* | *178.45* | *42.64* | | *20.07* | *4.65* |

---

[8] See Table 6.2 of Appendix A *Memorandum from Mike Remsberg and Ronald Hawks, Trinity Consultants, to AISI, Cleveland Cliffs and U. S. Steel, Industry UFIP Memorandum – II&S MACT Proposed Rule* (Sept. 28, 2023).   Docket ID EPA-HQ-OAR-2002-0083-1608. (Data only presented here for new UFIP sources subject to IFR.)

12. In the RIA, EPA has presented estimates from UFIP sources that would be granted a revised compliance date; the summary of these emission estimates results is found in Table 6 of the RIA. Although I cannot fully review the underlying methods for how EPA precisely completed their estimates, EPA does continue to propagate its erroneous and overstated emissions estimates by continuing to rely on the EPA UFIP memorandum which Industry has identified as erroneous and deficient since September 2023.[9] In the RIA, EPA makes no mention of any further substantive corrections to this memo or the estimates contained in the RIA. Therefore, I can only conclude that the emission estimates of HAP, PM and $PM_{2.5}$ are similarly in error and remain overstated for the previously identified reasons.

13. EPA's erroneous estimates in the RIA indicate 1,900, 470, and 64 tons per year for PM, $PM_{2.5}$ and HAPs, respectively, would result during the deferred compliance date period. Comparatively, Industry's estimates for PM, $PM_{2.5}$ and HAP are 42.64, 4.65, and 0.35 tons per year, respectively. More simply, EPA's presentation of annual emissions for this deferred compliance period are roughly 100 times overstated compared to Industry estimates.

14. Although not a subject of the RIA and IFR, I should also note that Petitioners have raised lead emissions as being a co-benefit of controlling new UFIP sources and have asserted that lead (Pb) emissions could also increase as a result of the IFR's revised compliance dates. As Industry has extensively commented, EPA's value for reduction of lead emissions from these sources is also grossly overstated. Table 3 below illustrates the overestimation of lead

---

[9] The IFR RIA references the UFIP Memo: Key et al. (Feb 22, 2024). *Unmeasured Fugitive and Intermittent Particulate Emissions and Cost Impacts for Integrated Iron and Steel Facilities under 40 CFR Part 63, Subpart FFFFF*. Available at: https://www.regulations.gov/document/EPA-HQ-OAR-2002-0083-1974. This version of the memo was updated between the proposed and final II&S MACT rulemakings however the minor revisions that were made to this version of the UFIP memo do not substantively alter Industry Comments based on the April 3, 2023 version of the UFUP memo found at https://www.regulations.gov/document/EPA-HQ-OAR-2002-0083-1446.

reductions from UFIP sources.[10]  EPA elected to not substantively correct these deficiencies in the final rulemaking record.

**Table 3. Comparison of UFIP Emissions Estimates for Lead (Pb) from Industry Comments on Proposed Rulemaking**

| UFIP SOURCE | Base Case Pb Emissions (tpy) | Corrected EPA Pb Emissions (tpy) | Industry Pb Emissions (tpy) |
|---|---|---|---|
| BF Unplanned Openings | 0.05 | 0.02 | 0.01 |
| BF Planned Openings | 0.04 | 0.01 | 0.01 |
| BF Bell Leaks | 1.74 | 0.02 | 0.00 |
| BF Iron Beaching | 0.00 | 0.00 | 0.00 |
| Slag Handling & Storage | 7.14 | 0.02 | 0.00 |
| *New UFIP Sources* | *8.97* | *0.07* | *0.02* |

15. In conclusion, the RIA supporting the July 2025 IFR grossly overestimates the emissions that could result from revised compliance dates for the new UFIP sources in the RIA.

16. I should also note that EPA's acceptable risk determination from 2020 is consistent with more recent ambient air concentration data and information that Trinity analyzed in support of Industry Comments[11] on the proposed rule and available data collected since that time.[12]  EPA required fenceline air monitoring for the Information Collection Request (ICR) for this rulemaking (and in the final rule), despite regulatorily required Federal and State ambient air monitoring showing that actual concentration levels of HAPs in ambient air nearby II&S facilities are a fraction of the EPA risk reference threshold concentrations and remain safe today.  As discussed at length in the Industry

---

[10] See Table 8.2 of Appendix A *Memorandum from Mike Remsberg and Ronald Hawks, Trinity Consultants, to AISI, Cleveland Cliffs and U. S. Steel, Industry UFIP Memorandum – II&S MACT Proposed Rule* (Sept. 28, 2023).   Docket ID EPA-HQ-OAR-2002-0083-1608. (Data only presented here for new UFIP sources subject to IFR.)

