**ORAL ARGUMENT NOT YET SCHEDULED**

No. 25-1163

---

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

CLEAN AIR COUNCIL, *et al.*,
*Petitioners*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, *et al.*,
*Respondents*.

---

Petition for Review of Action of the U.S. Environmental Protection Agency

---

**RESPONDENTS' OPPOSITION TO MOTION FOR
SUMMARY VACATUR OR, IN THE ALTERNATIVE,
A STAY PENDING JUDICIAL REVIEW**

---

ADAM R.F. GUSTAFSON
*Acting Assistant Attorney General*
ROBERT N. STANDER
*Deputy Assistant Attorney General*

MARIO A. LUNA
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7611
Washington, D.C. 20044
(202) 532-3357
Mario.Luna@usdoj.gov

Of Counsel:

ERIKA GERSTENBERGER
U.S. Environmental Protection Agency
Washington, D.C.

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................. ii

GLOSSARY .................................................................................................... v

INTRODUCTION ............................................................................................. 1

BACKGROUND ............................................................................................... 2

    I.    Statutory Background ............................................................................. 2

    II.   Factual Background ............................................................................... 3

STANDARD OF REVIEW ................................................................................. 7

ARGUMENT .................................................................................................. 7

    I.    Petitioners are not entitled to summary vacatur ........................................ 7

        A.    EPA reasonably determined that the standards were infeasible or unworkable. ...................................................................................... 9

        B.    EPA diligently evaluated the issues before it and invoked the good-cause exception to prevent imminent safety and national-security concerns. ....................................................................................... 12

    II.   Petitioners are not entitled to a stay ....................................................... 17

        A.    Petitioners are unlikely to succeed on the merits. ............................... 18

        B.    Petitioners fail to demonstrate irreparable harm. ............................... 19

        C.    The balance of equities and public interest disfavor a stay ................. 22

        D.    Any remedy should be limited. ...................................................... 23

CONCLUSION ............................................................................................... 24

i

## TABLE OF AUTHORITIES

**Cases**

*Air All. Hous. v. EPA*,
  906 F.3d 1049 (D.C. Cir. 2018) .................................................................. 16

*Appalachian Power Co. v. EPA*,
  251 F.3d 1026 (D.C. Cir. 2001) ............................................................. 11, 12

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ..................................................................................... 11

*Fontem US, LLC v. FDA*,
  No. 22-1076, 2022 WL 2761393 (D.C. Cir. July 12, 2022) .......................... 11

*Fund for Animals v. Frizzell*,
  530 F.2d 982 (D.C. Cir. 1975) ............................................................... 21, 22

*Gary Advocs. for Responsible Develop. v. EPA*,
  No. 25-1128 (D.C. Cir. May 16, 2025)......................................................... 22

*Gill v. Whitford*,
  585 U.S. 48 (2018) ....................................................................................... 24

*Jifry v. FAA*,
  370 F.3d 1174 (D.C. Cir. 2004) ............................................................... 8, 16

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
  591 U.S. 657 (2020)..................................................................................... 17

*La. Env't Action Network v. EPA*,
  955 F.3d 1088 (D.C. Cir. 2020) ..................................................................... 4

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997)................................................................................. 7, 17

*Motor Vehicle Mfr. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)................................................................................... 8, 19

*Nken v. Holder*,
  556 U.S. 418 (2009)....................................................................................... 7

ii

*NRDC v. EPA,*
   No. 04-1438, 2005 WL 5394743 (D.C. Cir. Feb. 3, 2005) .............................. 21

*Olu-Cole v. E.L. Haynes Pub. Charter Sch.,*
   930 F.3d 519 (D.C. Cir. 2019) ...................................................................... 19

*Sampson v. Murray,*
   415 U.S. 61 (1974) ........................................................................................ 19

*Tri-Cnty. Tel. Ass'n v. FCC,*
   999 F.3d 714 (D.C. Cir. 2021) .................................................................. 8, 15

*Trump v. CASA, Inc.,*
   145 S. Ct. 2540 (2025) .................................................................................. 24

## STATUTES

5 U.S.C. § 553(b)(B) ........................................................................................ 3, 7

42 U.S.C. § 7412(d) ............................................................................................... 3

42 U.S.C. § 7412(d)(1) ........................................................................................... 2

42 U.S.C. § 7412(d)(6) ........................................................................................... 3

42 U.S.C. § 7412(d)(10) ........................................................................................ 18

42 U.S.C. § 7412(f)(2) ..................................................................................... 3, 20

42 U.S.C. § 7412(f)(2)(A) .............................................................................. 3, 4, 20

42 U.S.C. § 7412(i)(3)(A) ............................................................................... 2, 18

42 U.S.C. § 7607(d)(1) ................................................................................. 1, 3, 7

42 U.S.C. § 7607(d)(3) ........................................................................................... 3

42 U.S.C. § 7607(d)(7)(B) ............................................................................... 5, 16

## CODE OF FEDERAL REGULATIONS

40 C.F.R. § 63.7852 ................................................................................................ 9

**FEDERAL REGISTER**

85 Fed. Reg. 42074 (July 13, 2020) ...................................................... 3, 4, 20

89 Fed. Reg. 23294 (Apr. 3, 2024)............................... 3, 4, 9, 11, 12, 18, 20, 21

90 Fed. Reg. 14207 (Mar. 31, 2025) ................................................. 5, 10, 13, 21

90 Fed. Reg. 29485 (July 3, 2025) ................................. 5, 6, 9, 10-16, 18, 19, 22

# **GLOSSARY**

| | |
|---|---|
| 2024 Rule | National Emission Standards for Hazardous Air Pollutants: Integrated Iron and Steel Manufacturing Facilities Technology Review, 89 Fed. Reg. 23294 (Apr. 3, 2024) |
| Air toxics | Hazardous air pollutants |
| APA | Administrative Procedure Act, 5 U.S.C. § 551-59 |
| EPA | U.S. Environmental Protection Agency |
| Interim Final Rule | National Emission Standards for Hazardous Air Pollutants: Integrated Iron and Steel Manufacturing Facilities Technology Review: Interim Final Rule, 90 Fed. Reg. 29485 (July 3, 2025) |
| The Act | Clean Air Act, 42 U.S.C. §§ 7401–7671 |

