<u>**ORAL ARGUMENT NOT YET SCHEDULED**</u>

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

No. 25-1163

CLEAN AIR COUNCIL, *et al.*,
*Petitioners*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*,
*Respondents*.

Petition for Review of Final Administrative Action of the
United States Environmental Protection Agency

**PETITIONERS' PROOF OPENING BRIEF**

Adrienne Y. Lee
James S. Pew
Earthjustice
1001 G Street NW, Suite 1000
Washington, D.C. 20001
(202) 667-4500
alee@earthjustice.org
jpew@earthjustice.org

*Counsel for Clean Air Council, Gary
Advocates for Responsible Development,
Hoosier Environmental Council, Just
Transition Northwest Indiana, and Sierra Club*

**DATED: December 1, 2025**

<u>ORAL ARGUMENT NOT YET SCHEDULED</u>

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

|  |  |  |
|---|---|---|
| CLEAN AIR COUNCIL, *et al.*,<br><br>    *Petitioners,*<br><br>    v.<br><br>U.S. ENVIRONMENTAL PROTECTION AGENCY, *et al.*,<br><br>    *Respondents.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 25-1163 |

**PETITIONERS' CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to this D.C. Circuit Rule 28(a)(1), petitioners Clean Air Council, Gary Advocates for Responsible Development, Hoosier Environmental Council, Just Transition Northwest Indiana, and Sierra Club submit this Certificate as to Parties, Rulings, and Related Cases.

**(A) Parties and *Amici***

   **(i) Parties, Intervenors, and *Amici* Who Appeared in the District Court**

This case is a petition for review of final agency action, not an appeal from the ruling of a district court.

   **(ii) Parties to this Case**

Petitioners:

Petitioners are Clean Air Council, Gary Advocates for Responsible Development, Hoosier Environmental Council, Just Transition Northwest Indiana, and Sierra Club.

Respondents:

Respondents are the United States Environmental Protection Agency ("EPA") and Lee Zeldin, in his official capacity as Administrator of the EPA.

Intervenors:

Intervenors are United States Steel Corporation, Cleveland-Cliffs Inc., and American Iron and Steel Institute.

**(iii) *Amici* in this Case**

None at present.

**(iv) Circuit Rule 26.1 Disclosures**

See Petitioners' disclosure statement filed herewith.

**(B) Rulings Under Review**

Petitioners seek review of the final action taken by EPA in the final rule entitled "National Emission Standards for Hazardous Air Pollutants: Integrated Iron and Steel Manufacturing Facilities Technology Review: Interim Final Rule" and published at 90 Fed. Reg. 29485 (July 3, 2025).

**(C) Related Cases**

None at present.

Dated: December 1, 2025

Respectfully submitted,

*/s/ Adrienne Y. Lee*
Adrienne Y. Lee
James S. Pew
Earthjustice
1001 G Street NW, Suite 1000
Washington, D.C. 20001
(202) 667-4500
alee@earthjustice.org
jpew@earthjustice.org

*Counsel for Petitioners*
*Clean Air Council, Gary Advocates for*
*Responsible Development, Hoosier*
*Environmental Council, Just Transition*
*Northwest Indiana, and Sierra Club*

<u>**ORAL ARGUMENT NOT YET SCHEDULED**</u>

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| CLEAN AIR COUNCIL, *et al.*,<br><br>    *Petitioners*,<br><br>    v.<br><br>U.S. ENVIRONMENTAL<br>PROTECTION AGENCY, *et al.*,<br><br>    *Respondents*. | Case No. 25-1163 |

**RULE 26.1 DISCLOSURE STATEMENT**

Pursuant to Federal Rules of Appellate Procedure 26.1 and 28(a)(1), and D.C. Circuit Rule 26.1, Clean Air Council, Gary Advocates for Responsible Development, Hoosier Environmental Council, Just Transition Northwest Indiana, and Sierra Club make the following disclosures:

**Clean Air Council**

<u>Non-Governmental Corporate Party to this Action</u>: Clean Air Council ("CAC").

<u>Parent Corporations</u>: None.

<u>Publicly Held Company that Owns 10% or More of Party's Stock</u>: None.

<u>Party's General Nature and Purpose</u>: CAC is a nonprofit corporation organized and existing under the laws of the Commonwealth of Pennsylvania. As an

environmental health advocacy organization, CAC is focused on protecting people's health from the harmful impacts of pollution.

## Gary Advocates for Responsible Development

Non-Governmental Corporate Party to this Action: Gary Advocates for Responsible Development ("GARD").

Parent Corporations: None.

Publicly Held Company that Owns 10% or More of Party's Stock: None.

Party's General Nature and Purpose: GARD is a nonprofit corporation organized and existing under the laws of the State of Indiana. GARD is dedicated to promoting economic development in the City of Gary that prioritizes environmental sustainability.

## Hoosier Environmental Council

Non-Governmental Corporate Party to this Action: Hoosier Environmental Council ("HEC").

Parent Corporations: None.

Publicly Held Company that Owns 10% or More of Party's Stock: None.

Party's General Nature and Purpose: HEC is a nonprofit corporation organized and existing under the laws of the State of Indiana. HEC is Indiana's largest environmental public policy organization, working to improve people's health, the

economy, and the environment for forty years, through education, technical assistance, and advocacy.

## Just Transition Northwest Indiana

Non-Governmental Corporate Party to this Action: Just Transition Northwest Indiana.

Parent Corporations: None.

Publicly Held Company that Owns 10% or More of Party's Stock: None.

Party's General Nature and Purpose: JTNWI is a nonprofit corporation organized and existing under the laws of the State of Indiana. JTNWI educates and organizes Northwest Indiana communities and workers to support a just transition to a regenerative economy that protects the environment, climate, and future generations.

## Sierra Club

Non-Governmental Corporate Party to this Action: Sierra Club.

Parent Corporations: None.

Publicly Held Company that Owns 10% or More of Party's Stock: None.

Party's General Nature and Purpose: Sierra Club is a nonprofit corporation organized and existing under the laws of the State of California, dedicated to the protection and enjoyment of the environment.

Dated:          December 1, 2025          Respectfully submitted,

_/s/ Adrienne Y. Lee_
Adrienne Y. Lee
James S. Pew
Earthjustice
1001 G Street NW, Suite 1000
Washington, DC 20001
(202) 667-4500
alee@earthjustice.org
jpew@earthjustice.org

*Counsel for Petitioners
Clean Air Council, Gary
Advocates for Responsible
Development, Hoosier
Environmental Council, Just
Transition Northwest Indiana,
and Sierra Club*

## TABLE OF CONTENTS

GLOSSARY OF ACRONYMS AND ABBREVIATIONS.....................................1

JURISDICTIONAL STATEMENT ....................................................................2

STATUTES AND REGULATIONS...................................................................2

INTRODUCTION ...........................................................................................3

STATEMENT OF ISSUES ..............................................................................5

STATEMENT OF THE CASE...........................................................................6

    I.      STATUTORY BACKGROUND .............................................................6

          A.    The Clean Air Act Requires EPA to Establish Air Toxics Standards and Set Deadlines for Compliance. .................................6

          B.    The Clean Air Act Requires EPA to Provide for Public Notice and Participation. ...............................................................8

    II.     FACTUAL BACKGROUND........................................................................9

    III.   PRIOR LITIGATION AND REGULATORY BACKGROUND ............13

          A.    The 2024 Rule Establishes New Requirements to Manage Nonpoint Source Emissions. ...............................................................13

          B.    EPA Rebuffs Multiple Industry Efforts to Stay the Effectiveness of the 2024 Rule. .............................................................17

          C.    EPA Reverses Course and Delays the Compliance Deadlines for Standards Set to Go into Effect in 2025. ...........................................19

          D.    The 2025 Interim Final Rule Delays All of the 2024 Rule's 2025 and 2026 Compliance Deadlines. ...........................................21

SUMMARY OF ARGUMENT ........................................................................22

STANDARD OF REVIEW ............................................................................25

STANDING ...............................................................................................26

ARGUMENT ...............................................................................................29

    I.     EPA'S INTERIM FINAL RULE MUST BE VACATED BECAUSE EPA LACKED GOOD CAUSE TO FORGO NOTICE AND COMMENT. ...29

i

A.    Because Notice and Comment Was Not "Impracticable," EPA's Promulgation of the Interim Final Rule Violates the Clean Air Act.29

B.    EPA Lacks a Reasonable Basis to Conclude that Steel Mills Risked Being in "Immediate Noncompliance." ............................................36

II.    EPA SET NEW COMPLIANCE DEADLINES THAT ARE UNLAWFUL AND ARBITRARY AND CAPRICIOUS. .......................40

A.    EPA's Failure to Acknowledge or Apply the Statutory Test for Setting Compliance Deadlines is Unlawful and Arbitrary and Capricious. ...................................................................................40

B.    EPA's Reliance on Reconsideration Proceedings to Delay Industry Compliance Obligations is Unlawful and Arbitrary and Capricious.42

C.    EPA's Explanations for the New Compliance Deadlines Are Inadequate and Inconsistent. ............................................................43

D.    EPA Did Not Provide a Reasoned Explanation for Reversing Prior Conclusions Regarding the Feasibility of the Original Deadlines. ...45

CONCLUSION ......................................................................................................48

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT .................49

CERTIFICATE OF SERVICE .............................................................................50

ii

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Air All. Houston v. EPA*,
  906 F.3d 1049 (D.C. Cir. 2018) ................................................................40, 42, 43

*Am. Fed'n of Gov't Emps., AFL-CIO v. Block*,
  655 F.2d 1153 (D.C. Cir. 1981) ................................................................33

*Apple Inc. v. Pepper*,
  587 U.S. 273 (2019) ................................................................42