[11] Comments of the American Iron and Steel Institute and United States Steel Corporation, Docket ID EPA-HQ-OAR-2002-0083-1631 (Sept. 29, 2023) ("Industry Comments"), pp. II-15-II-21.

[12] *National Emission Standards for Hazardous Air Pollutants: Integrated Iron and Steel Manufacturing Facilities Technology Review; Proposed Rule,* 88 FR 49402, Docket No. EPA-HQ-OAR-2002-0083 (July 31, 2023).

Comments, results of ICR fenceline monitoring and regulatory agency derived ambient air monitoring near II&S facilities confirm that an ample margin of safety continues to exist from this sector.[13, 14]  Figures 1 and 2 visually illustrate that the ambient air levels are well below EPA's lead (Pb) National Ambient Air Quality Standard (NAAQS) and the EPA's risk reference threshold for arsenic (As).  It should be noted that additional data for several II&S facilities is provided in Industry Comments on the proposed rule that show similarly low monitored levels versus EPA's Pb NAAQS and EPA As Risk Thresholds to the data provided in Figure 1 for Pb in Northwest Indiana and Figure 2 for As in East Chicago, Indiana below.[15]

---

[13] From Industry Comments, page ES-6.  *"...the purported concentrations of arsenic would not raise public health risks for this source category above acceptable limits, and the purported concentrations of lead would still remain well below National Ambient Air Quality Standards [and risk reference concentrations] for protection of public health. EPA has years of actual ambient data for lead, arsenic, and chromium from monitors adjacent to these regulated facilities that show de minimis risk levels far below existing health-based standards."*

[14] Industry Comments documented that EPA's estimate of lead emissions from UFIP sources is 56 tons per year, however, correcting for EPA's errors and applying industry's estimation methods emissions of lead from UFIP sources is 3 tons per year. See Section 8 of Appendix A *Memorandum from Mike Remsberg and Ronald Hawks, Trinity Consultants, to AISI, Cleveland Cliffs and U. S. Steel, Industry UFIP Memorandum – II&S MACT Proposed Rule* (Sept. 28, 2023).  Docket ID EPA-HQ-OAR-2002-0083-1608.

[15] Refer to *Appendix G. Industry's Updated As and Pb Monitoring Data Analysis (Sept. 2023).* Docket ID: EPA-HQ-OAR-2002-0083-1617.

**Figure 1. Data Confirming the Low Levels of Lead Measured in Ambient Air Near II&S Mills versus EPA's NAAQS Standard[16]**



---

[16] See Table 1. Northwest Indiana Lead Ambient Air Monitors Adjacent to Integrated Steel Plants Demonstrate Consistent Attainment with National Ambient Air Quality Standard (NAAQS) of 0.15 μg/m$^3$. *Appendix G. Industry's Updated As and Pb Monitoring Data Analysis (Sept. 2023)*. Docket ID: EPA-HQ-OAR-2002-0083-1617. Additional data from the Indiana Department of Environmental Management is added, which is available at https://www.in.gov/idem/airmonitoring/air-quality-data/.

**Figure 2. Data Confirming the Low Levels of Arsenic in Measured in Ambient Air Near II&S Mills versus EPA's Risk Threshold[17]**



[17] See Table 10. EPA Ambient Air Data East Chicago, IN Arsenic vs Risk Threshold 0.0043 µg/m³. *Appendix G. Industry's Updated As and Pb Monitoring Data Analysis (Sept. 2023).* Docket ID: EPA-HQ-OAR-2002-0083-1617. Additional data from the US Environmental Protection Agency is added, which is available at https://www.epa.gov/outdoor-air-quality-data/interactive-map-air-quality-monitors.

17. In conclusion, ambient monitoring data indicates air quality near II&S facilities confirm that an ample margin of safety continues to exist from this sector and that EPA should amend the PM, $PM_{2.5}$, and HAP emissions estimates and RIA accordingly to correct the underlying record associated with this rulemaking.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Sincerely,

Adrian M. Remsberg Jr.
Divisional President
Trinity Consultants Inc.
Executed September 8, 2025