v

**INTRODUCTION**

Congress recognized that the U.S. Environmental Protection Agency ("EPA") must sometimes promulgate rules on an expedited basis incompatible with the rulemaking requirements of the Clean Air Act ("Act"). For this reason, Congress incorporated the Administrative Procedure Act's ("APA") good-cause exception into the Act. 42 U.S.C. § 7607(d)(1). Here, EPA faced the type of urgent situation that Congress contemplated and lawfully promulgated the Interim Final Rule for good cause without notice and comment.

The Interim Final Rule applies to eight facilities producing iron and steel that are critical to national security. It extends the compliance deadlines for certain technology-based emissions standards that EPA promulgated in April 2024. After EPA set those standards, regulated entities informed the agency that some were infeasible and would create safety and national-security risks. As it promptly sought to address those feasibility concerns, EPA discovered that the standards required more substantive changes than initially anticipated. With the compliance deadlines fast approaching, EPA extended them to alleviate the pressure on regulated entities to choose between either: (A) taking risky measures in an attempt to meet infeasible standards or (B) safely operating their facilities and meeting national-security needs. Because it was impracticable to undergo notice-and-comment rulemaking before the compliance deadlines, EPA lawfully promulgated

1

the Interim Final Rule.

Accordingly, this Court should deny Petitioners' extraordinary request for summary vacatur or a stay. Not only are Petitioners wrong on the merits, but they fail to demonstrate irreparable harm to their members' health from the Interim Final Rule's extension of compliance deadlines for *technology*-based, not *health*-based, standards. A stay, moreover, would risk safety and endanger national security. Lastly, any alleged procedural error will be cured. EPA anticipates promulgating a final rule upon consideration of the comments it receives on the Interim Final Rule by October 31, 2025. Thus, this case may soon be moot.

## BACKGROUND

### I.    Statutory Background

The Act directs EPA to set emission standards for each category or subcategory of major sources and area sources of hazardous air pollutants (commonly known as "air toxics"). 42 U.S.C. § 7412(d)(1). And it requires EPA to establish a compliance date that provides for an existing source to comply "as expeditiously as practicable, but in no event later than 3 years after the effective date of such standard." *Id.* § 7412(i)(3)(A).

Once EPA promulgates initial standards for source categories, EPA reassesses them through two distinct provisions—a technology review and a risk review. Under a technology review, EPA must "revise as necessary" the standards

2

by "taking into account developments in practices, processes, and control technologies." *Id.* § 7412(d)(6). Under a risk review, EPA must ensure that relevant health risks are acceptable and that the standards provide "an ample margin of safety to protect public health." *Id.* § 7412(f)(2)(A).

When EPA sets air-toxic standards, it must generally undergo the Act's notice-and-comment rulemaking procedures. *Id.* § 7607(d)(3). However, the Act provides a good-cause exception to this requirement. *Id.* § 7607(d)(1) (citing 5 U.S.C. § 553(b)(B)). Good cause exists if the agency "finds (and incorporates the finding and a brief statement of reasons therefor[e] in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B).

## II.    Factual Background

This case concerns the integrated iron and steel source category. Currently, there are eight operating facilities in this category. 89 Fed. Reg. 23294, 23298 (Apr. 3, 2024). These facilities produce iron and steel, which are vital to the nation's manufacturing sector, public infrastructure system, and national security. Ex. 2, Cleveland-Cliffs Pet. at 3.

In 2020, EPA fulfilled its obligations under the Act, 42 U.S.C. § 7412(d), (f)(2), by issuing a risk and technology review of its existing standards for the integrated iron and steel source category. 85 Fed. Reg. 42074 (July 13, 2020). In

3

its risk review, EPA determined that risks due to emissions of air toxics from this source category were acceptable and concluded that the rule provided "an ample margin of safety to protect public health." *Id.* at 42074/1; 42 U.S.C. § 7412(f)(2)(A).

In 2024, EPA completed another technology review (the "2024 Rule") following this Court's decision in *Louisiana Environmental Action Network v. EPA,* 955 F.3d 1088 (D.C. Cir. 2020). *See* 89 Fed. Reg. at 23295/1. The 2024 Rule revised existing emission standards for certain air toxics, set standards for previously unregulated sources of air toxics, and required fenceline monitoring.[1] *Id.* at 23295/1-2, 23307/2. EPA set compliance deadlines for each standard for either one, two, or three years after the 2024 Rule's promulgation date based on EPA's consideration of the information before it at the time regarding the regulated entities' ability to expeditiously comply. *Id.* at 23314/3 & tbl. 5.