*Buschmann v. Schweiker*,
  676 F.2d 352 (9th Cir. 1982) ................................................................30

*Clean Air Council v. Pruitt*,
  862 F.3d 1 (D.C. Cir. 2017) ................................................................9

*Clean Wisconsin v. EPA*,
  964 F.3d 1145 (D.C. Cir. 2020) ................................................................29

*Coburn v. McHugh*,
  679 F.3d 924 (D.C. Cir. 2012) ................................................................44

*Consumer Energy Council of Am. v. FERC*,
  673 F.2d 425 (D.C. Cir. 1982) ................................................................32

*Council of the S. Mountains, Inc. v. Donovan*,
  653 F.2d 573 (D.C. Cir. 1981) ................................................................35

*County of Maui v. Haw. Wildlife Fund*,
  590 U.S. 165 (2020) ................................................................42

*Env't Def. Fund, Inc. v. EPA*,
  716 F.2d 915 (D.C. Cir. 1983) ................................................31, 32, 33, 36

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ................................................................45, 47

*Authorities upon which we chiefly rely are marked with asterisks*

iii

*Friends of the Earth v. Laidlaw Env't Servs.*,
    528 U.S. 167 (2000)..................................................................................29

*Jifry v. FAA*,
    370 F.3d 1174 (D.C. Cir. 2004)...............................................................35

*La. Env't Action Network v. EPA*,
    955 F.3d 1088 (D.C. Cir. 2020)..................................................................7

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024)..................................................................................26

*Mack Trucks v. EPA*,
    682 F.3d 87 (D.C. Cir. 2012) ...............................................30, 34, 35, 36

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.
    Co.*,
    463 U.S. 29 (1983)...............................................26, 40, 42, 43, 44

*Nat'l Ass'n of Farmworkers Orgs., v. Marshall*,
    628 F.2d 604 (D.C. Cir. 1980)...........................................................33, 34

*Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*,
    53 F.4th 869 (5th Cir. 2022) ...................................................................30

*Nat'l Lime Ass'n v. EPA*,
    233 F.3d 625 (D.C. Cir. 2000)....................................................................6

*NRDC v. EPA*,
    749 F.3d 1055 (D.C. Cir. 2014).................................................................29

*NRDC v. EPA*,
    777 F.3d 456 (D.C. Cir. 2014)...................................................................42

*Pub. Citizen v. Fed. Motor Carrier Safety Admin.*,
    374 F.3d 1209 (D.C. Cir. 2004)................................................................41

*SEC v. Chenery Corp.*,
    318 U.S. 80 (1943).....................................................................................41

*Sierra Club v. EPA*,
    479 F.3d 875 ...............................................................................................6

*Tennessee Gas Pipeline Co. v. FERC*,
  969 F.2d 1141 (D.C. Cir. 1992)......................................................43.

*U.S. Sugar Corp. v. EPA*,
  830 F.3d 579 (D.C. Cir. 2016)....................................................7, 35

*\*Util. Solid Waste Activities Grp. v. EPA*,
  236 F.3d 749 (D.C. Cir. 2001) ..................................................30, 36

**STATUTES**

5 U.S.C. § 553(b)(A)-(B) ...............................................................9

5 U.S.C. § 553(b)(B) ....................................................................29

5 U.S.C. § 706(2)(A), (C) ............................................................25

42 U.S.C. § 7412(i)(3)(A)...............................................6, 8, 40, 43

42 U.S.C. § 7412(d)(1).....................................................................6

42 U.S.C. § 7412(d)(3)(B) ...............................................................6

42 U.S.C. § 7412(d)(6).....................................................................7

42 U.S.C. § 7412(e)(1)(E)................................................................7

42 U.S.C. § 7412(h)(1).....................................................................7

42 U.S.C. § 7607(b)(1).....................................................................2

42 U.S.C. § 7607(d) .........................................................................5

42 U.S.C. § 7607(d)(1).....................................................................8

42 U.S.C. § 7607(d)(1)(C) ...............................................................8

42 U.S.C. § 7607(d)(3).....................................................................8

42 U.S.C. § 7607(d)(6)(B) ...............................................................8

42 U.S.C. § 7607(d)(7)(B) .....................................................9, 21, 42

42 U.S.C. § 7607(d)(9)(A), (C).......................................................25

**FEDERAL REGISTER NOTICES**

68 Fed. Reg. 27646 (May 20, 2003) ........................................................................12

89 Fed. Reg. 23294 (Apr. 3, 2024) . 1, 5, 9, 13, 14, 15, 16, 17, 18, 28, 38, 44, 45, 47

89 Fed. Reg. 62872 (Aug. 1, 2024).........................................................................38

90 Fed. Reg. 14207 (Mar. 31, 2025).........................................................................21

90 Fed. Reg. 29485 (July 3, 2025). 21, 22, 29, 31, 33, 34, 35, 37, 38, 39, 41, 42, 43, 44, 46, 47

(Page 14 of Total)

## GLOSSARY OF ACRONYMS AND ABBREVIATIONS

Pursuant to D.C. Circuit Rule 28(a)(3), the following is a glossary of

acronyms and abbreviations used in this brief:

| | |
|---|---|
| 2024 Rule (or "Rule") | "National Emission Standards for Hazardous Air Pollutants: Integrated Iron and Steel Manufacturing Facilities Technology Review," 89 Fed. Reg. 23,294 (Apr. 3, 2024) |
| APA | Administrative Procedure Act |
| EPA | U.S. Environmental Protection Agency |
| IFR | "National Emission Standards for Hazardous Air Pollutants: Integrated Iron and Steel Manufacturing Facilities Technology Review: Interim Final Rule," 90 Fed. Reg. 29485 (July 3, 2025) |
| Industry | Owners and operators of integrated iron and steel manufacturing facilities and their representatives |
| Petitioners | Clean Air Council, Gary Advocates for Responsible Development, Hoosier Environmental Council, Just Transition Northwest Indiana, and Sierra Club |
| Steel mills | Integrated iron and steel manufacturing facilities operating as major sources of hazardous air pollutants |

1

## JURISDICTIONAL STATEMENT

**Agency.** Respondents U.S. Environmental Protection Agency, *et al.* ("EPA" or "the Agency") have jurisdiction to promulgate amendments to the emission standards under section 112 of the Clean Air Act, 42 U.S.C. § 7412, for integrated iron and steel manufacturing facilities operating as major sources of hazardous air pollutants ("steel mills").

**Court of Appeals.** Pursuant to Clean Air Act section 307(b)(1), 42 U.S.C. § 7607(b)(1), this Court has jurisdiction to review the final action taken by EPA at 90 Fed. Reg. 29485 (July 3, 2025), JA___, and titled "National Emission Standards for Hazardous Air Pollutants: Integrated Iron and Steel Manufacturing Facilities Technology Review: Interim Final Rule."

**Timeliness.** This petition for review was timely filed within the 60-day period provided by Clean Air Act section 307(b)(1), 42 U.S.C. § 7607(b)(1), on July 29, 2025.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations appear in an addendum to this brief.

2

**INTRODUCTION**

Petitioners challenge EPA's Interim Final Rule ("IFR"), which unlawfully delays industry compliance with critical new air toxics standards applicable to integrated iron and steel manufacturing facilities ("steel mills"). EPA extended compliance deadlines for regulated industry without first providing notice or an opportunity for public comment, thereby shutting out communities affected by steel mill pollution from the rulemaking process and violating the Clean Air Act.

The IFR continues EPA's years-long pattern of failing Petitioners and their members, who live, work, and recreate in close proximity to steel mills. For over a two decades, EPA has unlawfully failed to establish air toxics standards for steel mills that comply with the Clean Air Act's requirements. Finally, acting under a court order secured by community and environmental organizations back in 2015, EPA issued modest but important new protections in 2024 (the "2024 Rule" or "Rule"). But for the IFR, these standards would have started reducing steel mills' hazardous air pollution, primarily composed of toxic metals that cause cancer and other serious health harms, earlier this year. EPA defended these standards in administrative proceedings and in court, successfully opposing a motion filed by Cleveland-Cliffs Inc. and U.S. Steel Corporation, the two companies that now own all of the steel mills in the United States, to stay their effectiveness.

3

Less than one year after finalizing the new standards, however, EPA decided to reverse course at the request of these same steel companies. Just as the new protections were about to take effect in April 2025, EPA pushed them off for three months, claiming that a temporary stay was necessary to accommodate the Agency's plans to reconsider the 2024 Rule. Then, just as the three-month stay expired, EPA bypassed the Clean Air Act's procedural requirements to promulgate an interim final rule that delayed all 2025 and 2026 compliance deadlines to July 2027, the maximum time allowed under the Clean Air Act.

EPA's delay of the compliance dates without providing notice or comment and without responding to comment – all of which the Clean Air Act explicitly requires – is blatantly unlawful. Although EPA claims that it was "impracticable" for the Agency to have gone through notice and comment on the delay action before regulated entities would be required to comply with or prepare to comply with the Rule, that claim is not true. The record shows that EPA has been on notice of industry-proffered compliance concerns since at least June 2024, when industry representatives brought those issues to the Agency's attention. EPA thus had ample time to propose a rule to delay the 2024 Rule's compliance deadlines with notice and an opportunity for public comment. Instead, EPA dallied until just weeks before the 2024 Rule's first compliance dates. Now, belatedly, it tries to invoke "good cause" as an excuse for dodging statutory requirements.

In addition to being improperly promulgated, the IFR establishes new compliance deadlines for the 2024 Rule that do not comply with the Clean Air Act's statutory requirements, unlawfully circumvent the Act's limits on stays of final rules pending reconsideration, and reflect irrational and inadequately supported decisionmaking.