In June 2024, EPA received administrative petitions for reconsideration, including from regulated entities. Ex. 2, Cleveland-Cliffs Pet.; Ex. 3, U.S. Steel Pet. The regulated entities' petitions emphasized the importance of feasible standards for reliable iron and steel production to support national infrastructure and national-security needs, particularly for applications in the defense industry,

---

[1] The standards mentioned in this brief refer to those set by the 2024 Rule, unless otherwise stated.

homeland security, and critical infrastructure, and raised compliance challenges with several standards in the 2024 Rule. *See, e.g.*, Ex. 2, Cleveland-Cliffs Pet. at 3, 18-40. They also identified safety concerns with attempting to comply with these provisions as written. *See id.*

In August 2024, EPA issued a letter stating that it was granting discretionary reconsideration of three standards and would issue a correction notice to address others. Ex. 4, 2024 Reconsideration Letter. Additionally, "[g]iven the large amount of complex data involved," EPA committed to continue reviewing the petitions to determine whether other issues should be reconsidered. *Id.*

In conducting this review, EPA determined in March 2025 that four standards warranted mandatory reconsideration under 42 U.S.C. § 7607(d)(7)(B). *See* 90 Fed. Reg. 14207, 14208/1-2 (Mar. 31, 2025). Considering the need for additional time for mandatory reconsideration, EPA issued a 90-day administrative stay of the standards with 2025 compliance deadlines until July 1, 2025. *Id.* at 14208/3; 42 U.S.C. § 7607(d)(7)(B).

Upon further evaluation, EPA determined that the standards under reconsideration could not be implemented as written by their compliance deadlines and that a correction notice could not sufficiently address any reconsidered standard. *See* 90 Fed. Reg. 29485, 29488/3 (July 3, 2025). Recognizing that it would be unable to remedy those problems through standard rulemaking

procedures before the compliance deadlines and that the infeasible standards raised safety and national-security concerns, EPA promulgated the Interim Final Rule in July 2025, which extended those infeasible standards' compliance deadlines to April 3, 2027. *Id.* at 29488/1-3. EPA also extended the compliance deadline for fenceline monitoring to align with the other extensions. *Id.* at 29489/1. These extensions alleviate the safety and national security concerns by allowing critical industries to operate while EPA addresses the infeasible standards through substantive rulemaking. The table below provides the initial and extended compliance deadlines for the relevant standards.

| Standard | Initial Compliance Date | Extended Compliance Date |
|---|---|---|
| Opacity limits for planned openings of bleeder valves | April 3, 2025 | April 3, 2027 |
| Work practice standards for bell leaks | April 3, 2025 | April 3, 2027 |
| Opacity monitoring frequency for furnaces | April 3, 2025 | April 3, 2027 |
| Work practice standards and operational limits for unplanned bleeder valve openings | April 3, 2026 | April 3, 2027 |
| Work practice standards for beaching | April 3, 2026 | April 3, 2027 |
| Opacity limit for slag processing activities | April 3, 2026 | April 3, 2027 |
| Fenceline monitoring for chromium | 1 year after promulgation of fenceline method or April 3, 2026, whichever is later | 1 year after promulgation of fenceline method or April 3, 2027, whichever is later |

6

## STANDARD OF REVIEW

This Court "rarely" grants summary vacatur and only when the merits are "so clear, plenary briefing, oral argument, and the traditional collegiality of the decisional process would not affect [the Court's] decision." D.C. Cir. Handbook of Practice & Internal Procedures at 36 (citation omitted).

Relatedly, a stay "is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). Petitioners must establish that: (1) they are likely to succeed on the merits; (2) they will be imminently and irreparably injured absent a stay; (3) a stay will not injure other parties; and (4) a stay would be consistent with the public interest. *Nken v. Holder*, 556 U.S. 418, 434 (2009). Where, as here, the Government is the opposing party, the final two factors merge. *Id.* at 436.

## ARGUMENT

### I.    Petitioners are not entitled to summary vacatur.

This Court should deny Petitioners' extraordinary request for summary vacatur because EPA lawfully determined that notice-and-comment rulemaking for the Interim Final Rule was "impracticable." 5 U.S.C. § 553(b)(B); *see also* 42 U.S.C. § 7607(d)(1).

An agency satisfies the impracticability standard if it finds and explains why

7

there is an imminent safety or national-security concern that cannot await the rulemaking process. *Jifry v. FAA*, 370 F.3d 1174, 1179-80 (D.C. Cir. 2004). This Court "review[s] de novo the agency's legal conclusion that good cause exists" but "defer[s] to its factual findings unless they are arbitrary and capricious." *Tri-Cnty. Tel. Ass'n v. FCC*, 999 F.3d 714, 719 (D.C. Cir. 2021). Thus, the Court's review of the agency's factual finding underpinning its good-cause conclusion is "narrow." *Motor Vehicle Mfr. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). It evaluates whether the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation," and will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.*

EPA lawfully invoked the good-cause exception. The record demonstrates EPA's diligent evaluation of the issues raised in the reconsideration petitions and reasoned determination that several standards were infeasible or unworkable. By the time EPA discovered the extent of the issues that required fixing, regulated entities faced impending compliance deadlines for infeasible standards, which jeopardized safety and national security. Given the timing and these risks, it was impracticable for EPA to undergo notice-and-comment rulemaking before the standards' compliance deadlines. Thus, based on "consideration of all the reconsideration issues, the parties' petitions for reconsideration, and further discussion with stakeholders," EPA lawfully invoked the good-cause exception in

8

the Interim Final Rule.  90 Fed. Reg. at 29488/1.

A.    **EPA reasonably determined that the standards were infeasible or unworkable.**

The Interim Final Rule extends compliance deadlines for seven standards, each of which rests on stand-alone determinations and is severable.  90 Fed. Reg. at 29488/2-89/3; 89 Fed. Reg. at 23314/2.  EPA's explanations for why these standards are infeasible or unworkable fall within three categories.