Petitioners are national and regional nonprofit groups who advocate for stronger health protections against steel mill pollution and a cleaner environment for their members and the general public. EPA's unlawful decision to delay the 2024 Rule's compliance deadlines harms Petitioners and their members by subjecting them to excess amounts of steel mill hazardous air pollutant emissions, which threatens their health and burdens their daily lives. Accordingly, Petitioners seek an order from this Court vacating the IFR in its entirety.

## STATEMENT OF ISSUES

1. Whether EPA lacked good cause to delay the 2025 and 2026 compliance deadlines in the 2024 Rule[1] without providing notice or opportunity for public comment, thereby contravening Clean Air Act section 307(d). 42 U.S.C. § 7607(d).

---

[1] "National Emission Standards for Hazardous Air Pollutants: Integrated Iron and Steel Manufacturing Facilities Technology Review," 89 Fed. Reg. 23294 (Apr. 3, 2024), JA___.

5

2. Whether EPA contravened the Clean Air Act and acted unreasonably by establishing new deadlines for the 2024 Rule that do not "provide for compliance as expeditiously as practicable." 42 U.S.C. § 7412(i)(3)(A).

## STATEMENT OF THE CASE

### I.     Statutory Background

### A.     The Clean Air Act Requires EPA to Establish Air Toxics Standards and Set Deadlines for Compliance.

Section 112 of the Clean Air Act establishes a "clear statutory obligation" for EPA to set limits for each hazardous air pollutant (also called "air toxics") that a source category emits. *Nat'l Lime Ass'n v. EPA*, 233 F.3d 625, 633-634 (D.C. Cir. 2000); 42 U.S.C. § 7412(d)(1). Section 112(d)(3)'s minimum stringency ("floor") provision mandates that these limits must be at least as stringent as the average emission limitation achieved by the relevant best performing sources. For source categories such as steel mills with fewer than 30 existing sources, these floors must reflect the average emission limitation achieved by the best performing 5 sources for which the Administrator has "or could reasonably obtain" emissions information. 42 U.S.C. § 7412(d)(3)(B). As this Court has explained, these provisions unambiguously require EPA to set floors reflecting the average emission level achieved by the best performing sources, "those with the lowest emission levels." *Sierra Club v. EPA*, 479 F.3d 875, 880-881 (citing *Cement Kiln*

6

*Recycling Coal. v. EPA*, 255 F.3d 855, 861 (D.C. Cir. 2001)). EPA must set limits for a pollutant at the floor regardless of the cost of bringing other underperforming facilities into compliance with the floor. *See U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 594 (D.C. Cir. 2016).

Section 112(e) required EPA to complete section 112(d) emission standards for all source categories no later than November 15, 2000. 42 U.S.C. § 7412(e)(1)(E). In addition, section 112(d)(6) requires EPA to review these standards every eight years and revise them "as necessary." *Id.* § 7412(d)(6). Among the necessary revisions that EPA must make under section 112(d)(6) is to ensure its existing standards for a source category "conform [] to the basic requisites for 'emission standards' under § 112." *La. Env't Action Network v. EPA ("LEAN")*, 955 F.3d 1088, 1098 (D.C. Cir. 2020). In particular, where the Agency's existing standards are missing limits for a hazardous air pollutant, EPA must set those limits in its section 112(d)(6) review. *Id.* at 1096-1100.

Under Clean Air Act section 112(h), if EPA determines that a numeric emission limit is not "feasible," the Agency may "promulgate a design, equipment, work practice, or operational standard" in lieu of a numeric emission standard. 42 U.S.C. § 7412(h)(1). Standards promulgated under this section must be "consistent with the provisions of subsection [112](d)." *Id.*

Clean Air Act section 112(i)(3) requires EPA to set deadlines that "provide for compliance as expeditiously as practicable, but in no event later than 3 years after the effective date of such standard." 42 U.S.C. § 7412(i)(3)(A).

**B.    The Clean Air Act Requires EPA to Provide for Public Notice and Participation.**

The procedures in Clean Air Act section 307(d) govern the "promulgation or revision" of any "emission standard or limitation" under section 112(d). *See* 42 U.S.C. § 7607(d)(1)(C); *see also* § 7607(d)(1) (procedural requirements of the Clean Air act supersede Administrative Procedure Act ("APA") procedural requirements unless otherwise specified in the Act). To promulgate a revision of the 2024 Rule's compliance deadlines, EPA must therefore follow section 307(d)'s procedures.

Under the Clean Air Act, rulemakings under section 307(d) must include a "notice of proposed rulemaking" published in the Federal Register, which "shall be accompanied by a statement of its basis and purpose" and must "specify the period available for public comment." 42 U.S.C. § 7607(d)(3). A promulgated rule must be "accompanied by a response to each of the significant comments, criticisms, and new data submitted in written or oral presentations during the comment period." 42 U.S.C. § 7607(d)(6)(B).

Clean Air Act section 307(d) recognizes only two exceptions to the statutory procedural requirements for agency rulemakings, and these exceptions are defined

8

in the APA. 42 U.S.C. § 7607(d)(1) (referencing subsections 553(b)(A), (B) of the APA, 5 U.S.C. § 553(b)(A)-(B)). Thus, EPA may forgo the Clean Air Act's notice-and-comment rulemaking procedures only (i) when issuing "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice," or (ii) "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(A), (B).

While administrative reconsideration of a final rule does not normally postpone the effectiveness of the rule, the Clean Air Act authorizes one stay of no more than 90 days under section 307(d)(7)(B) when EPA has convened mandatory reconsideration proceedings. 42 U.S.C. § 7607(d)(7)(B); *see Clean Air Council v. Pruitt*, 862 F.3d 1, 9 (D.C. Cir. 2017).

## II.    Factual Background

According to EPA, there are eight currently operating integrated iron and steelmaking manfucaturing facilities in the United States. 89 Fed. Reg. at 23298, JA___. Steel mills collectively emit almost 600 tons of hazardous air pollution every year. EPA, *Summary of Integrated Iron and Steel Point Source Emissions Estimates for Risk and Technology Review* ("Emissions Summary"), at 7 tbl. 4 (May 1, 2019 (revised Sept. 15, 2021)), EPA-HQ-OAR-2002-0083-1458 (point

9

source emissions), JA ___; EPA, *Unmeasured Fugitive and Intermittent Particulate Emissions and Cost Impacts for Integrated Iron and Steel Facilities under 40 C.F.R. Part 63, Subpart FFFFF* ("UFIP Memo"), at 8 (Feb. 22, 2024), EPA-HQ-OAR-2002-0083-1974 (nonpoint source emissions), JA ___. Over half of this pollution – approximately 350 tons per year – consists of "fugitive" or "nonpoint source" emissions (also referred to as "unmeasured fugitive and intermittent particulate" or "UFIP" emissions) that emerge from steel mills' doors, roof vents, and leaking equipment. UFIP Memo at 8, JA___. These nonpoint source emissions are composed entirely of toxic metals, including lead, arsenic, and mercury. *See* UFIP Memo at 7, JA___.

Much of this pollution is not only highly toxic but also persistent and bioaccumulative, so that it both persists in the environment and builds up in people's bodies over time. *See* EPA, *Residual Risk Assessment for the Integrated Iron and Steel Manufacturing Source Category in Support of the 2020 Risk and Technology Review Final Rule* ("RRA"), at 5, 16-21, Attach. B/B-1 (Feb. 2020), EPA-HQ-2002-0083-1083, JA___, ___-___, ___. Infants and babies of mothers who are exposed to steel mill pollution are in turn exposed to these persistent and bioaccumulative pollutants in the womb and through their mothers' breast milk. *See* RRA at Attach. B/B-1, JA___. Exposures to the hazardous air pollutants

10

emitted by steel mills can cause cancer, developmental damage to infants and babies, and other serious health harms.

Exposure to lead, for example, can cause adverse effects on the central nervous system, kidney function, the immune system, reproductive and developmental systems, and the cardiovascular system. *See* EPA, *Basic Information about Lead Air Pollution* (last updated on July 18, 2025), https://www.epa.gov/lead-air-pollution/basic-information-about-lead-air-pollution, JA___. These exposures can contribute to behavioral problems, learning deficits, and lowered IQ. *Id.*

Arsenic is a major risk driver of cancer risk from steel mill emissions. *See* RRA at 5-6, 41-42, 52, JA___-___, ___-___, ___. In addition, arsenic exposure can cause nausea, vomiting, decreased production of red and white blood cells, abnormal heart rhythm, damage to blood vessels, and "a sensation of 'pins and needles' in hands and feet." *See* Agency for Toxic Substances and Disease Registry, *ToxFAQs for Arsenic* (page last viewed Mar. 12, 2015), https://wwwn.cdc.gov/TSp/ToxFAQs/ToxFAQsDetails.aspx?faqid=19&toxid=3, JA___. Chronic ingestion or breathing in low levels of arsenic can also lead to adverse skin conditions. *Id.*

Mercury air emissions deposited onto waterbodies are converted into methylmercury by microorganisms, which build up in the bodies of fish and

11

shellfish. *See* EPA, *How People Are Exposed to Mercury* (Last updated on March 6, 2025), https://www.epa.gov/mercury/how-people-are-exposed-mercury, JA___. Methylmercury is a potent neurotoxin, which can cause a variety of adverse neurological symptoms in people who ingested contaminated fish and shellfish and can negatively impact cognitive and nervous system development in utero. *See* EPA, *Health Effects of Exposures to Mercury* (Last updated on Nov. 21, 2025), https://www.epa.gov/mercury/health-effects-exposures-mercury, JA___. Mercury contamination in the Great Lakes, where many steel mills are located, is particularly harmful to sensitive subpopulations—such as pregnant women and young children who consume lake fish, and to subsistence fish-eating subpopulations who consume substantial amounts of lake fish. *See* EPA, 3 *Deposition of Air Pollutants to the Great Waters* at ii (2000). https://nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=00002VG1.txt, JA___.