In one category are standards whose broad regulatory text imposed more stringent requirements than the data showed was feasible.  Take for example the opacity limit for planned bleeder valve openings.  A bleeder valve relieves pressure that builds up in a furnace.  89 Fed. Reg. at 23298/1-2.  For planned openings, operators typically have time to prepare, take steps to mitigate emissions from such events, and measure the exhaust plume's opacity (an indicator of air-toxic emissions).  *See* Ex. 2, Cleveland-Cliffs Pet. at 23.  However, operators may need to quickly relieve pressure without advance planning to prevent a catastrophic explosion.  *See id.* at 20, 23.  In those situations, they may be unable to implement the necessary practices to limit opacity.  *See id.* at 23-24; 90 Fed. Reg. at 29488/2.  The 2024 Rule defined planned bleeder valved openings broadly as *any* operator-initiated opening, irrespective of lead time for the opening.  40 C.F.R. § 63.7852.  Yet as newly analyzed data showed, when a valve must be opened quickly, operators cannot implement the necessary work practices to achieve the 2024

9

Rule's opacity limit.  90 Fed. Reg. at 29488/2; Ex. 2, Cleveland-Cliffs Pet. at 23-24.  Thus, EPA reasonably concluded that regulated entities could not feasibly comply with the opacity limits for planned bleeder valves as written.  90 Fed. Reg. at 29488/2.  EPA came to similar conclusions regarding the feasibility of work practice standards and operational limits for unplanned bleeder valve openings, work practice standards for bell leaks, and monitoring frequency for furnaces.  *Id.* at 29488/2-3.

For standards in the second category—work practice standards for beaching and opacity limits for slag processing activities—EPA determined that new or newly understood information revealed that complying with the standards was not feasible.  *Id.* at 29488/3.  Petitioners focus on slag processing.  Mot. at 16-17.  The 2024 Rule set a 10% opacity limit for numerous slag processing activities based on data from only *some* covered activities, which showed that *most* opacity readings were below 10%.  Ex. 1, 2024 Rule Response to Comments at 94-95; Ex. 3, U.S. Steel Pet. at 13.  However, regulated entities submitted new data demonstrating that the 10% opacity limit was unachievable for the broader scope of slag processing activities, including slag pit filling, covered by the 2024 Rule.  Ex. 2, Cleveland-Cliffs Pet. at 34-35; *id.*, Att. A at 21, 23 (providing opacity data for slag pit filling that continuously exceed 10%); *see also* 90 Fed. Reg. at 14208/2.  Based on such "new data," EPA reasonably determined that the opacity limit was

10

infeasible, 90 Fed. Reg. at 29488/3, and did not unreasonably change its position. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513-14 (2009) (holding that an agency reasonably changes its position if its explanation can "reasonably be discerned" by the record); *contra* Mot. at 16-17.

In the last category is fenceline monitoring. EPA determined that this monitoring was no longer workable because of the issues surrounding the other standards detailed above. Fenceline monitoring measures emissions at the perimeter of a facility to "ensur[e] that . . . standards . . . are achieving the anticipated reductions." 90 Fed. Reg. at 29487/2; *see also* 89 Fed. Reg. at 23307/1. But it is unreasonable to monitor a facility's compliance with standards covered by the Interim Final Rule that are not yet implemented. Thus, EPA reasonably extended the compliance deadline for fenceline monitoring for "consistency" with the other extended standards. 90 Fed. Reg. at 29489/1.

In any event, prior notice and comment was not required for this clerical adjustment, which realigned the fenceline-monitoring deadline by the same interval of time as in the 2024 Rule. *Appalachian Power Co. v. EPA*, 251 F.3d 1026, 1039 (D.C. Cir. 2001) (holding that notice and comment were not required for "fixes to technical errors" that do not "evince a change in policy or methodology" because petitioners had the opportunity to comment on the original policy or methodology). EPA originally set a deadline of one year after

11

promulgation of a test method or April 2026, whichever is later. 89 Fed. Reg. at 23306/3. When EPA issued the Interim Final Rule in July 2025, there was "no operational deadline" because EPA had not promulgated a test method. 90 Fed. Reg. at 29489/1. EPA simply shifted the deadline—to one year after promulgation of a test method or April 2027, whichever is later—to realign with the other standards' revised 2027 deadlines. *Id.* Because EPA preserved the coordinated timeframe for fenceline monitoring, on which Petitioners had ample opportunity to comment, notice-and-comment rulemaking was not required to extend this deadline. *Appalachian Power*, 251 F.3d at 1039.

In short, EPA reasonably determined that the compliance deadlines for the standards required extensions because the standards were infeasible or unworkable.

**B.      EPA diligently evaluated the issues before it and invoked the good-cause exception to prevent imminent safety and national-security concerns.**

EPA promulgated the Interim Final Rule based on thorough and continuous evaluation of "all the reconsideration issues, the parties' petitions for reconsideration, and further discussion with stakeholders." 90 Fed. Reg. at 29488/1. In doing so, EPA lawfully invoked the good-cause exception to prevent imminent safety and national-security concerns.

In June 2024, regulated entities documented compliance concerns with certain standards. *See id.* at 29487/3. EPA promptly acted and granted

12

discretionary reconsideration two months later, initially believing that most concerns could be resolved through a correction notice. *See id.*

However, upon continued evaluation of the petitions and after receiving additional information, EPA in March 2025 determined that several standards were infeasible as promulgated and would require substantial analysis and revision—beyond a simple correction notice—to fix. *See id.* at 29487/3-88/3; *see also* 90 Fed. Reg. at 14208/2. To address those issues, EPA stayed the 2025 compliance deadlines for the infeasible standards to July 2025. 90 Fed. Reg. at 14208/3. However, EPA was unable to address them before the impending deadlines through standard rulemaking procedures.