EPA first promulgated air toxics emission standards for steel mills in 2003, almost three years after they were due under Clean Air Act section 112(e)(1)(E). 68 Fed. Reg. 27646 (May 20, 2003), JA___. Those standards suffered from multiple legal flaws and EPA sought and obtained a voluntary remand in 2009. However, EPA did not respond to this remand until 2020, and then only in response to a court order that nonprofit community and environmental groups

12

obtained when they sued over the Agency's years-long inaction. *See California Communities Against Toxics v. EPA*, No. 1:15-cv-00512 (D.D.C. Apr. 8, 2015).

The 2020 Rule still did not comply with the Clean Air Act's requirements. The Act requires EPA to set limits for each hazardous air pollutant that a source category emits and to add limits for all previously unregulated air toxics and emission sources when conducting a section 112(d)(6) review, which EPA conceded it did not do. *See* Joint Motion to Extend Deadline, *California Communities Against Toxics v. EPA*, No. 1:15-cv-00512 (D.D.C. Apr. 13, 2021); Order, *id.* (D.D.C. Apr. 14, 2021). To rectify these errors, EPA then commenced another rulemaking process that culminated in the promulgation of the 2024 Rule.

### III.     Prior Litigation and Regulatory Background

#### A.     The 2024 Rule Establishes New Requirements to Manage Nonpoint Source Emissions.

Having recognized that its prior rules lacked statutorily-required emission limits – and never satisfied its statutory obligations – EPA finally set many long-overdue limits for hazardous air pollutants emitted by steel mills in 2024. *See* National Emission Standards for Hazardous Air Pollutants: Integrated Iron and Steel Manufacturing Facilities Technology Review, 89 Fed. Reg. 23294 (Apr. 3, 2024) ("2024 Rule" or "Rule"), JA ___. The 2024 Rule is a direct consequence of EPA's admitted failure to promulgate a lawful rule in 2020 or any time prior. It was the product of a three-year rulemaking process involving extensive data

13

collection from steel mills and input from more than 400 commenters. *See generally* EPA, *Point Source Data Summary for Integrated Iron and Steel Facilities under 40 C.F.R Part 63, Subpart FFFFF* (Jan. 17, 2024), EPA-HQ-OAR-2002-0083-1953, JA ___ (describing data collection); *see also* EPA, *Response to Comments* ("RTC"), EPA-HQ-OAR-2002-0083-1976, at 2-11, JA___-___ (listing Commenter IDs).

Of particular relevance to this litigation, the 2024 Rule established new floor standards for several nonpoint sources that EPA had previously left unregulated, in the form of either opacity limits or work practices under Clean Air Act section 112(h). 89 Fed. Reg. at 23295, JA___. In the context of air toxics regulation, "opacity" refers to the "measure of the amount of light that is blocked or absorbed by an air pollution plume." 89 Fed. Reg. at 23295, JA___. Whereas an "opacity level of 0 percent means" there are "no visible emissions," an "opacity of 100 percent means that plumes are dense and block all light." *Id*. Opacity measurements can be obtained via visual observation by a trained and certified observer (EPA Method 9), or alternatively, with a special camera that takes images which are then interpreted by trained individuals. *Id*. Because the light-blocking components of air pollution are primarily particulate matter, and because a significant amount of particulate matter that steel mills emit is composed of air

14

toxic metals, EPA treats particulate matter and opacity as surrogates for particulate air toxic metals in this rule. *Id.*

The 2024 Rule's new work practice standards and opacity limits do not require steel mills to permanently install pollution control devices or make structural modifications to their facilities. Rather, steel mills need only adopt practices that are already in use within the industry to reduce emissions from various steelmaking processes. *See generally* UFIP Memo, JA___. EPA projects that the 2024 Rule's new limits on previously unregulated nonpoint sources, when fully implemented, will reduce steel mill emissions by about 64 tons per year of hazardous air pollutant metals, and about 473 tons per year of $PM_{2.5}$. 89 Fed. Reg. at 23314, JA___.

Two of the new standards pertain to the operation of a bleeder valve, which is a device located at the top of a blast furnace, the process unit where molten iron is produced from raw materials. 89 Fed. Reg. at 23298, JA___. An unplanned bleeder valve opening occurs when the valve automatically opens to relieve excess pressure buildup within the furnace, releasing emissions into the ambient air. *Id.* A planned bleeder valve opening, on the other hand, is operator-initiated. The Rule sets work practice standards for unplanned bleeder valve openings and an opacity limit for planned bleeder valve openings.

The 2024 Rule also establishes work practice standards to manage emissions from blast furnace bells and iron beaching. Blast furnace bells are designed to prevent the escape of blast furnace gas when raw materials are loaded into the furnace and must be tightly sealed to the blast furnace when not in use to block uncontrolled emissions. 89 Fed. Reg. at 23298, JA___. Because the seal material can be worn down over time, bells must be repaired or replaced in a timely manner to avert significant increases in hazardous air pollutant and particulate matter emissions. *Id.* Iron beaching occurs when hot molten iron from the blast furnace cannot be loaded into the basic oxygen process (steelmaking) furnace because of issues with the steelmaking unit and is placed on the ground, exposed to the open air. *Id.*

Slag is a byproduct that is removed from the blast furnace and basic oxygen process furnace and transported to pits where it is exposed to the open air as it cools. *Id.* The 2024 Rule imposes an opacity limit for slag pits, and slag processing, handling, and storage. *See* 89 Fed. Reg. at 23301, JA___.

Prior to the 2024 Rule, EPA regulated fugitive emissions from the structures that house the blast furnace and the basic oxygen process furnace and their associated operations, called the blast furnace casthouse and the basic oxygen process shop, respectively. 89 Fed. Reg. at 23298, JA___. These sources are subject to opacity limits. *Id.* The 2024 Rule leaves those limits unchanged but

16

requires facilities to perform opacity monitoring twice a month. 89 Fed. Reg. at 23305, JA___.

Finally, the Rule introduces a fenceline monitoring requirement for total chromium, including a requirement that when a monitor exceeds a total chromium action level, a facility must conduct a root cause analysis and take corrective action to lower emissions. *Id.* at 23308, JA___. EPA expects that monitoring, when paired with root cause analysis and corrective action, "can be effective in reducing emissions" and "provides public transparency and greater visibility, leading to more focus and effort in reducing emissions." *Id*. at 23306, JA___.

## B. EPA Rebuffs Multiple Industry Efforts to Stay the Effectiveness of the 2024 Rule.

On June 3, 2024, Cleveland-Cliffs Inc. and U.S. Steel Corporation submitted petitions for reconsideration of the 2024 Rule. Both petitioners included in their petitions a request that EPA stay the effectiveness of the Rule pending reconsideration under Clean Air Act section 307(d)(7)(B). *See* Cleveland-Cliffs Inc. Petition for Reconsideration and Request for Administrative Stay of the *National Emission Standards for Hazardous Air Pollutants: Integrated Iron and Steel Manufacturing Facilities Technology Review*, 89 Fed. Reg. 23294 (April 3, 2024) ("CCI Recon."), EPA-HQ-OAR-2002-0083-1989, at 39-41, JA ___-___; Petition for Reconsideration and for Stay of the National Emission Standards for Hazardous Air Pollutants: Integrated Iron and Steel Manufacturing Facilities

17

Technology Review ("II&S MACT") ("USSC Recon."), EPA-HQ-OAR-2002-0083-1988, at 21-22, JA \_\_\_-\_\_\_.[2]

Cleveland-Cliffs and U.S. Steel also petitioned for review of the 2024 Rule in the D.C. Circuit and moved to stay the Rule pending judicial review.[3] *See* Case No. 24-1170, Doc. No. 2057654 (June 3, 2024); Case No. 24-1171, Doc. No. 2057738 (June 3, 2024); Case No. 24-1170, Doc. Nos. 2062303 (June 28, 2024), 2063048 (July 3, 2024).

EPA defended the Rule's work practice standards as "achievable, supported in the record, and lawful." *See* Case No. 24-1170, Doc. No. 2070301, at 19 (Aug. 15, 2024) (citation modified). This Court denied the motions for a stay and rejected an industry petition for rehearing en banc of its order. *See* Case No. 24-1170, Doc. No. 2081727 (Oct. 24, 2024); Doc. No. 2093681 (Jan. 13, 2025). The three petitions for review of the 2024 Rule have since been consolidated with petitions for review of the 2020 Rule and held in abeyance pending Agency reconsideration. Case No. 20-1354, Doc. No. 2118141 (May 29, 2025).

---

[2] Petitioners also submitted petitions for reconsideration but did not seek a stay of the Rule's effectiveness. *See* Earthjustice Petition for Reconsideration of the National Emission Standards for Hazardous Air Pollutants: Integrated Iron and Steel Manufacturing Facilities Technology Review, 89 Fed. Reg. 23294, EPA-HQ-OAR-2002-0083-1990, JA\_\_\_.

[3] Petitioners also sought review of the 2024 Rule, seeking to strengthen several of its provisions, but did not seek a stay. Case No. 24-1177, Doc. No. 2057831 (June 3, 2024).