Thus, as a last resort, EPA promulgated the Interim Final Rule in July to alleviate regulated entities from the impending deadlines to comply with infeasible standards, which implicate safety and national-security concerns. 90 Fed. Reg. at 29489/2 (noting that regulated entities face "compliance challenges that must be resolved before [they] will be able to comply with many [standards]"). As regulated entities emphasized in their petitions, feasible standards are necessary given the "strategic importance" of iron and steel on "national security, particularly for applications in the defense industry, homeland security, and critical infrastructure." Ex. 2, Cleveland-Cliffs Pet. at 3, 39, 41-43. Indeed, they included a bipartisan congressional letter urging EPA to set feasible standards to not

13

"dramatically undermine the domestic steel industry and national security." *Id.*, Att. G.

Regulated entities also raised several safety concerns. For example, they explained that challenges with complying with the bleeder valve opening provisions "discourage[d] the opening of bleeder valves necessary to manage pressure and prevent a catastrophic explosion." *Id.* at 20. And they explained that for certain slag activities, measuring opacity would subject workers to unsafe conditions given that those activities are frequently conducted with moving railcars and in low visibility areas. Ex. 3, U.S. Steel Pet. at 14; *id.*, Att. B, Mangahas Decl. ¶ 7.

Simply put, EPA had to extend the standards' compliance deadlines before they came to pass. If EPA failed to do so, regulated entities would have had to: (A) attempt to meet infeasible standards at the risk of their employees' safety and disrupting iron and steel production, or (B) safely operate their facilities and meet production needs to support national security. EPA thus promulgated the Interim Final Rule to redress this dangerous situation—the Rule "allow[s] sufficient time to address the issues [raised by regulated entities]." 90 Fed. Reg. at 29489/1. In doing so, EPA lawfully invoked the good-cause exception because EPA could not undergo notice-and-comment rulemaking before regulated entities faced the impending compliance deadlines.

14

Petitioners' two contrary arguments ignore the factual record. First, EPA did not wait until the last minute to promulgate the Interim Final Rule while invoking the good-cause exception. Mot. at 9-12. Rather, like in *Tri-County*, EPA continuously evaluated the highly technical issues before it and appropriately acted based on its assessment at the time. 999 F.3d at 720. In *Tri-County*, this Court held that an agency did not unjustifiably delay its invocation of the good-cause exception because the agency took immediate action after an emergency and invoked the exception when it determined another action was required to fully redress the emergency. *Id.* Likewise, EPA promptly granted discretionary reconsideration upon initially reviewing the reconsideration petitions, believing that a notice correction would be sufficient to address serval issues. 90 Fed. Reg. at 29487/3. However, as explained above, EPA's assessment of the issues raised in the petitions evolved over time, and EPA took appropriate measures at each step. *See id.* at 29487/3-88/1. When EPA determined the extent of the issues and how to redress them, EPA lacked time to undergo notice-and-comment rulemaking before regulated entities would be subject to the impending compliance deadlines for the infeasible standards that implicated imminent safety and national-security concerns.

Second, EPA did not exceed its authority under the Act to postpone the effectiveness of a rule under reconsideration for up to 90 days. Mot. at 13, 14

15

(citing 42 U.S.C. § 7607(d)(7)(B), *Air All. Hous. v. EPA*, 906 F.3d 1049 (D.C. Cir. 2018)).  Unlike in *Air Alliance*, EPA did not extend compliance deadlines "only" for the purpose of "conduct[ing] reconsideration proceedings."  906 F.3d at 1060. Rather, as explained above, EPA extended the deadlines for the infeasible standards that "pose compliance challenges" and implicate safety and national-security concerns.  90 Fed. Reg. at 29489/2.  EPA promulgated the Interim Final Rule for reasons beyond allowing more time for reconsideration.

*     *     *

Upon consideration of "all" the issues before it, EPA lawfully concluded that it was impracticable to undergo notice-and-comment rulemaking because the time to go through that process would leave regulated entities with infeasible standards that raise imminent safety and national-security concerns.  90 Fed. Reg. at 29488/1; *id.* at 29489/2-3; *Jifry*, 370 F.3d at 1179-80 (holding that agency's imminent air-traffic safety concerns satisfied the Act's good-cause exception).  In any event, any alleged procedural error will soon be cured.  At Petitioners' request, EPA held a public hearing on September 3, 2025.  Att. A, Szabo Decl. ¶¶ 7-8. Based on that hearing (at which Petitioners testified) and the comments EPA receives on the Interim Final Rule (including Petitioners' already-submitted comments), EPA plans to issue a final rule by October 31, 2025.  *Id.* ¶ 9.  Thus, Petitioners' alleged procedural argument may soon be moot.  *Little Sisters of the*

16

*Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 685-86 & n.14 (2020) (declining to reach Petitioners' argument that the agency unlawfully invoked the good-cause exception because the agency subsequently satisfied the applicable rulemaking requirements).

At the very least, Petitioners fail to demonstrate that the merits of their petition are "so clear" to justify skipping the normal procedural process. D.C. Cir. Handbook of Practice & Internal Procedures at 36 (2025). As demonstrated above, this case turns on complex, technical questions regarding the standards, safety and feasibility concerns with compliance, and the imminent need for EPA to extend the compliance deadlines to prevent safety and national-security risks. Thus, this case squarely presents issues that would benefit from the "plenary briefing, oral argument, and the traditional collegiality of the decisional process." *Id.*

## II.    Petitioners are not entitled to a stay.

Petitioners fail to meet their heavy burden for their extraordinary stay request. *Mazurek*, 520 U.S. at 972. They are unlikely to prevail on the merits because their arguments are premised on factual and legal errors. They have not shown how extending the compliance deadline for *technology*-based, not *health*-based standards, irreparably harms their health. And staying the Interim Final Rule raises safety and national-security concerns.