On August 14, 2024, EPA also sent a letter to all petitioners, stating that the Agency had "not identified any information in those petitions that undermine[d] the validity of the II&S Final Rule." *See* August 14, 2024, Letter ("August 2024 Letter"), EPA-HQ-OAR-2002-0083-1991, at 1, JA ___. However, EPA said it would exercise its discretion to reconsider three aspects of the Rule, including work practice standards for two nonpoint sources of pollution: unplanned bleeder valve openings and iron beaching. EPA also announced that it would "issue a correction notice" to address "certain errors and ambiguities in the II&S Final Rule that were brought to [the Agency's] attention by [the] reconsideration petitions." *Id.* Proposed corrections relating to standards for nonpoint sources included "clarify[ing]" (i) "that the definition of an 'unplanned bleeder valve opening' includes only those openings that are not located downstream from a control device (*i.e.*, 'dirty bleeder valve openings')"; (ii) "the timing of planned openings and how they may affect opacity readings"; (iii) "the definition of a 'single bleeder valve opening event,'" and (iv) "the method that must be used to measure opacity for bell leaks." August 2024 Letter at 2, JA ___.

C.     **EPA Reverses Course and Delays the Compliance Deadlines for Standards Set to Go into Effect in 2025.**

Rather than issuing a correction notice, EPA waited until March 5, 2025, to announce that, instead of conducting discretionary reconsideration and issuing a corrections notice, it would commence mandatory reconsideration under Clean Air

19

Act section 307(d)(7)(B).[4] The Agency claimed it had newly identified "four challenges raised in the petitions that arose after the comment period or were impracticable for the parties to have raised during the comment period and are of central relevance to the outcome of the II&S Final Rule." *See* March 5, 2025, Letter ("March 2025 Letter"), EPA-HQ-OAR-2002-0083-1992, at 1, JA ___. EPA identified these provisions as: "Work practice standards for unmeasured fugitive and intermittent particulate from unplanned bleeder valve openings," "Opacity limit for planned bleeder valve openings," "Work practice standards for bell leaks," and "Opacity limit for slag processing and handling." *Id.* Three of these four provisions – all but the last – were the same ones EPA had previously identified for discretionary rulemaking or a correction notice. *See* August 2024 Letter, at 1, JA ___.

On March 31, 2025, EPA administratively stayed compliance deadlines for two of the nonpoint source standards for which the Agency now claimed

---

[4] On March 12, 2025, EPA Administrator Zeldin announced the "greatest day of deregulation [the United States] has seen," and specifically identified National Emission Standards for Hazardous Pollutants that apply to steel mills as a target for "roll back." *See* EPA Press Release, EPA Launches Biggest Deregulatory Action in U.S. History, https://www.epa.gov/newsreleases/epa-launches-biggest-deregulatory-action-us-history, JA___; National Emission Standards for Hazardous Air Pollutants (NESHAP): Powering the Great American Comeback Fact Sheet, https://www.epa.gov/system/files/documents/2025-03/neshap_powering-the-great-american-comeback_fact-sheet_2.pdf, JA___.

mandatory reconsideration was required. *See* Partial Administrative Stay of National Emission Standards for Hazardous Air Pollutants: Integrated Iron and Steel Manufacturing Facilities Technology Review, 90 Fed. Reg. 14207, 14207 (Mar. 31, 2025), JA ___. These provisions would have required steel mill operators to limit emissions from planned openings of blast furnace bleeder valves and leaking bell seals by April 3, 2025. EPA's action delayed the deadline for operators to comply by 90 days, the maximum amount of time allowed under the Clean Air Act. *See id.* at 14208, JA___; 42 U.S.C. § 7607(d)(7)(B).

**D.    The 2025 Interim Final Rule Delays All of the 2024 Rule's 2025 and 2026 Compliance Deadlines.**

Two days after the 90-day administrative stay expired on July 1, 2025, EPA promulgated the IFR, which delayed all 2025 and 2026 compliance deadlines in the 2024 Rule to April 3, 2027. *See* "National Emission Standards for Hazardous Air Pollutants: Integrated Iron and Steel Manufacturing Facilities Technology Review: Interim Final Rule," 90 Fed. Reg. 29485, 29489 (July 3, 2025), JA___. EPA did not provide notice or an opportunity to comment on the delayed compliance dates and made them effective immediately. *Id*.

| Standard | Initial Compliance Date | Extended Compliance Date |
|---|---|---|
| Opacity limits for planned bleeder valve openings | April 3, 2025 | April 3, 2027 |
| Work practice standards for bell leaks | April 3, 2025 | April 3, 2027 |

21

| | | |
|---|---|---|
| Opacity monitoring frequency for furnaces[5] | April 3, 2025 | April 3, 2027 |
| Work practice standards for unplanned bleeder valve openings | April 3, 2026 | April 3, 2027 |
| Work practice standards for beaching | April 3, 2026 | April 3, 2027 |
| Opacity limit for slag processing activities | April 3, 2026 | April 3, 2027 |
| Fenceline monitoring and corrective action | 1 year after promulgation of monitoring method or April 3, 2026, whichever is later | 1 year after promulgation of monitoring method or April 3, 2027, whichever is later |

EPA acknowledged that modifying the compliance dates for a final rule requires notice-and-comment rulemaking pursuant to Clean Air Act section 307(d)(1)(C). 90 Fed. Reg. at 29489 n.6, JA___. However, EPA claimed that notice and comment would have been "impracticable" and therefore it had "good cause" to promulgate the IFR without following statutory procedures. 90 Fed. Reg. at 29489, JA___ (citing 5 U.S.C. § 553(b)(B)).

## SUMMARY OF ARGUMENT

The IFR violates the Clean Air Act because EPA did not have good cause to alter the 2024 Rule's compliance deadlines without first going through notice and comment. This Court's precedents make clear that the good cause exception to

---

[5] "Furnaces" here refers to the blast furnace casthouse and the basic oxygen process furnace shop, *see supra* at 16-17.

22

notice-and-comment rulemaking is exceedingly narrow, justifiable only in truly exceptional circumstances not present here.

The record shows that it was not "impracticable" for EPA to provide notice and consider public input before promulgating the IFR. EPA's desire to excuse regulated industry from the 2024 Rule's requirements while it conducts reconsideration rulemaking to roll these requirements back is not a legitimate reason to ignore the Clean Air Act's procedures. This is especially true given that the Agency waited until the eleventh hour to take action just as the Rule's deadlines kicked in.

According to EPA, the compliance delay will allow the Agency to reconsider parts of the 2024 Rule that create compliance problems for regulated entities. Yet EPA had ample time to conduct notice-and-comment rulemaking on a proposal to postpone the 2024 Rule's compliance deadlines while it reconsiders the Rule's provisions. Industry representatives told EPA they anticipated compliance difficulties over a year ago and, assuming *arguendo* that EPA needed to extend the compliance dates at all, it could have done so through the normal notice-and-comment rulemaking process. Nowhere in the record does EPA explain why it failed to do so. That EPA did manage to find time to consult with regulated industry on options for compliance relief further undermines its claim that it was "impracticable" to also invite public participation.

23

Nor does EPA claim, much less demonstrate, that an emergency arose that forced the Agency's hand. EPA's purported concerns regarding industry compliance are both unreasonable and unsupported in the administrative record, and do not come close to reflecting the level of urgency required to justify dispensing with statutory rulemaking requirements.

The IFR establishes new compliance deadlines that contravene the Clean Air Act because they do not provide for compliance "as expeditiously as practicable," which the Act requires. The IFR neither mentions nor applies this express statutory requirement.

The IFR's delay of the 2024 Rule's compliance deadlines, which the Agency admits it promulgated to excuse steel mills from compliance during its reconsideration proceedings, also functions as an unlawful stay of the associated Rule provisions. The Clean Air Act makes clear that final rules remain in effect even while under reconsideration and establishes a limited exception for administrative stays pending mandatory reconsideration. Such stays may last no longer than 90 days. Having already exhausted the administrative stay option for provisions that were supposed to go into effect in April 2025, EPA has used the IFR to illegally circumvent the Clean Air Act and Circuit precedent, both of which make clear that the Agency may not stay rules for more than 90 days pending reconsideration.

24

EPA's decision to ignore the Clean Air Act's requirement for compliance "as expeditiously as practicable," in favor of EPA's statutorily irrelevant desire to excuse sources from compliance during its reconsideration of the 2024 Rule, exposes the Agency's lack of reasoned decisionmaking. Instead of providing a rational explanation for how its newly extended deadlines provide for compliance as expeditiously as practicable, the IFR relies on vague and conclusory assertions about the feasibility of the 2024 Rule's original compliance deadlines. EPA provides no explanation at all for setting uniform new 2027 compliance dates for Rule provisions that allegedly suffer from very different deficiencies, or for reversing its prior findings that the 2024 Rule's original compliance deadlines are feasible.

Because EPA's actions fall outside the scope of the good cause exception to the Clean Air Act's notice-and-comment procedures and because the new deadlines are unlawful and arbitrary, this Court should vacate the IFR.

## STANDARD OF REVIEW

The Administrative Procedure Act and Clean Air Act require a court to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C); 42 U.S.C. § 7607(d)(9)(A), (C).

25

To assess whether an agency "acted within its statutory authority," a court must exercise its own "independent judgment" in order "to determine the best reading of the statute." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 373, 412 (2024).

Agency action is arbitrary and capricious when "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made," and its findings must be "supported by substantial evidence on the record considered as a whole." *State Farm*, 463 U.S. at 43-44 (citation modified).

## STANDING

Petitioners are national and regional nonprofit groups that advocate for stronger health protections and a cleaner environment for their members and the general public. *See* Brooks, Carey, Fox, Isherwood, and Williams Declarations, Addendum at DEC0001-0022. Petitioners' members and their families live, work,

and recreate near steel mills, and they are exposed to the toxic air pollution these facilities emit. *See* Abeyta, Ammons, Ballinger, Peller, and Vallee Declarations, Addendum at DEC0027-0041. Exposure to toxic air pollution from steel mills harms these individuals' health, wellbeing, and aesthetic and recreational interests. In addition, because metals emitted into the air from steel mills are eventually deposited into the communities where Petitioners' members live, work and recreate, they will contaminate soil, water and food for decades to come. *See* RRA at 42-52, JA ___-___.