17

### A.    Petitioners are unlikely to succeed on the merits.

Petitioners are unlikely to prevail on their two merits arguments. First, as explained above, EPA lawfully invoked the good-cause exception here. *See supra* Arg. I; *contra* Mot. at 12-14. Second, in doing so, EPA reasonably extended the compliance deadlines consistent with the Act's requirements, which directs EPA to establish compliance deadlines that "provide for compliance as expeditiously as practicable, but in no event later than 3 years after the effective date of such standard." 42 U.S.C. § 7412(i)(3)(A); *contra* Mot. at 14-15.

Here, EPA promulgated the standards on April 3, 2024. 89 Fed. Reg. at 23294/1. In their reconsideration petitions, regulated entities explained that if the infeasible standards remain, it will take *more* than three years to (a) find solutions to comply with these requirements, (b) test those solutions to ensure they are sufficient, and (c) implement them. Ex. 2, Cleveland Cliffs Pet., Att. C, Palmer Decl. ¶¶ 9-10; Ex. 3, U.S. Steel Pet., Piscitelli Decl. ¶¶ 39-40. Based on that information, EPA reasonably determined that regulated entities could have difficulty complying by even the Act's three-year compliance-deadline cap. 90 Fed. Reg. at 29488/3. Yet EPA complied with the Act's requirement and extended compliance deadlines to April 3, 2027, which is "no [] later than 3 years after the effective date" of the 2024 Rule. 42 U.S.C. § 7412(d)(10), (i)(3)(A); 90 Fed. Reg. at 29488/1.

18

Petitioners' three contrary arguments ignore EPA's rationale and lack merit. First, the Act does not require EPA to expressly use the phrase "as expeditiously as practicable" or cite Section 7412(i)(3)(A). Mot. at 14. To survive arbitrary-and-capricious review, EPA simply needs to "examine the relevant data and articulate a satisfactory explanation," which, as explained above, EPA did here. *State Farm*, 463 U.S. at 43. Second, EPA did not set a deadline for the agency to complete its reconsideration process. Mot. at 14-15. EPA set compliance deadlines for regulated entities. *See supra* Arg. I. Lastly, EPA reasonably extended the compliance deadline for fenceline monitoring for the reasons explained above. *Contra* Mot. at 15; *see supra* Arg. I.A.; 90 Fed. Reg. at 29487/2, 29489/1.

**B.    Petitioners fail to demonstrate irreparable harm.**

A showing of irreparable harm "has always" been a prerequisite to issuing a stay. *Sampson v. Murray*, 415 U.S. 61, 88 (1974). A movant's failure to show any irreparable harm is sufficient grounds for refusing to issue a stay. *Olu-Cole v. E.L. Haynes Pub. Charter Sch.*, 930 F.3d 519, 529 (D.C. Cir. 2019).

Further, "the degree of proof required for irreparable harm is high." *Id.* (quotation omitted). Movants must show that their injury is certain, great, and imminent, creating "a clear and present need for equitable relief." *Id.* (quotation omitted).

Petitioners failed to demonstrate the Interim Final Rule's delay of air-toxic

reductions irreparably harms their members' health.  Mot. at 18-19.  In fact, they cannot make this demonstration because the public is sufficiently protected by the standards that were in place *before* the 2024 Rule.  In 2020, EPA conducted a risk review, assessed facility-wide air-toxic emission estimates, including those from regulated and unregulated sources at integrated iron and steel facilities, and concluded that the then-standards "provide[d] an ample margin of safety to protect public health."  85 Fed. Reg. at 42074/1; 42 U.S.C. § 7412(f)(2); Ex. 5, Development of Emissions Estimates for Risk Assessment at 1.  EPA then conducted a technology review and set more stringent *technology-based* standards in the 2024 Rule.  89 Fed. Reg. at 23299/1.  Although it also set some new standards, EPA already accounted for unregulated sources of air-toxic emissions in its 2020 risk review.  *See generally* Ex. 5, Development of Emissions Estimates for Risk Assessment.  Thus, even without the standards covered by the Interim Final Rule, regulated entities will still be subject to standards that EPA has determined provide "an ample margin of safety to protect public health." 42 U.S.C. § 7412(f)(2)(A).

Petitioners' focus on health harms from lead emissions underscores this point. Mot. at 18.  EPA declined to promulgate fenceline monitoring for lead in the 2024 Rule because even the highest monitored lead levels at the fenceline were found to be five times lower than the air quality standards for lead.  89 Fed. Reg. at

20

23307/1.

In any event, Petitioners overstate the air-toxic reductions estimated by the 2024 Rule. Any reductions under the 2024 Rule must be considered in the context of *all* air-toxic emissions from regulated facilities to which member-declarants are exposed. As Petitioners note, the eight regulated facilities collectively emit approximately 600 tons of air toxics per year. *See* Mot. at 2. If the 2024 Rule were implemented, these facilities were anticipated to reduce their air-toxic emissions by 64 tons per year (approximately 10%) by 2027. *See id.* at 8. Petitioners fail to demonstrate how the Interim Final Rule's delay of this relatively small amount of air-toxics reductions irreparably harms their members. *Cf. NRDC v. EPA*, No. 04-1438, 2005 WL 5394743, *9-10 (D.C. Cir. Feb. 3, 2005) (arguing that petitioner failed to show irreparable injury by asserting harm from any increase in a pollutant's emissions); *see id.*, Doc. No. 880556 (denying stay).