Petitioners' members who live especially close to steel mills must take numerous precautions to protect themselves from steel mill emissions, including wearing masks, staying indoors with the windows closed, and even driving to out-of-town locations for relief from polluted air. *See* Abeyta, Ammons, Ballinger, Peller, and Vallee Declarations, Addendum at DEC0027-0041. Several of Petitioners' members have underlying health conditions that make them especially sensitive to air pollution. *See* Ammons, Ballinger, and Vallee Declarations, Addendum at DEC0031-0035, DEC0041. Several members also live with or frequently host young children, who are particularly vulnerable to adverse health effects from exposure to toxic air pollutants. *See* Ammons and Ballinger Declarations, Addendum at DEC0031-0035.

Absent EPA's unlawful promulgation of the IFR, steel mills would already be required to comply with the 2024 Rule's new standards for planned bleeder valve openings and bell leaks, two significant sources of nonpoint source emissions. EPA estimates that these emission sources contribute 86.9 tons per year of hazardous air pollutants. *See* UFIP Memo at 8, JA\_\_\_. The Rule's new controls for these emission sources would have resulted in an average 27 percent reduction in hazardous air pollutant emissions for planned bleed valve openings and a 42 percent reduction for bell leaks, resulting in a total reduction of 31.41 tons per year. *See id.* at 15, JA\_\_\_ (quantifying projected emissions reductions from planned bleeder valve openings and bell leaks alone). This means that the IFR delays nearly half the total amount of hazardous air pollutant reduction that EPA estimates for the entire Rule. 89 Fed. Reg. at 23314, JA\_\_\_.

By delaying pollution reductions that the 2024 Rule requires, the IFR prolongs and exacerbates the harm caused by steel mills' toxic pollution. If not for the IFR, Petitioners and their members would already be experiencing the benefits of reduced emissions from steel mills. They will be further harmed by EPA's delay of emissions reduction standards that would have required compliance in 2026, as well as EPA's delay of fenceline monitoring. This Court could remedy those injuries by vacating the IFR. *See NRDC v. EPA*, 749 F.3d 1055, 1062 (D.C. Cir. 2014) (finding standing where environmental groups' members alleged they would

28

be harmed by higher emissions allowed by affirmative defense provision in challenged air rule); *Clean Wisconsin v. EPA*, 964 F.3d 1145, 1158 (D.C. Cir. 2020) (finding petitioners are injured by EPA actions that "expose them to higher [pollution] levels"); *Friends of the Earth v. Laidlaw Env't Servs.*, 528 U.S. 167, 183 (2000) (finding standing based on "aesthetic and recreational" injuries).

## ARGUMENT

### I.     EPA's Interim Final Rule Must Be Vacated Because EPA Lacked Good Cause to Forgo Notice and Comment.

#### A.     Because Notice and Comment Was Not "Impracticable," EPA's Promulgation of the Interim Final Rule Violates the Clean Air Act.

An agency may invoke the good cause exception to notice-and-comment rulemaking only where notice and comment is "impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B). Because the administrative record shows that it was not "impracticable" for EPA modify the 2024 Rule's compliance dates via notice and comment, the Agency's decision to forgo those procedures in promulgating the IFR was unlawful. As EPA based its good cause argument solely on impracticability grounds and did not rely on the APA's "unnecessary" or "contrary to the public interest" rationales, *see* 90 Fed. Reg. at 29489, JA___, Petitioners do not address those other factors here.

This Circuit has "repeatedly made clear that the good cause exception is to be narrowly construed and only reluctantly countenanced." *Mack Trucks v. EPA*,

29

682 F.3d 87, 93 (D.C. Cir. 2012) (citation modified). The "exception is not an 'escape clause,'" and "its use 'should be limited to emergency situations.'" *Util. Solid Waste Activities Grp. v. EPA* ("*USWAG*"), 236 F.3d 749, 754 (D.C. Cir. 2001) (quoting *Am. Fed'n of Gov't Emps., AFL-CIO v. Block* ("*AFGE*"), 655 F.2d 1153, 1156 (D.C. Cir. 1981)); *Mack Trucks*, 682 F.3d at 93 (similar).[6] Courts evaluating an agency's "impracticability" rationale for asserting good cause typically look to whether agency action was required to address a "threat to the environment or human health." *USWAG*, 236 F.3d at 755. This Court has, for example, sustained agency action on "impracticability of notice and comment" grounds where it was deemed necessary to address potentially imminent security threats in the wake of the September 11th terrorist attacks. *See Mack Trucks*, 682 F.3d at 93 (citing *Jifry v. FAA*, 370 F.3d 1174, 1179 (D.C. Cir. 2004)). This Court has also found notice and comment impracticable where "a rule was of life-saving importance to mine workers in the event of a mine explosion." *Id.* (citation modified) (citing the "special, possibly unique" situation in *Council of the S. Mountains, Inc. v. Donovan*, 653 F.2d 573, 581 (D.C. Cir. 1981)).

---

[6] Other Circuits are in agreement. *See Buschmann v. Schweiker*, 676 F.2d 352, 357 (9th Cir. 1982) ("The good cause exception is essentially an emergency procedure."); *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 883 (5th Cir. 2022) (The APA's good cause exemption "is narrow authority reserved for emergency situations." (citation modified)).

By contrast, an agency cannot "simply wait until the eve of an administrative deadline, then raise up the 'good cause' banner and promulgate rules without following [statutory] procedures." *Env't Def. Fund, Inc. v. EPA*, 716 F.2d 915, 921 (D.C. Cir. 1983) (citation modified). Yet, by EPA's own account, that is what it did here.

EPA's "good cause" boils down to this: earlier this year, after several of the compliance deadlines had already passed, EPA decided to revise those and other subsequent deadlines to relieve steel mills from compliance with the Rule while EPA reconsiders its provisions. 90 Fed. Reg. at 29489, JA___. EPA did not want companies to have to make investments to comply with the Rule during the reconsideration process. *Id.* Nor did it want to even "potentially" risk "throwing regulated parties into immediate non-compliance with regulatory requirements that will most likely be revised during the reconsideration rulemaking process." *Id*. So, having waited too long to revise these deadlines as Clean Air Act section 307(d) requires, EPA "raised up the 'good cause' banner" to bypass section 307(d) and revise the deadlines through an IFR. *Env't Def. Fund,* 716 F.2d at 921 (citation modified).

The situation EPA describes does not remotely resemble the extraordinary circumstances required to support good cause under this Court's precedents. EPA's failure to act until it ran up against a deadline—in this case the expiration of the

31

administrative stay—does not excuse it from complying with notice-and-comment procedures. This Court's reasoning in *Environmental Defense Fund* is directly on point. 716 F.3d 915 (D.C. Cir. 1983). There, as here, EPA invoked the good cause exception to suspend hazardous waste reporting requirements without notice and comment due to "an alleged pressing need to avoid industry compliance with regulations that were to be eliminated." *Env't Def. Fund*, 716 F.2d at 920. There too, EPA argued that it was "essential to take action before the regulated community expended resources," and that "immediate suspension" was "crucial" due to an imminent reporting deadline. This Court rejected all of EPA's arguments, finding that these were not the sort of "exceptional circumstances" that justified avoiding statutory procedures. *Id.* at 920-21. Even if EPA believes changes to the 2024 Rule are warranted, the fact that EPA "considered these regulations defective did not imply that an emergency existed" and "does not explain why notice and comment could not be provided." *Consumer Energy Council of Am. v. FERC*, 673 F.2d 425, 448 (D.C. Cir. 1982).

Further, an agency cannot claim good cause to avoid notice and comment where it "ha[s] a substantial period of time within which to prepare regulations." *AFGE*, 655 F.2d at 1158. Nor is there good cause when an allegedly urgent situation "arises as the result of an agency's own delay," *Env't Def. Fund*, 716 F.2d at 921, or when "the time pressure posed by the impending [deadlines] was due in

32

large part to the [agency's] own delays," *Nat'l Ass'n of Farmworkers Orgs., v. Marshall* (*"Farmworkers"*), 628 F.2d 604, 622 (D.C. Cir. 1980) ). Here, EPA had ample time to amend the 2024 Rule's compliance deadlines through notice-and-comment rulemaking. EPA admits that regulated entities articulated to the Agency compliance concerns with the standards covered by the IFR as early as June 2024, when regulated parties submitted petitions for reconsideration. *See* 90 Fed. Reg. at 29487-88 (describing issues identified in the industry reconsideration petitions), *id.* at 29488 (describing reconsideration of those same issues), *id.* at 29489 (invoking those same issues to justify use of good cause exception). Therefore, EPA had more than a year to address the alleged compliance concerns by moving compliance deadlines, which is far more than the seven months this Court has found to be sufficient for such procedures. *Farmworkers*, 628 F.2d at 622.

Moreover, this Court has already held that where an agency "apparently found it quite possible to consult" with "state farm bureaus, growers, and congressional staff members" regarding a change to rules protecting child farmworkers from pesticide exposure, the Court "cannot sustain the suspension of notice and comment to the general public which includes parties, such as plaintiffs who are primarily concerned with the health of their children." *Farmworkers*, 628 F.2d at 622. The situation before this Court is closely similar. During the twelve-plus months leading up to the IFR, EPA held conversations with the steel

33

companies on potential changes to the 2024 Rule. This informational exchange included a call on December 20, 2024, between EPA and representatives of Cleveland-Cliffs and U.S. Steel "to discuss compliance concerns and timing of the reconsideration" and "concerns regarding the upcoming 2025 deadlines." *See* EPA-HQ-OAR-2002-00873-2022_attachment_2, JA___; *see also* EPA-HQ-OAR-2002-00873-2022_attachment_3, JA___ (email correspondence); EPA-HQ-OAR-2002-00873-2022_attachment_1, JA___ (correspondence re September 17, 2024, call between the same parties). Having managed to find time for "further discussion with [industry] stakeholders," 90 Fed. Reg. at 29488, JA___, EPA has no basis to claim that it was "impracticable" to involve the general public, including Petitioners and their members who would have raised concerns regarding the impact of steel mills' toxic pollution on themselves and their children. *See Farmworkers*, 628 F.2d at 622.