Lastly, Petitioners' own litigation delays belie their irreparable-harm claim. *See Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975). When EPA issued a 90-day administrative stay of the compliance deadlines on March 31, 2025, Petitioners waited 46 days to challenge that action. *See* 90 Fed. Reg. 14207 (Mar. 31, 2025) (administrative stay); Petition, *Gary Advocs. for Responsible*

21

*Develop. v. EPA*, No. 25-1128 (D.C. Cir. May 16, 2025), Doc. No. 2116297.[2]

They then waited 25 days to challenge the Interim Final Rule and an additional 2 days to seek extraordinary relief. *See* 90 Fed. Reg. 29485 (July 3, 2025) (rule); Doc. No. 2127735 (July 28, 2025) (petition); Doc. No. 2127933 (July 30, 2025) (motion). Petitioners further delayed by obtaining an extension to file their reply brief to attend their company meeting. Doc. No. 2130938. Petitioners' weeks-long delay in seeking relief undermines their irreparable-harm claim. *See Fund for Animals*, 530 F.2d at 987 (holding that movants' 44-day delay in bringing action was "inexcusable"); *Fontem US, LLC v. FDA*, No. 22-1076, 2022 WL 2761393, *1 (D.C. Cir. July 12, 2022) (holding that movant's two-month delay in seeking emergency relief weakened its claim of irreparable harm).

Because Petitioners have failed to demonstrate that their members would be irreparably harmed absent a stay, this Court should deny their stay motion.

**C.    The balance of equities and public interest disfavor a stay.**

A stay would cause more public harm than good. It would immediately subject regulated entities to severe compliance challenges that raise safety

---

[2] Even prior to the administrative stay, EPA publicly shared that it may extend several compliance deadlines set by the 2024 Rule. *See* EPA, Trump EPA Announces Reconsideration of Air Rules Regulating American Energy, Manufacturing, Chemical Sectors (NESHAPs), (Mar. 12, 2025), https://www.epa.gov/newsreleases/trump-epa-announces-reconsideration-air-rules-regulating-american-energy-manufacturing.

22

concerns at their facilities, disrupt iron and steel production, and endanger national security. *See supra* Arg. I.

Petitioners erroneously balance the equities based on information available when the 2024 Rule was promulgated. Mot. at 20-23. New information and analysis, which led to the Interim Final Rule, shifts the balance. On harm, Petitioners wrongly assert that regulated entities can comply with the 2024 Rule's standards and that compliance costs are minimal. *Id.* at 21-23. But as explained above, new information revealed the compliance challenges with the standards that are covered by the Interim Final Rule. *See supra* Arg. I.A. EPA's previously estimated compliance costs are no longer applicable, as EPA did not consider those challenges to compliance that regulated entities later raised. Thus, the harms are more significant than Petitioners contend.

Petitioners' asserted public-health benefits are also based on the then-reasonable assumption that the standards were feasible. Mot. at 20-21. That is no longer the case. Further, as explained in Argument II.B., EPA did not promulgate the 2024 Rule to protect public health. Thus, the public-health benefits from the 2024 Rule's standards are marginal and outweighed by the significant harms detailed above.

### D.     Any remedy should be limited.

If the Court determines a stay is appropriate, the Court should limit

23

injunctive relief to only those four facilities from which Petitioners have alleged harm. Any injunctive relief "must be tailored to redress the [petitioners'] particular injury." *Gill v. Whitford*, 585 U.S. 48, 73 (2018); *see also Trump v. CASA, Inc.*, 145 S.Ct. 2540, 2562-63 (2025) (staying injunctive relief "to the extent that the injunctions are broader than necessary to provide complete relief").

Here, Petitioners have identified only four members who have alleged health harms from a specific integrated steel and iron facility that would allegedly be redressed by a stay. *See* Mot., Exs. 11-13, 15. Accordingly, any injunctive relief must be limited to those four facilities that purportedly harm identified members' health.

## CONCLUSION

For the foregoing reasons, the Court should deny Petitioners' motion.

24

DATED: September 8, 2025

Respectfully submitted,

ADAM R.F. GUSTAFSON
Acting Assistant Attorney General
ROBERT N. STANDER
*Deputy Assistant Attorney General*

OF COUNSEL:

ERIKA GERSTENBERGER
U.S. Environmental Protection Agency
Office of General Counsel
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

*/s/ Mario A. Luna*
MARIO A. LUNA
U.S. Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044
Phone: (202) 532-3357
Email: Mario.Luna@usdoj.gov

*Counsel for Respondents*

25

## CERTIFICATE OF COMPLIANCE UNDER FED. R. APP. P. 27

I hereby certify that this document complies with the type-volume limitation of Fed. R. App. P. 27 because this filing contains 5,197 words, excluding the parts of the filing that are exempt under applicable rules. This filing complies with the typeface requirements of Fed. R. App. P. 27 and 32(a)(5) and the typeface style requirements of Fed. R. App. P. 32(a)(6), because the filing was prepared in proportionally spaced typeface using Microsoft Word 14-point Times New Roman type.

So certified on September 8, 2025.

/s/ Mario A. Luna
MARIO A. LUNA

*Counsel for Respondents*

26

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of said filing to the attorneys of record for Petitioners and all other parties who have registered with the Court's CM/ECF system.

So certified on September 8, 2025.

/s/ Mario A. Luna
MARIO A. LUNA
*Counsel for Respondents*

27

# Attachment A

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA**

_____

)
Clean Air Council, et al.,                            )
                                                      )
            *Petitioner*,                             )
                                                      )
       v.                                             )            No. 25-1163
                                                      )
United States Environmental Protection                )
Agency, et al.,                                       )
                                                      )
            *Respondents*.                            )
_____)

**DECLARATION OF AARON SZABO**

I, Aaron Szabo, under penalty of perjury, affirm and declare that the following statements are true and correct to the best of my knowledge and belief, and are based on my own personal knowledge or on information contained in the record of the United States Environmental Protection Agency (EPA or the Agency) or supplied to me by EPA employees under my supervision.