No emergency arose that forced the Agency to amend the 2024 Rule's compliance deadlines only when it was too late to seek public input, nor does EPA claim the existence of such an emergency. In *Mack Trucks*, this Court found no showing of good cause in the absence of an "imminent threat to the environment or safety or national security." 682 F.3d at 93. The same is true here. At minimum, EPA's explanation for bypassing notice and comment with the IFR does not reflect concerns that are nearly as weighty, unanticipated, or immediate as the prevention

34

of further terrorist attacks in *Jifry*, 370 F.3d at 1174, or the protection of miners in the event of a mine disaster in *Council of Southern Mountains*, 653 F.2d at 581.

That EPA believes steel mills must make "investment decisions and modifications to equipment and operating procedures" to achieve compliance, and could "potentially" be in noncompliance with a rule EPA wants to revise, is not an emergency. 90 Fed. Reg. at 29489, JA___. For one thing, EPA's claim that steel mills cannot comply with the 2024 Rule is both unreasonable and unsupported in the administrative record. *See infra* at Argument I.B. Moreover, the Clean Air Act requires EPA to set floor standards (in this case work practices in lieu of floors) based on what the "best performing" facilities have achieved, regardless of the "the cost of putting a source in line with its better-performing counterparts." *U.S. Sugar*, 830 F.3d at 594. The possibility that at least some sources in a regulated source category may need to make investments and operational modifications to meet a new standard is hardly unusual. And it would be "nonsensical" to find "good cause" every time "a manufacturer in a regulated field felt a new regulation imposed some degree of economic hardship." *Mack Trucks*, 682 F.3d at 94.

In sum, there is no legitimate reason for EPA's decision not to go through notice and comment before finalizing amendments to the 2024 Rule's deadlines. Rather, in the absence of any emergency or other extraordinary circumstance, EPA "simply waited until the eve of an administrative deadline, then raised up the 'good

(Page 49 of Total)

cause' banner" to evade the Clean Air Act's notice-and-comment rulemaking requirements. *Env't Def. Fund*, 716 F.2d at 921 (citation modified). "Because EPA lacked good cause to dispense with required notice and comment procedures . . . the IFR must be vacated." *Mack Trucks*, 682 F.3d at 95; *see also USWAG*, 236 F.3d at 755.

> **B.      EPA Lacks a Reasonable Basis to Conclude that Steel Mills Risked Being in "Immediate Noncompliance."**

Even if EPA's desire to relieve steel companies from having to comply with a rule it planned to revise could possibly constitute good cause, *but see supra* at Argument I.A, the administrative record does not support EPA's assertion that steel mills would be thrown into "immediate noncompliance" had the 2024 Rule's deadlines been allowed to go into effect on July 1, 2025 (the expiration of the administrative stay).

Without the IFR, only three of the 2024 Rule's provisions would have been in effect between July 2025 and April 2026: work practices for bell leaks, opacity monitoring frequency for furnaces, and opacity limits for planned bleeder valve openings. As with the 2024 Rule's other standards for nonpoint source emissions, EPA based the three standards on practices that are already in use within the industry to minimize emissions from various steelmaking processes. *See* UFIP Memo at 8-14, C-3 tbl. C-2, JA___-___, ___.

36

For two of the standards, work practices for bell leaks and opacity monitoring frequency for furnaces, the only issues EPA identified in the 2024 Rule pertain to ambiguities in the regulatory text that relate to how compliance is demonstrated. *See* 90 Fed. Reg. at 29488, JA___ ("for bell leaks . . . the 2024 rule's regulatory language setting compliance action levels is inconsistent with what was proposed and needs to be clarified for compliance to be achieved"; "for [furnaces] . . . there is ambiguity in the regulatory text for the monitoring frequency and location of fugitive emissions that must be addressed to clarify how to demonstrate compliance with these standards."). The Agency has not provided a rational explanation for why it could not implement these technical corrections to the regulatory text through a corrections notice in the Federal Register prior to the expiration of the administrative stay, having previously articulated plans to issue a corrections notice in its August 2024 letter. *See* August 2024 Letter, JA___. EPA has also published technical corrections to the regulatory text of other Clean Air Act rules. *See, e.g.*, Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review: Correction, 89 Fed. Reg. 62872 (Aug. 1, 2024), JA___.

For planned bleeder valve openings, EPA now claims that "a majority" of steel mills "likely" will not be able to comply with an 8 percent opacity limit

because of operational variability among individual steel mills. 90 Fed. Reg. at 29488, JA___. The record, however, demonstrates that facilities can meet the 8 percent opacity standard if they adopt EPA's proposed work practices for reducing emissions to the maximum degree practicable. *See* RTC at 84, JA___. These work practices are measures that operators can take before opening bleeder valves that will minimize emissions from the opening: tapping out as much iron and slag out of the furnace as possible, removing fuel and/or stopping fuel injection into the furnace, and lowering bottom pressure. 89 Fed. Reg. at 23301, JA___. Of the five top-performing facilities that EPA analyzed when setting the standard, three[7] were already meeting the standard. Out of six facilities that reported planned bleeder valve opening opacity data as part of the rulemaking process, the three facilities that were not meeting the standard had either not adopted all of EPA's proposed work practices or were not consistently and completely implementing them. *See* Information Collection Request Responses.[8]

---

[7] Two facilities were below the limit and one facility, Cleveland-Cliffs Indiana Harbor, was at 8.33 percent. *See* UFIP Memo at B-1 tbl. B-2, JA___. Because the opacity limit is expressed as a whole percentage, Petitioners assume that an opacity testing result of 8.33 percent would be rounded down to 8 percent.

[8] EPA-HQ-OAR-2002-0083-1376, EPA-HQ-OAR-2002-0083-1478, EPA-HQ-OAR-2002-0083-1479, EPA-HQ-OAR-2002-0083-1480, EPA-HQ-OAR-2002-0083-1486, EPA-HQ-OAR-2002-0083-1488, JA___-___.

As for EPA's claim that "new" supplemental monitoring data "provide evidence that there is more variability in each source's operations and opacity than . . . accounted for in developing the final opacity standards," 90 Fed. Reg. at 29488, JA___, the only such evidence in the record appears to be an additional planned bleeder valve opening observation at the Indiana Harbor blast furnace, which resulted in an opacity reading of 20 percent, *see* CCI Recon. at 26, JA___. EPA's unsupported and unexplained assumption that a single additional data point shows steel mills are incapable of meeting the 8 percent opacity limit using EPA's recommended work practices is arbitrary and capricious. As explained above, EPA has ample data showing that steel mills can comply, including data showing Indiana Harbor had previously tested at 8.33 percent opacity (8 percent when rounded to the nearest whole percentage point) and U.S. Steel Gary had tested at 0 percent opacity during both opacity tests it submitted to EPA during the rulemaking. *See* UFIP Memo at B-1 tbls. B-1, B-2, B-3, JA___. And EPA provides no record basis for its apparent assumption that the facility in question was fully implementing the enumerated work practices when this single opacity reading was taken. *See State Farm*, 463 U.S. at 43 (action is arbitrary where agency fails to establish rational connection between facts found and choice made or fails to consider an important aspect of the problem).

Because EPA fails to provide a rational basis for its assumption that steel mills cannot comply with the 2024 Rule's requirements for bell leaks, opacity monitoring frequence at furnaces, and planned bleeder valve openings, the Agency's decision to delay those requirements based on preventing "immediate noncompliance" is unreasonable.

## II. EPA Set New Compliance Deadlines that Are Unlawful and Arbitrary and Capricious.

### A. EPA's Failure to Acknowledge or Apply the Statutory Test for Setting Compliance Deadlines is Unlawful and Arbitrary and Capricious.

Clean Air Act section 112(i)(3) requires EPA to set deadlines that "provide for compliance as expeditiously as practicable" (but no later than three years after a rule's effective date). 42 U.S.C. § 7412(i)(3)(A). Therefore, the "timeframe for effective or compliance dates must be justified in terms of '*assuring compliance* as expeditiously as practicable,'" *Air All. Houston v. EPA*, 906 F.3d 1049, 1067 (D.C. Cir. 2018) (emphasis in original) (interpreting analogous provision of § 7412 which mandates deadlines that "assure[] compliance as expeditiously as practicable").

The IFR confirms that ensuring compliance as expeditiously as practicable was not something EPA even considered in delaying the compliance dates. For example, for fenceline monitoring, EPA states that it is revising the compliance deadline for "consistency" with the other standards. 90 Fed. Reg. at 29489, JA___.

(Page 54 of Total)

In other words, having granted an extension until April 2027 for a number of standards, EPA altered the fenceline monitoring compliance date irrespective of whether the existing date was impracticable. Even for the other deadlines, nothing in the IFR suggests EPA considered whether more expeditious compliance than the three-year statutory maximum was viable for any of the individual requirements. Instead, EPA concluded that an April 2027 deadline would be "sufficient time for compliance," without analyzing whether sources could comply more expeditiously. *See* 90 Fed. Reg. at 29489, JA___.