1.      I am the Assistant Administrator for the United States Environmental Protection Agency Office of Air and Radiation (OAR), which is located at 1200 Pennsylvania Avenue, NW, Washington D.C. 20460.

2.      Prior to joining EPA, I served as a federal civil servant, first at the Nuclear Regulatory Commission, where I worked on nuclear power plant issues and regulations, and then at the White House Office of Information and Regulatory

1

Affairs, where I worked on major climate and air regulations. I continued my career civil service as the Senior Counsel at the Council on Environmental Quality, where my role expanded to include the National Environmental Policy Act and federal sustainability issues. I hold degrees in economics, government, and politics from the University of Maryland, College Park, and a law degree from George Washington University Law School.

3.      OAR is the EPA office with primary responsibility for administration of the Clean Air Act. As the Assistant Administrator for OAR, I serve as the principal advisor to the Administrator on matters pertaining to air and radiation programs and am responsible for managing these programs, including: policy development and evaluation; development of emissions standards; policy guidance and overview; and technical support and evaluation of regional air and radiation program activities.

4.      Through my role as Assistant Administrator for OAR, I am familiar with the development and implementation of EPA programs, policies, and regulations under the Clean Air Act. As part of my duties, I oversee the development and implementation of regulations, policy, and guidance under section 112 of the Clean Air Act, 42 U.S.C. § 7412, including regulating hazardous air pollutants emitted by major sources and area sources.

5.      The purpose of this declaration is to provide the Court with information and context for EPA's interim final rule entitled, "National Emission Standards for

Hazardous Air Pollutants: Integrated Iron and Steel Manufacturing Facilities Technology Review: Interim Final Rule," 90 Fed. Reg. 29485 (July 3, 2025) ("Interim Final Rule").

6.      This declaration is filed in support of EPA's Response to Petitioners' Motion for Summary Vacatur or, in the Alternative, a Stay Pending Judicial Review.

7.      On July 7, 2025, counsel for Petitioners in this action, Earthjustice, requested a public hearing (Docket ID No. EPA–HQ–OAR–2002–0083-1998), which EPA granted, 90 Fed. Reg. 39,333 (Aug. 15, 2025); 90 Fed. Reg. 40975 (Aug. 22, 2025). EPA also extended the public comment period for the Interim Final Rule to October 2, 2025 (*Id.*), and Petitioners have submitted comments (Docket ID No. EPA-HQ-OAR-2002-0083-2015).

8.      EPA held a virtual public hearing on the Interim Final Rule on September 3, 2025, that Petitioners attended and where Petitioners provided oral testimony (https://www.youtube.com/live/nZFhAfSIKss).

9.      Once the comment period closes, EPA intends to expeditiously evaluate and respond to significant written public comments and hearing testimony on the Interim Final Rule. EPA intends to sign a final rule by October 31, 2025.

10.     Additionally, EPA is currently undertaking a thorough reconsideration process to ensure that the emission standards for the integrated iron and steel source category are both protective and achievable. The reconsidered standards will be

3

developed and promulgated via notice-and-comment rulemaking, and EPA intends to take final action on the reconsideration in 2026.

11.　　I certify that the record documents contained in the Respondents' Opposition to Motion for Summary Vacatur or, in the Alternative, a Stay Pending Judicial Review, are true and correct copies:

    a.　Attached as Exhibit 1 is a true and correct copy of the Summary of Public Comments and Responses for Amendments to the NESHAP for Integrated Iron and Steel Manufacturing Facilities prepared by EPA for the final rule National Emissions Standards for Hazardous Air Pollutants: Integrated Iron and Steel Manufacturing Facilities Technology Review. 89 Fed. Reg. 23294 (Apr. 3, 2024).

    b.　Attached as Exhibit 2 is a true and correct copy of the June 3, 2024, *Petition for Reconsideration and Request for Administrative Stay of the National Emissions Standards for Hazardous Air Pollutants: Integrated Iron and Steel Manufacturing Facilities Technology Review*, 89 Fed. Reg. 23294 (Apr. 3, 2024), submitted by Squire Patton Boggs on behalf of Cleveland-Cliffs, Inc.

    c.　Attached as Exhibit 3 is a true and correct copy of the June 3, 2024, *Petition for Reconsideration and Request for Administrative Stay of the National Emissions Standards for Hazardous Air Pollutants:*

4

*Integrated Iron and Steel Manufacturing Facilities Technology Review*, 89 Fed. Reg. 23294 (Apr. 3, 2024), submitted by Squire Patton Boggs on behalf of United States Steel Corporation.

d.  Attached as Exhibit 4 is a true and correct copy of the August 14, 2024, letter from EPA to Squire Patton Boggs (on behalf of Cleveland-Cliffs, Inc. and United States Steel Corporation) and Earthjustice (on behalf of Clean Air Council, et al.) granting discretionary reconsideration of certain provisions of the final rule *National Emissions Standards for Hazardous Air Pollutants: Integrated Iron and Steel Manufacturing Facilities Technology Review*, 89 Fed. Reg. 23294 (Apr. 3, 2024).

e.  Attached as Exhibit 5 is a true and correct copy of the May 1, 2019, memorandum *Development of Emissions Estimates for Fugitive or Intermittent HAP Emission Sources for an Example II&S Facility for input to the RTR Risk Assessment* submitted by EPA for the final rule *National Emission Standards for Hazardous Air Pollutants: Integrated Iron and Steel Manufacturing Facilities Residual Risk and Technology Review*, 85 Fed. Reg. 42074 (July 13, 2020).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 8, 2025 in Washington, D.C.

_____

Aaron Szabo
Assistant Administrator, Office of Air and Radiation
U.S. Environmental Protection Agency

6