By ignoring the statutory requirement to ensure compliance "as expeditiously as practicable," EPA deprives it of effect and contravenes the Clean Air Act. *See SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) ("an order may not stand if the agency has misconceived the law"). Further, by neglecting to acknowledge or apply the statutory test for setting compliance deadlines, EPA ignores a "statutorily mandated factor," and thus "fails to take account of this statutory limit on its authority, making the agency's reasoning arbitrary and capricious." *Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1216 (D.C. Cir. 2004) (citation modified); *see also State Farm*, 463 U.S. at 43 (agency action is arbitrary and capricious where it "entirely failed to consider an important aspect of the problem").

41

**B.    EPA's Reliance on Reconsideration Proceedings to Delay Industry Compliance Obligations is Unlawful and Arbitrary and Capricious.**

Clean Air Act section 307(d)(7)(B) specifies that reconsideration "shall not postpone the effectiveness of the rule" except that the "effectiveness of the rule may be stayed during such reconsideration . . . for a period not to exceed three months." 42 U.S.C. § 7607(d)(7)(B); *see Air All. Houston*, 906 F.3d at 1060-61. Nonetheless, EPA admits it is using the IFR to delay the 2024 Rule's compliance deadlines at least in part to "allow sufficient time to address the issues [under reconsideration]." 90 Fed. Reg. at 29488-89, JA___-___. EPA's open use of an IFR to do what is forbidden under section 307(d)(7)(B) therefore contravenes the Clean Air Act and defies D.C. Circuit precedent. EPA's action also runs counter to D.C. Circuit and Supreme Court precedent prohibiting such end runs around fundamental statutory commands. *See, e.g.*, *County of Maui v. Haw. Wildlife Fund*, 590 U.S. 165, 178-79 (2020); *Apple Inc. v. Pepper*, 587 U.S. 273, 283-85 (2019); *NRDC v. EPA*, 777 F.3d 456, 466-67 (D.C. Cir. 2014).

EPA's reliance on reconsideration proceedings to justify delaying the 2024 Rule's deadlines is also arbitrary and capricious. As explained above, the Clean Air Act directs EPA to consider only one factor when setting compliance deadlines for air toxics standards: whether such deadlines "provide for compliance as expeditiously as practicable." 42 U.S.C. § 7412(i)(3)(A). The Agency's

42

explanatory focus must be on the soonest practicable date "for regulated parties *to comply with the rule expeditiously* — not for the agency to engage in the regulatory process." *Air All. Houston*, 906 F.3d at 1067 (emphasis in original). Therefore, EPA's invocation of reconsideration is reliance on a "factor[] which Congress has not intended it to consider" and is therefore unreasonable. *State Farm*, 463 U.S. at 43.

### C.    EPA's Explanations for the New Compliance Deadlines Are Inadequate and Inconsistent.

An agency must, "at a minimum," explain the basis for its conclusions, including "the facts and policy concerns it relies on," such that a reviewing court can conclude that "a reasonable person could have made the judgment the agency did." *Tennessee Gas Pipeline Co. v. FERC*, 969 F.2d 1141, 1145 (D.C. Cir. 1992). EPA's justifications for extending the 2024 Rule's compliance deadlines do not meet even these "minimum" requirements.

For example, EPA justifies extending compliance deadlines for three Rule provisions that were slated to go into effect on April 3, 2026, based on unspecified "additional information provided by the petitioners after promulgation of the rule and after further discussions and analyses." 90 Fed. Reg. at 29488, JA___. EPA never indicates what this additional information is or how it supports the Agency's decision. The IFR also alludes to "some feasibility challenges" with the requirements for iron beaching, without additional specificity or citation to

43

administrative record findings. *Id*. These generic and conclusory statements do not enable judicial review of EPA's decision. *Coburn v. McHugh*, 679 F.3d 924, 934 (D.C. Cir. 2012) ("At the very least, the [agency] must provide an explanation that will enable the court to evaluate the agency's rationale at the time of decision." (citation modified)).

At minimum, EPA has failed to explain why it decided to give the same new compliance deadline for all seven delayed standards, when the alleged "documented issues regarding compliance with the 2024 rule" that prompted the change are diverse in nature. 90 Fed. Reg. at 29488-89, JA___-___. For several standards, including work practices for bell leaks and unplanned bleeder valve openings, EPA asserts there are ambiguities in the regulatory text that require clarification. 90 Fed. Reg. at 29488, JA___. For other standards, such as those involving opacity limits, EPA suggests that the opacity limits may need to be recalculated, a process that presumably takes more time than amending regulatory text. *Id*. Nowhere in the IFR does EPA provide any explanation for its apparent belief that disparate alleged problems all require exactly the same solution. *See State Farm*, 463 U.S. at 56-57 (agency acts arbitrarily where it treats different situations the same without providing a rational basis for doing so).

44

**D.    EPA Did Not Provide a Reasoned Explanation for Reversing Prior Conclusions Regarding the Feasibility of the Original Deadlines.**

Where an agency reverses a prior decision or policy, it must offer a "reasoned explanation . . . for disregarding facts and circumstances that underlay . . . [the] prior policy." *FCC v. Fox Television Stations, Inc.,* 556 U.S. 502, 516 (2009). In the 2024 Rule, EPA carefully considered and rejected various industry arguments asserting steel mills' inability to comply with the new standards. In the IFR, EPA reverses course—adopting the very industry arguments it previously rejected—but without supporting evidence or a reasoned explanation.

For example, EPA claims that "new" industry-collected data showing higher opacity concentrations for slag processing and handling necessitates reconsideration of the opacity limit for these activities. 90 Fed. Reg. at 29488, JA___. While those data do post-date the comment period, they do not show anything "new." EPA was well aware during the rulemaking that opacity measurements at some facilities sometimes exceeded the limit. *See* RTC at 94-95, JA ___-___. It expressly rejected the notion that these occasional exceedances, measured before any limit existed, show the limit is unachievable, concluding instead that because "300+ readings of opacity data collected from the 2022 section 114 collection requests," show "most opacity readings . . . done at slag

45

processing in 2022 were below 10 percent," the 10 percent opacity limit could be maintained safely. *Id.*

The only explanation EPA now offers for its changed position regarding the viability of a 10 percent opacity limit for slag processing is that it is "based on additional information provided by the petitioners after promulgation of the rule" and "further discussions and analyses." 90 Fed. Reg. at 29488, JA___. Although the IFR does not specify what "additional information" refers to, *see supra* Argument II.C, there is record evidence that Cleveland-Cliffs submitted 14 additional opacity test results with its reconsideration petition. *See* CCI Recon. Attach. A: II&S MACT Final Rule Technical Report – UFIP and Fenceline Monitoring at 21, JA___. These few after-the-fact data points alone do not undermine EPA's conclusion that the majority of 300+ opacity readings it reviewed were below the 10 percent limit. In addition, this "additional information" simply confirms what EPA already knew: before the limit existed, emissions were sometimes higher than that limit. This unsurprising fact scarcely shows that steel mills are incapable of meeting the limits, and EPA does not identify any other particular insights from the new data or explain why they caused EPA to reverse its prior conclusion.

EPA's assertion that it "failed to adequately consider some feasibility challenges with certain required work practices" to limit beaching emissions,

90 Fed. Reg. at 29488, JA___, is also contrary to the Agency's previous record analysis. The 2024 Rule requires steel mills to "have full or partial enclosures for the beaching process or use $CO_2$ to suppress fumes" and "minimize the height, slope and speed of beaching." 89 Fed. Reg. at 23303, JA___. Responding to comments on the 2024 Rule, EPA repudiated industry-proffered concerns regarding the feasibility of partial enclosures and carbon dioxide suppression systems for managing beaching emissions, noting that "[t]hese work practices are already in place at some facilities." RTC at 107-108, JA___-___. EPA further explained that, "based on information collected" during the rulemaking process, EPA determined "even partial (hoods) enclosures will result in emission reductions from beaching," RTC at 107-108, JA___-___, and that costs to industry would be minimal given that "four of the six facilities that had beaching operations in 2022 [already] have a full or partial enclosure for beaching processes," RTC at 231, JA___. Again, EPA offers no explanation for its reversal regarding the feasibility of beaching work practices and its corresponding decision to delay the compliance date for this component of the 2024 Rule.

In short, EPA's new compliance deadlines "rest[] upon factual findings that contradict those which underlay its prior" deadlines and EPA has not provided a "reasoned explanation . . . for disregarding facts and circumstances" that supported the prior deadlines. *Fox Television Stations*, 556 U.S. at 516.

## CONCLUSION

For the reasons set forth above, Petitioners respectfully ask that the Court vacate the IFR.

Dated: December 1, 2025

Respectfully submitted,

*/s/ Adrienne Y. Lee*
Adrienne Y. Lee
James S. Pew
Earthjustice
1001 G Street NW, Suite 1000
Washington, D.C. 20001
(202) 667-4500
alee@earthjustice.org
jpew@earthjustice.org

*Counsel for Clean Air Council, Gary Advocates for Responsible Development, Hoosier Environmental Council, Just Transition Northwest Indiana, and Sierra Club*

48

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), counsel hereby certifies that the foregoing document contains 10,412 words, as counted by counsel's word processing system, and thus complies with the 13,000-word limit. *See* Fed. R. App. P. 32(a)(7)(B)(i).

Further, this document complies with the typeface and type-style requirements of the Federal Rules of Appellate Procedure, 32(a)(5) and (a)(6), because this document has been prepared in a proportionally spaced typeface using **Microsoft Word for Microsoft 365** using **size 14 Times New Roman** font.

Dated: December 1, 2025

*/s/ Adrienne Y. Lee*
Adrienne Y. Lee

**CERTIFICATE OF SERVICE**

I hereby certify that on this 1st day of December, 2025, I filed the foregoing document with the Court's CMS/ECF system, which will notify each party.

Dated: December 1, 2025

/s/ Adrienne Y. Lee
Adrienne Y. Lee

50