**ORAL ARGUMENT NOT YET SCHEDULED**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

No. 25-1163 (consolidated with No. 25-1286)

CLEAN AIR COUNCIL, *et al.*,
*Petitioners*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, *et al.*,
*Respondents*.

Petition for Review of Actions of the U.S. Environmental Protection Agency

**EPA'S PROOF ANSWERING BRIEF**

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*
ROBERT N. STANDER
*Deputy Assistant Attorney General*

MARIO A. LUNA
U.S. Department of Justice
*Of Counsel*:                                    Environment and Natural Resources Division
Environmental Defense Section
STEVE ANDERSON                          P.O. Box 7611
U.S. Environmental Protection Agency    Washington, D.C. 20044
Office of General Counsel                (202) 532-3357
Washington, D.C.                         Mario.Luna@usdoj.gov

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

As required by D.C. Circuit Rule 28(a)(1), I certify as follows:

## A.      Parties and Amici.

All parties and intervenors appearing in this Court are identified in Petitioners' Supplemental Opening Brief.  On January 20, 2026, United States Steel Corporation, Cleveland-Cliffs, Inc., and American Iron and Steel Institute moved for leave to intervene in Case No. 25-1286.

## B.      Rulings Under Review.

References to the rulings at issue appear in Petitioners' Supplemental Opening Brief.

## C.      Related Cases.

This case was not previously before this Court or any other court.

/s/ Mario A. Luna
MARIO A. LUNA

Counsel for Respondents

**TABLE OF CONTENTS**

Certificate as to Parties, Rulings, and Related Cases ................................. i

Table of Contents ........................................................................ ii

Table of Authorities ....................................................................v

Glossary ...............................................................................ixx

Introduction ............................................................................1

Statement of Jurisdiction ................................................................3

Issues Presented .........................................................................3

Pertinent Statutes and Regulations .......................................................4

Statement of the Case ....................................................................4

    I.       Statutory Background ........................................................4

          A.     Clean Air Act section 112 .................................................4

          B.     The Clean Air Act's procedural requirements for rulemaking. ...............................................................5

    II.      Regulatory and Procedural Background ........................................6

          A.     In 2020, EPA found that the standards for integrated iron and steel provided an ample margin of safety to protect public health. ...............................................................7

          B.     The 2024 Rule strengthened the already protective standards ...............................................................8

          C.     EPA diligently assessed the issues raised by regulated entities. ...............................................................10

          D.     EPA issued the interim final rule and later issued the final rule after notice and comment. ...............................12

Summary of Argument ............................................................................15

Standard of Review.............................................................................18

Argument.............................................................................................19

    I.     EPA Lawfully Extended the Original Compliance Deadlines............19

          A.     EPA explained why the original compliance deadlines were infeasible and reasonably revised them. ..........................20

               1.     Planned Bleeder Valve Openings....................................21

               2.     Unplanned Bleeder Valve Openings ..............................25

               3.     Bell Leaks ......................................................................27

               4.     Beaching ........................................................................31

               5.     Blast Furnace Casthouses and Basic Oxygen Process Furnace Shops Work Practices..........................32

               6.     Slag Handling Processes.................................................34

                7.     Fenceline Monitoring .....................................................37

           B.     The new compliance deadlines provide for compliance as expeditiously as practicable and hew to the statute's three-year cap............................................................................38

          C.     The challenged rules delayed the 2024 Rule's compliance deadlines, not its effective date..............................................40

    II.    Petitioners' Procedural Arguments Are Moot and, In Any Event, They Are Meritless. ...............................................................42

          A.     The Interim Final Rule served as notice of the Final Rule and promulgation of the Final Rule cured the alleged procedural defects. ...............................................................42

          B.     EPA lawfully invoked the good-cause exception because notice and comment was impracticable. ..................................45

III. The Court Should Not Vacate Either Rule...........................51

Conclusion .................................................................................53

Certificates of Compliance and Service.................................................54

# TABLE OF AUTHORITIES

## CASES

*Air Alliance Hous. v. EPA*,
906 F.3d 1049 (D.C. Cir. 2018)............................................................ 20, 40, 41

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
988 F.2d 146 (D.C. Cir. 1993)................................................................... 51, 52

*Am. Bar Ass'n v. FTC*,
636 F.3d 641 (D.C. Cir. 2011)...........................................................................42

*Appalachian Power Co. v. EPA*,
251 F.3d 1026 (D.C. Cir. 2001).........................................................................50

*Ass'n of Battery Recyclers, Inc. v. EPA*,
716 F.3d 667 (D.C. Cir. 2015)............................................................................5

*Black Oak Energy, LLC v. FERC*,
725 F.3d 230 (D.C. Cir. 2013)................................................................... 51, 52

*Catawba Cnty. v. EPA*,
571 F.3d 20 (D.C. Cir. 2009)............................................................................18

*Env't Def. Fund, Inc. v. EPA*,
716 F.2d 915 (D.C. Cir. 1983)..........................................................................50

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ........................................................................................18

*FDA v. Wages & White Lion Invs., L.L.C.*,
604 U.S. 542 (2025) ........................................................................................18

*Heartland Reg'l Med. Ctr. v. Sebelius*,
566 F.3d 193 (D.C. Cir. 2009)..........................................................................51

*Huntsman Petrochemical LLC v. EPA*,
114 F.4th 727 (D.C. Cir. 2024) ........................................................................18

*Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*,
591 U.S. 657 (2020) ............................................................................ 16, 43, 44

---

\* Authorities chiefly relied upon are marked with an asterisk.

*Loper Bright Enters. v. Raimondo,
   603 U.S. 369 (2024) ........................................................19

La. Env't Action Network v. EPA (LEAN),
   955 F.3d 1088 (D.C. Cir. 2020)........................................8

Mid-Tex Elec. Coop., Inc. v. FERC,
   822 F.2d 1123 (D.C. Cir. 1987)......................................49

*Miss. Comm'n on Env't Quality v. EPA,
   790 F.3d 138 (D.C. Cir. 2015)........................................18

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,
   463 U.S. 29 (1983) ........................................................39

Nat'l Ass'n of Farmworkers Orgs. v. Marshall,
   628 F.2d 604 (D.C. Cir. 1980)................................. 50, 51

Tri-County Telephone Ass'n v. FCC,
   999 F.3d 714 (D.C. Cir. 2021)................................. 46, 48

**STATUTES**

5 U.S.C. § 553(b) ...............................................................5

5 U.S.C. § 553(b)(A), (B) ..................................................6

5 U.S.C. § 553(d)(5)...........................................................5

42 U.S.C. § 7412 ...............................................................4

42 U.S.C. § 7412(d)(2).......................................................4

42 U.S.C. § 7412(d)(3).......................................................4

42 U.S.C. § 7412(d)(6).....................................................5, 7

42 U.S.C. § 7412(d)(10) ...................................................39

42 U.S.C. § 7412(f)(2) .......................................................5

42 U.S.C. § 7412(h) ...........................................................4

---

\* Authorities chiefly relied upon are marked with an asterisk.

42 U.S.C. § 7412(i)(3)(A) ............................................ 1, 5, 13, 19, 38, 39

42 U.S.C. § 7607(b)(1)...................................................................................3

42 U.S.C. § 7607(d)(1)...................................................................................6

42 U.S.C. § 7607(d)(1)(C) .........................................................................5, 41

42 U.S.C. § 7607(d)(3)...................................................................................5

42 U.S.C. § 7607(d)(6)(B) .............................................................................6

42 U.S.C. § 7607(d)(7)(B) ........................................................ 6, 12, 41, 48

42 U.S.C. § 7607(d)(8).................................................................................45

42 U.S.C. § 7607(d)(9)(A)...........................................................................18

## CODE OF FEDERAL REGULATIONS

40 C.F.R. part 60, App. A-4 .......................................................................29

40 C.F.R. part 63, subpart FFFFF ...............................................................7

40 C.F.R. § 63.7793(f)(8) ...........................................................................33

40 C.F.R. § 63.7821(l) ................................................................................28

40 C.F.R. § 63.7823(c)(3)(i) .......................................................................33

40 C.F.R. § 63.7823(d)(6) ...........................................................................33

40 C.F.R. § 63.7852 .............................................................................. 22, 26

## FEDERAL REGISTER

68 Fed. Reg. 27646 (May 20, 2003) ............................................................7

85 Fed. Reg. 42074 (July 13, 2020)..........................................................7, 8

88 Fed. Reg. 49402 (July 31, 2023)...........................................................29

89 Fed. Reg. 23294 (Apr. 3, 2024) .. 6, 8, 9, 13-14, 21, 22, 25-26, 28, 30-34, 37, 50, 53

_____

\* Authorities chiefly relied upon are marked with an asterisk.

90 Fed. Reg. 14207 (Mar. 31, 2025).......................................................... 12, 34, 48

90 Fed. Reg. 29485 (July 3, 2025)........ 12, 13, 20, 30, 36, 37, 39, 40, 43, 46, 47, 49

90 Fed. Reg. 39333 (Aug. 15, 2025)............................................................... 14, 43

90 Fed. Reg. 40975 (Aug. 22, 2025)............................................................... 14, 43

90 Fed. Reg. 55681 (Dec. 3, 2025)..................... 2, 15, 20, 33, 35, 36, 37, 39, 44, 53

---

* Authorities chiefly relied upon are marked with an asterisk.

# GLOSSARY

| | |
|---|---|
| 2020 Rule | National Emission Standards for Hazardous Air Pollutants: Integrated Iron and Steel Manufacturing Facilities Residual Risk and Technology Review, 85 Fed. Reg. 42074 (July 13, 2020) |
| 2024 Rule | National Emission Standards for Hazardous Air Pollutants: Integrated Iron and Steel Manufacturing Facilities Technology Review, 89 Fed. Reg. 23294 (Apr. 3, 2024) |
| CAA or Act | Clean Air Act |
| EPA | U.S. Environmental Protection Agency |
| Final Rule | National Emission Standards for Hazardous Air Pollutants: Integrated Iron and Steel Manufacturing Facilities Technology Review, 90 Fed. Reg. 55681 (Dec. 3, 2025) |
| Interim Final Rule | National Emission Standards for Hazardous Air Pollutants: Integrated Iron and Steel Manufacturing Facilities Technology Review: Interim Final Rule, 90 Fed. Reg. 29485 (July 3, 2025) |
| MACT | Maximum achievable control technology |
| RTC | Response to Comments |

## INTRODUCTION

The U.S. Environmental Protection Agency (EPA) regulates hazardous air pollutants or "air toxics" under section 112 of the Clean Air Act. When EPA sets or revises emissions standards, the statute instructs EPA to set deadlines that achieve compliance "as expeditiously as practicable, but in no event later than 3 years after the effective date of such standard." 42 U.S.C. § 7412(i)(3)(A). The final rule challenged in this case revises compliance deadlines for emissions standards issued under section 112. Those deadline revisions are consistent with the statute and should be upheld.

In 2024, EPA promulgated new standards for previously unregulated emissions and strengthened other existing standards that already provided the ample margin of safety required by section 112. EPA set compliance deadlines for these standards from one to three years after promulgation based on the information then available. Soon after EPA issued the 2024 rule, however, regulated entities submitted extensive petitions for reconsideration identifying errors, ambiguities, and compliance issues that made compliance by the original deadlines infeasible. These entities also raised operational-safety concerns and the need for feasible standards to support reliable iron and steel production for critical infrastructure and national security needs. EPA promptly began evaluating those issues.

1

But by the time EPA determined that substantive rulemaking was necessary to address the identified issues, the first set of compliance deadlines was only a month away. As a result, EPA administratively stayed the approaching deadlines and separately issued an interim final rule to revise the original deadlines. In doing so, EPA invoked the Administrative Procedure Act's good-cause exception to forgo notice and comment to avoid disruptive noncompliance across the domestic iron and steel industry.

In the interim final rule, EPA determined that, given the issues identified with certain standards, the original compliance deadlines for these standards were not practicable, and it thus revised those deadlines to April 3, 2027. Those deadlines complied with the Clean Air Act's requirement to provide for compliance "as expeditiously as practicable, but in no event later than 3 years after the effective date of such standard." The Agency solicited comments on the interim final rule and, in December 2025, issued a final rule responding to comments and concluding that the amendments in the interim final rule were warranted. 90 Fed. Reg. 55681 (Dec. 3, 2025).

The compliance deadline revisions in EPA's final rule comply with the Clean Air Act and must be upheld. First, the Clean Air Act authorizes EPA to revise its rules through rulemaking, and EPA reasonably explained—standard by standard—why the original deadlines could not be met and why the revised

2

deadlines met the Act's requirement. Second, Petitioners' procedural objections are mooted by the process that EPA followed: EPA issued the interim final rule noticing the revision to compliance deadlines, took comments on those revisions, held a public hearing, responded to those comments, and issued a final rule affirming that the revised compliance deadlines were warranted, thereby satisfying the full slate of Clean Air Act notice-and-comment procedures. And in any case, EPA had good cause to issue the interim final rule given the approaching compliance cliff and the need to prevent widespread noncompliance in the integrated iron and steel industry, which implicated operational-safety and national security concerns.

The Court should deny the petitions.

## STATEMENT OF JURISDICTION

This Court has jurisdiction under 42 U.S.C. § 7607(b)(1).

## ISSUES PRESENTED

1. Whether EPA's revised compliance deadlines—which require integrated iron and steel sources to meet their standards as expeditiously as practicable—are reasonably explained and supported by the record.

2. Whether EPA's interim final rule and final rule together complied with "the maximum procedural requirements" of the Clean Air Act such that Petitioners' procedural arguments are now moot.

3

**PERTINENT STATUTES AND REGULATIONS**

All pertinent statutes and regulations not included in Petitioners' Opening Brief are set forth in the Supplemental Addendum to this brief.

**STATEMENT OF THE CASE**

**I.      Statutory Background**

**A.      Clean Air Act section 112.**

Congress established a detailed set of instructions for EPA's air toxics program under section 112 of the Clean Air Act ("CAA" or "Act"). Specifically, section 112(d)(2)–(3) requires EPA to establish initial standards for certain air pollutants emitted by each source category that reflect the maximum degree of emission reductions achievable after considering cost, energy requirements, and non-air quality health and environmental impacts. 42 U.S.C. § 7412(d)(2)–(3). These standards are commonly referred to as the maximum achievable control technology ("MACT") standards. The Act also establishes a minimum level for MACT standards, known as the MACT "floor." *Id.* § 7412. In addition, in certain instances, as provided in section 112(h), if in EPA's judgement it is not feasible to prescribe or enforce a numerical emission standard, EPA may set work practice standards in lieu of such numerical limits. *Id.* § 7412(h).

After EPA sets initial standards, the Act requires two different types of reviews. Section 112(f)(2) of the Act requires EPA to review, within eight years of

promulgating the MACT standards, the risk that remains after implementing the initial standards and to promulgate additional standards as needed to protect public health with an adequate margin of safety or to prevent an adverse environmental effect. *Id.* § 7412(f)(2). This review is known as the "residual-risk review." Furthermore, section 112(d)(6) of the Act requires EPA to review MACT standards every eight years and revise them "as necessary," considering developments in practices, processes, and control technologies and other relevant factors, including cost. *See Ass'n of Battery Recyclers, Inc. v. EPA*, 716 F.3d 667, 673-74 (D.C. Cir. 2013); 42 U.S.C. § 7412(d)(6). This review is known as the "technology review."

Additionally, section 112(i)(3)(A) of the Act requires EPA to establish compliance dates for initial and revised standards that provide for existing sources to comply "as expeditiously as practicable, but in no event later than 3 years after the effective date of such standard." 42 U.S.C. § 7412(i)(3)(A).

**B.      The Clean Air Act's procedural requirements for rulemaking.**

The promulgation or revision of any emission standard under section 112(d) must be accompanied by a general notice of proposed rulemaking, a statement of its basis and purpose, and a specification of the comment period. 42 U.S.C. § 7607(d)(1)(C), (d)(3) (citing 5 U.S.C. § 553(b)), (d)(5). Furthermore, the promulgated rule must be, among other things, accompanied by a response to each

of the significant comments, criticisms, and new data submitted in written or oral presentations during the comment period. 42 U.S.C. § 7607(d)(6)(B).

Recognizing that circumstances may arise that require rapid action, Congress also provided in section 307(d) that these procedural requirements "shall not apply" when, as relevant here, "the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." *Id.* § 7607(d)(1) (cross-referencing 5 U.S.C. § 553(b)(A), (B)).[1]

## II. Regulatory and Procedural Background

There are eight operating facilities in the integrated iron and steel manufacturing facilities source category in the United States. 89 Fed. Reg. 23294, 23298 (Apr. 3, 2024) ("2024 Rule"), JA _____. These facilities produce iron and steel for the nation's manufacturing sector, public infrastructure system, and national security sector. *See* Final Rule RTC at 22, JA _____; Cleveland-Cliffs Petition for Reconsideration ("CC Pet.") at 3, JA _____.

---

[1] Section 307(d)(7)(B) of the Act also provides a procedure for requesting mandatory reconsideration of a promulgated rule under certain conditions. 42 U.S.C. § 7607(d)(7)(B). If EPA grants mandatory reconsideration, it may stay implementation for up to three months. *Id.* As explained further below, this separate authority played no part in the challenged deadline revisions here.

**A.** **In 2020, EPA found that the standards for integrated iron and steel provided an ample margin of safety to protect public health.**

To fulfill its obligations under section 112(d) of the Act, EPA first set MACT standards for the integrated iron and steel manufacturing facilities source category in 2003. *See* 40 C.F.R. part 63, subpart FFFFF; 68 Fed. Reg. 27646, 27649 (May 20, 2003), JA \_\_\_\_\_ (changing the compliance date for integrated iron and steel sources from 2 years to 3 years after the effective date due to finding that facilities needed to install new systems and perform significant upgrades). As required by section 112(d)(6) and (f)(2), EPA completed a residual-risk and technology review for the integrated iron and steel manufacturing facilities source category in July 2020. 85 Fed. Reg. 42074 (July 13, 2020) ("2020 Rule"), JA \_\_\_\_\_. In the residual-risk review, EPA assessed facility-wide air-toxic emission estimates, including those from regulated and unregulated sources at integrated iron and steel facilities, and concluded that the then-standards "provide[d] an ample margin of safety to protect public health." *Id.* at 42074, JA \_\_\_\_\_; Development of Emissions Estimates for Risk Assessment at 1, JA \_\_\_\_\_. In its technology review, EPA determined that there had been "no developments in practices, processes, or control technologies that necessitate[d] revision of the standards." 85 Fed. Reg. at 42074, JA \_\_\_\_\_; *see* 42 U.S.C. § 7412(d)(6).

**B.     The 2024 Rule strengthened the already protective standards.**

As EPA acknowledged in the 2020 Rule, shortly before that rule was signed this Court issued its opinion in *Louisiana Environmental Action Network v. EPA*, 955 F.3d 1088, 1098-99 (D.C. Cir. 2020) ("*LEAN*"), holding that EPA must address unregulated pollutants in its technology reviews. 85 Fed. Reg. at 42091 n.12, JA _____. At the time of the 2020 Rule's signature, the Court had not yet issued the mandate in that case. *Id.*

In the 2024 Rule, EPA explained that the purpose of that rule was to complete a technology review that addressed unregulated pollutants in accordance with *LEAN*. 89 Fed. Reg. at 23295, 23297, JA _____, _____. Under a court-ordered March 11, 2024, deadline, EPA did so. *Id.* at 23297, JA _____.

The 2024 Rule finalized:

- new emissions limits based on MACT for five then-unregulated air toxics from the sinter plants located at integrated iron and steel manufacturing facilities;

- new MACT standards, in the form of opacity limits and work practice standards, for five unregulated sources of unmeasured fugitive and intermittent particulate emissions: Unplanned Bleeder Valve Openings, Planned Bleeder Valve Openings, Slag Pits, Beaching, and Bell Leaks;

- new emissions limits for unregulated pollutants for blast furnaces, blast furnace stoves, and basic oxygen process furnaces;

- work practice standards for the basic oxygen process furnace shops;

- a revised requirement that facilities conduct Method 9 readings at the basic oxygen process furnace shop and blast furnace casthouse;

- a fenceline monitoring requirement for chromium to help ensure the work practices and opacity limits are achieving the anticipated reductions; and

- revised standards for certain air toxics from sinter plants to reflect the installation and operation of emission-control technology.

89 Fed. Reg. at 23295, JA _____.

In a change from the approach taken in the initial 2003 standards, EPA set variable compliance deadlines for each standard for one, two, or three years after the 2024 Rule's promulgation—based on EPA's consideration of the information then available to the Agency. 89 Fed. Reg. at 23314 & tbl. 5, JA _____. Notably, the 2024 Rule preamble did not expressly reference the statutory requirement in section 112(i)(3), and EPA did not explain in detail its rationale for selecting the deadlines the agency finalized. *See id.*; 2024 Rule RTC at 195-200, JA _____-_____.

**C. EPA diligently assessed the issues raised by regulated entities.**

The 2024 Rule, promulgated under a court-ordered deadline, met with administrative reconsideration petitions from regulated entities soon after it was finalized. *See* CC Pet., JA \_\_\_\_\_-\_\_\_\_\_, and U.S. Steel Petition for Reconsideration ("U.S. Steel Pet."), JA \_\_\_\_\_-\_\_\_\_\_. Those petitions detailed errors and ambiguities in the final regulatory text, pointed to compliance challenges with several standards, identified operational-safety concerns with attempting to comply with certain provisions as written, and emphasized the importance of feasible standards for reliable iron and steel production to support national infrastructure and national security needs, particularly for applications in the defense industry, homeland security, and critical infrastructure. *See* CC Pet. at 3, 18-40, JA \_\_\_\_\_, \_\_\_\_\_-\_\_\_\_\_; U.S. Steel Pet. at 9-15, JA \_\_\_\_\_-\_\_\_\_\_.

In response, in August 2024, EPA issued a letter granting discretionary reconsideration of three standards, including the work practice standards for unplanned bleeder valve openings and beaching, and stating that the Agency intended to issue a correction notice to address "errors and ambiguities in the [2024 Rule]." August 2024 Reconsideration Letter, JA \_\_\_\_\_-\_\_\_\_\_. To address these errors and ambiguities, EPA committed to clarifying (i) "that the definition of an unplanned bleeder valve opening includes only those openings that are not located downstream from a control device (*i.e.*, 'dirty bleeder valve openings')"; (ii) "the

timing of planned openings and how they may affect opacity readings"; (iii) "the definition of a single bleeder valve opening event"; and (iv) "the method that must be used to measure opacity for bell leaks." *Id.* Additionally, EPA committed to deleting "from Part 63, subpart FFF [sic], Table 2 the emissions standard for 'windbox exhaust stream' for BF casthouses, BF stoves, and basic oxygen process furnace (BOPF) shops" because EPA erroneously included that standard in the regulatory text even though these sources do not have a windbox exhaust stream. *Id.* Furthermore, "[g]iven the large amount of complex data involved," EPA committed to continue evaluating the petitions to determine whether the Agency should reconsider other issues. *Id.*

Following the August 2024 letter, EPA met with regulated entities in September, November, and December 2024 to discuss the issues identified in the reconsideration letter as well as compliance and timing concerns. Industry Meetings September-December 2024, JA _____-_____. Additionally, regulated entities provided EPA with information about newly identified concerns outside the scope of the Agency's announced reconsideration. *Id.* Throughout late 2024 and 2025, EPA diligently sought to timely address these deficiencies, all while continuing to examine other issues identified in the petitions and undergoing a change in administration that required the Agency to balance competing deadlines and adjust to turnovers in its staff and leadership.

11

By March 2025, it had become clear that fixing the identified issues would require rulemaking rather than a simple correction notice. March 2025 Reconsideration Letter, JA _____-_____. The standards EPA identified for mandatory consideration included: (i) the "[w]ork practice standards for unmeasured fugitive and intermittent particulate from unplanned bleeder valve openings;" (ii) the "[o]pacity limit for planned bleeder valve openings;" (iii) the "[w]ork practice standards for bell leaks;" and (iv) the "opacity limit for slag processing and handling." *Id.* EPA stated that it intended to undertake a rulemaking to reconsider these standards along with the issues identified in the August 2024 Reconsideration Letter. *Id.* But considering that certain standards in the 2024 Rule had impending compliance deadlines one month away, EPA issued a 90-day administrative stay of those deadlines until July 1, 2025. 90 Fed. Reg. 14207, 14208 (Mar. 31, 2025), JA _____; *see* 42 U.S.C. § 7607(d)(7)(B).

### D. EPA issued the interim final rule and later issued the final rule after notice and comment.

Separately, EPA invoked the good-cause exception to promulgate an interim final rule in July 2025, finding that the original compliance deadlines for certain standards were infeasible given the issues identified and that it was impracticable to seek notice and comment on revised deadlines before the original deadlines would pass. 90 Fed. Reg. 29485 (July 3, 2025) ("Interim Final Rule"), JA _____-_____. The Interim Final Rule revised the original deadlines to April 3, 2027. *Id.* at

29488-89, JA _____-_____. EPA also revised the compliance deadline for fenceline monitoring, which was keyed off the compliance deadlines, to align with the new deadlines. *Id.* at 29489, JA _____. These revisions reflected EPA's considered assessment of the time it would take for regulated industries to comply with the standards as written, without exceeding the three-year statutory limit from the effective date of the 2024 Rule. *See* 42 U.S.C. § 7412(i)(3)(A). Meanwhile, EPA stated that it would substantively address the underlying standards through a separate rulemaking. 90 Fed. Reg. at 29489, JA _____.

The table below sets out the original and revised compliance deadlines for those standards. *Compare* 89 Fed. Reg. at 23314 tbl. 5, JA _____, *with* 90 Fed. Reg. at 29489, JA_____.

| Source | Original Compliance Date | Revised Compliance Date |
|---|---|---|
| Opacity limits for planned openings of bleeder valves | April 3, 2025 | April 3, 2027 |
| Work practice standards for bell leaks | April 3, 2025 | April 3, 2027 |
| Opacity monitoring frequency for blast furnace casthouses and basic oxygen process furnace shops | April 3, 2025 | April 3, 2027 |
| Operational limits and work practice standards and for unplanned bleeder valve openings | April 3, 2026 | April 3, 2027 |
| Opacity limit for slag processing activities | April 3, 2026 | April 3, 2027 |
| Work practice standards for beaching | April 3, 2026 | April 3, 2027 |

| Fenceline monitoring for chromium | 1 year after promulgation of fenceline method or April 3, 2026, whichever is later | 1 year after promulgation of fenceline method or April 3, 2027, whichever is later |
|---|---|---|

In the context of air toxics regulation, opacity refers to a measure of the amount of light that is blocked or absorbed by an air pollution plume (an indicator of air-toxic emissions). 89 Fed. Reg. at 23295, JA _____. An opacity level of 0 percent means that plumes do not block or absorb light and are fully transparent (*i.e.*, no visible emissions), while an opacity of 100 percent means that plumes are dense and block all light (*i.e.*, no background behind the plume can be observed). *Id.* Furthermore, the 2024 Rule requires a certain method (EPA Method 9) for measuring opacity that involves visual opacity readings conducted by qualified observers. *Id.* These readings must follow specific procedures, including requirements for the observer's angle relative to the plume and to the sun, the point of observation, background interference, etc. *Id.* Observers are trained and certified and require periodic recertification every six months. *Id.*

In the Interim Final Rule, EPA solicited comments on the revised compliance deadlines and later extended the comment period to allow for a public hearing that Petitioners requested. 90 Fed. Reg. 39333 (Aug. 15, 2025), JA _____-_____; 90 Fed. Reg. 40975 (Aug. 22, 2025), JA _____-_____.

In July 2025, Petitioners sought review of the Interim Final Rule and moved for summary vacatur or, in the alternative, a stay based largely on alleged procedural errors with the Interim Final Rule. Pet'rs' Mot. at 9-12. This Court denied Petitioners' motion and subsequently set a briefing schedule.

Petitioners filed their opening brief on December 1, 2025. Two days later, EPA published a final rule that considered and responded to comments on the Interim Final Rule and concluded that the revised compliance deadlines were warranted. 90 Fed. Reg. 55681 (Dec. 3, 2025) ("Final Rule"), JA _____-_____. On December 22, 2025, the Court then suspended the briefing schedule, and on January 6, 2026, upon consideration of several motions, consolidated the petitions for review of the Interim Final Rule and the Final Rule and set a new briefing schedule. Petitioners filed their supplemental opening brief on January 15, 2026.

## SUMMARY OF ARGUMENT

I.      The Clean Air Act requires existing sources to comply with section 112(d) standards "as expeditiously as practicable," but no later than three years after the effective date of the rule promulgating those standards. EPA followed that requirement to the letter. Petitioners accuse EPA of a statutory violation by claiming that the Agency did not comply with this requirement. But no one disputes that the revised compliance deadlines do not exceed the three-year cap. In addition, the revisions still require that regulated entities comply as expeditiously

15

as possible. Those revisions are also reasonably supported by the record. After promulgating the 2024 Rule, EPA received extensive reconsideration petitions and new data identifying errors, ambiguities, and feasibility issues with certain standards. In the Interim Final Rule and Final Rule, EPA evaluated that record and exercised its reasoned technical judgment to explain—standard by standard—why regulated entities could not comply with the original deadlines for certain standards and why an April 3, 2027 compliance deadline was appropriate. The revised deadlines both reflect EPA's reasoned judgment based on the record and accord with the Act's three-year outer limit. Furthermore, Petitioners' arguments confuse the Act's limitations on reconsideration proceedings with EPA's ordinary rulemaking authority to revise its own rules. Ultimately, Petitioners' arguments are record disputes that fail to overcome the substantial deference owed to EPA under the circumstances.

II.     EPA's promulgation of the Final Rule after notice and comment cured the procedural defects alleged here. As the Supreme Court has held, when an agency issues an interim final rule, solicits comments, and then promulgates a final rule after considering those comments, the combined process satisfies the APA's procedural requirements. *Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*, 591 U.S. 657, 683-86 (2020). Petitioners' procedural claims are thus moot. Nor can Petitioners show under section 307(d)(8) of the Act any procedural

error was significantly likely to change the outcome, given EPA's decision—after considering public comments and hearing testimony from Petitioners and others—that the revised deadlines are warranted. But even if this Court were to reach the merits of the procedural claims, EPA had good cause to issue the Interim Final Rule without notice and comment. By the time EPA understood that the 2024 standards would require substantive revisions through rulemaking, the first compliance deadlines were only a month away. EPA thus revised the compliance deadlines without notice and comment due to the identified feasibility concerns, rather than letting these deadlines come to pass, thus triggering industry-wide noncompliance and operational disruption that implicated operational-safety and national security concerns. That falls within the statutorily recognized "good cause" exception.

The Court should thus reject the procedural claims as moot and deny the petitions.

III. Finally, none of Petitioners' claims warrant vacatur of the revised deadlines. Each amount to an alleged failure of explanation or procedure that could readily be corrected on remand, while vacatur would throw the Nation's integrated iron and steel production base into immediate and retroactive noncompliance.

**STANDARD OF REVIEW**

The Clean Air Act applies the same arbitrary-and-capricious standard as the Administrative Procedure Act. *See* 42 U.S.C. § 7607(d)(9)(A); *Miss. Comm'n on Env't Quality v. EPA*, 790 F.3d 138, 150 (D.C. Cir. 2015) (per curiam). The Court gives an "extreme degree of deference" to EPA's evaluation of scientific data within its area of expertise, *Huntsman Petrochemical LLC v. EPA*, 114 F.4th 727, 735 (D.C. Cir. 2024). The question for the Court, then, is not whether it or anyone else "[l]ooking at the same data … would simply reach a different conclusion." *Miss. Comm'n*, 790 F.3d at 162. The question is whether EPA "considered all relevant factors and articulated a rational connection between the facts found and the choice made." *Id.* at 150 (internal quotation marks omitted).

When EPA reverses itself, it must show that there are good reasons for the new policy, but it need not show "that the reasons for the new policy are *better* than the reasons for the old one." *FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 570 (2025) (citing *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (emphasis in original). The Court will also "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Catawba Cnty. v. EPA*, 571 F.3d 20, 50 (D.C. Cir. 2009) (per curiam).

18

**ARGUMENT**

**I.      EPA Lawfully Extended the Original Compliance Deadlines.**

The disputed deadline extensions are lawful because EPA acted within its authority under section 112 of the Act. For one thing, that provision gives regulated entities up to three years to comply. EPA's deadline revisions stay within that cap because even after the revisions, regulated entities have no more than three years from the effective date of the 2024 Rule to comply with the standards. 42 U.S.C. § 7412(i)(3)(A). It is undisputed that EPA abided by this statutory cap.

In addition, section 112 requires that the deadline be as expeditious as practicable. *Id.* That is a technical determination for which the agency receives judicial deference. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 402 (2024). And the record supports EPA's decision that the original deadlines needed to be revised and that the revisions still require regulated entities to comply as expeditiously as practicable.

As detailed below, upon reviewing the petitions for reconsideration and additional information it received, EPA realized there were various flaws in the 2024 Rule's standards. Some standards were finalized with an inappropriate dataset. *See infra* Arg. I.A.1, I.A.2. Other standards were infeasible by the original deadlines in light of new or newly understood information. *See infra* Arg. I.A.1, I.A.4, I.A.6. And in still other instances, EPA finalized standards that contained

19

errors or ambiguities in the regulatory text. *See infra* Arg. I.A.3, I.A.5. Based on the full record before the Agency, EPA reasonably concluded that revisions to the deadlines were warranted so that regulated entities could comply as expeditiously as practicable.

Nor does this Court's precedent in *Air Alliance Houston v. EPA* bar EPA's deadline revisions. 906 F.3d 1049 (D.C. Cir. 2018). Unlike in that case, the disputed rules did not delay a rule's effectiveness. EPA instead revised certain compliance deadlines in the 2024 Rule through a rulemaking based on record findings. 90 Fed. Reg. at 29485, JA _____; 90 Fed. Reg. 55681, JA _____-_____.

### A. EPA explained why the original compliance deadlines were infeasible and reasonably revised them.

After assessing the information and data provided in the petitions for reconsideration and comments on the Interim Final Rule, EPA concluded that regulated entities would be unable to comply with certain standards in the 2024 Rule by the original compliance deadlines. EPA thus revised those deadlines to provide for compliance as "expeditiously as practicable" without exceeding three years. *See* 90 Fed. Reg. at 55684-86, JA _____-_____; Final Rule RTC at 7-15, JA _____-_____. EPA's reasoning is best understood by examining each standard at issue. Each was either finalized without the proper dataset, later shown to be infeasible by the original deadlines in light of new or newly understood information, or promulgated with errors or ambiguities in the regulatory text.

20

Before turning to these standards, however, it will be helpful to have a basic understanding of blast furnaces and basic oxygen process furnaces.

Blast furnaces are tall, chimney-like industrial ovens where operators feed raw materials such as iron ore, lime, sinter, and coke from the top while blasting hot air from the bottom. The heat and gases turn the iron ore into molten iron. *See* 89 Fed. Reg. at 23298, JA _____. Basic oxygen process furnaces are large, pear-shaped, heat-resistant vessels into which molten iron and scrap steel are fed and turned into high-quality steel by blowing pure oxygen into it. *See id.*

### 1.     **Planned Bleeder Valve Openings**

Because EPA did not have the proper data in setting the standard for planned bleeder valve openings, and in light of newly analyzed information, the Agency reasonably determined that the original compliance deadline for this standard was not practicable and that the revised deadline of April 3, 2027, provides for compliance as expeditiously as practicable without exceeding three years.

Bleeder valves are large safety vents on blast furnaces that, when opened, release excess gas pressure in the furnace. Planned bleeder valve openings are operator-initiated, while unplanned bleeder valve openings occur automatically. *See id.*

In theory, because operators have advance notice for planned bleeder valve openings, operators have time to prepare for these openings and take steps to

mitigate emissions from such events, such as by tapping as much iron and slag out of the furnace as possible, removing fuel or stopping fuel injection into the furnace, or lowering bottom pressure. *Id.* at 23301, JA _____. But operators can initiate planned openings on short notice if operators identify an unsafe buildup of pressure. Pressure buildup can occur when raw materials do not descend smoothly after being fed at the top of the blast furnace and accumulate in large masses within the furnace. When the large masses finally dislodge, or slip, due to their weight, a pressure surge results. *Id.* at 23298, JA _____.

In the 2024 Rule, EPA imposed an 8 percent opacity limit for furnaces based on data collected for planned openings where operators had two hours to prepare the furnace for opening and arrange for certified opacity readers. *Id.* at 23301, JA _____. The Agency's dataset thus captured only a subset of planned events by excluding short-notice planned openings that occur in practice. At the same time, the 2024 Rule broadly defined a planned bleeder valve opening as "the opening of a blast furnace pressure relief safety valve that is initiated by an operator." *Id.* at 23329, JA _____; 40 C.F.R. § 63.7852. This definition encompasses every opening that does not happen automatically, regardless of how much advance time was planned for the opening.

In the reconsideration petitions, industry demonstrated that EPA's data collection produced a distorted picture. Because planned openings can and do

22

occur with less than two hours' notice, EPA undercounted their frequency and underestimated their opacity levels. *See* CC Pet. at 23-27, JA \_\_\_\_\_-\_\_\_\_\_; U.S. Steel Pet. at 12, JA \_\_\_\_\_. Therefore, opacity levels during these planned openings can be more variable than EPA's dataset suggested. *See* Final Rule RTC at 9-10, JA \_\_\_\_\_-\_\_\_\_\_; *see also* CC Pet. at 26, JA \_\_\_\_\_. Applying the 2024 Rule's definition, regulated facilities could have insufficient lead time to arrange for a certified opacity reader, as required by the 2024 Rule, or prepare the furnace for the opening to help minimize or eliminate emissions. Final Rule RTC at 10, JA \_\_\_\_\_. Consequently, facilities are more likely to exceed this opacity limit during these short-notice planned openings. *Id.* This would result in fewer emission reductions than expected. It could also increase incidents of unplanned bleeder valve openings. These incidents could be triggered if operators allow furnace pressure to build while attempting to comply with the standard by preparing the furnace for an opening and finding a certified opacity reader. Such incidents would in turn affect the ability to comply with the unplanned bleeder valve opening standard. *Id*.

Petitioners admit that operators employ certain work practices to minimize emissions from planned openings. Pet'rs' Br. at 38. It is therefore striking that, in their supplemental brief, Petitioners now dispute the common-sense conclusion that planned openings conducted on short notice are likely to produce higher

opacity emissions. Pet'rs' Suppl. Br. at 13. Furthermore, Petitioners' argument that "there is no actual data in the record showing that to be true" highlights EPA's entire argument that the Agency set a standard for a safety device without the proper dataset. *Id.*

EPA initially intended to issue a correction notice to modify the definition of planned bleeder valve opening. But because EPA had solicited information on valve openings with at least a two-hour lead time, the Agency did not have the proper data to set a standard applicable to these scenarios. Furthermore, the 2024 Rule only provided two definitions for bleeder valve openings—planned and unplanned. Therefore, amending this definition to include only manual openings with more than 2 hours' advanced planning, so that industry could feasibly meet opacity limits, would have left unregulated air toxics from planned openings with less than 2 hours' notice. Thus, EPA would need to go through rulemaking to address the discrepancy in the definitions and determine how to regulate emissions from these events. Final Rule RTC at 9-10, JA _____.

In addition to the definitional issue, EPA subsequently reviewed an additional planned bleeder valve opening data point provided by industry that was not available during the 2024 Rule's rulemaking, as well as handwritten data from the 2022 information collection request. *Id.* at 10, JA _____. EPA later realized that the additional data point, when included, significantly raises the opacity

produced by emissions at one of the best performing facilities. *Id.*; CC Pet., Attach. A at 10-11, JA \_\_\_\_\_-\_\_\_\_\_. Furthermore, even without the handwritten data, it is now clear to EPA that not collecting data on planned openings with less than 2 hours' notice, along with the additional data point, shows that the standard it set did not adequately account for this source's variability. As a result, contrary to Petitioners' arguments, Pet'rs' Br. at 37-40 and Pet'rs' Suppl. Br. at 9-10, EPA reasonably concluded that this standard poses compliance challenges that cannot be resolved by the original deadline and that, for all the reasons above, the revised deadline provides for compliance as expeditiously as practicable without exceeding three years.

### 2.      Unplanned Bleeder Valve Openings

Because EPA did not have the proper data in setting the standard for unplanned bleeder valve openings, the Agency reasonably determined that the original compliance deadline for this standard was not practicable and that the revised deadline of April 3, 2027, provides for compliance as expeditiously as practicable without exceeding three years.

In the 2024 Rule, EPA set numeric caps for unplanned bleeder valve openings. 89 Fed. Reg. at 23302-03, JA \_\_\_\_\_-\_\_\_\_\_. In that rulemaking, EPA incorporated data from regulated entities on instances of unplanned bleeder valve openings for valves that are not routed to an existing control device (referred to as

"dirty bleeder valve openings"). Final Rule RTC at 13, JA _____. The 2024 Rule, however, defines unplanned bleeder valve opening to include all such openings, regardless of whether they route to an existing control device. 89 Fed. Reg. at 23329, JA _____; 40 C.F.R. § 63.7852. As a result, regulated entities showed that this definition encompasses more openings than EPA accounted for in the dataset and provided data to illustrate their concerns with meeting these operational limits. *See* CC Pet., Attach. A at 3-5, JA _____-_____. Petitioners' arguments to the contrary contradict the common-sense conclusion that a numeric limit on all unplanned openings based on data from only a subset of such openings undermines the accuracy and feasibility of that limit. Pet'rs' Suppl. Br. at 13.

In addition, the 2024 Rule required facilities to install stockline monitors at a minimum of three locations to monitor material levels in the furnace and alert operators to conditions indicating a slip may occur, to enable them to take action to prevent slips and unplanned openings. Additionally, regulated entities again informed EPA that the requirement to install stockline monitors at three locations, regardless of whether certain facilities are already meeting this requirement, is not feasible or may be redundant in certain smaller furnaces with limited space. CC Pet. at 22, Attach. A at 2, 6-8, JA _____, _____-_____; Pet'rs' Suppl. Br. at 14.

EPA initially intended to issue a correction notice to modify the definition of unplanned bleeder valve opening. But because EPA only received information on a

subset of unplanned bleeder valve openings, the Agency set the standard using data that was not representative of the process. Thus, EPA would need to go through rulemaking to address the work practice standard for unplanned bleeder valve openings. Final Rule RTC at 13, JA _____.

For all these reasons, the record demonstrates that compliance with this standard involves substantially more effort than the Agency previously understood. *Id.* EPA thus reasonably concluded that this standard poses compliance challenges that cannot be resolved by the original deadline and that, for all the reasons above, the revised deadline provides for compliance as expeditiously as practicable without exceeding three years.

### 3. Bell Leaks

EPA did not fully realize the operational implications of the standard for blast furnace bells. Because of those implications, EPA reasonably determined that the original compliance deadline was not practicable and that the revised deadline of April 3, 2027, provides for compliance as expeditiously as practicable without exceeding three years.

Blast furnace bells are cone-shaped vessels at the top of the furnace that lower and rise to drop batches of raw materials into the furnace while preventing gases from escaping. A blast furnace typically uses a small bell and a large bell, which operate alternately to maintain a seal at the top of the furnace. Operators

place raw materials on the closed small bell, which then lowers to create an opening through which the raw materials drop onto the larger bell. After the small bell rises again to reseal the top, the large bell lowers, which releases the raw materials into the furnace. These bells must be tightly sealed to the blast furnace. Over time, the surfaces that seal the bells wear down and must be repaired or replaced. *See* 89 Fed. Reg. at 23298, JA _____.

In the 2024 Rule, EPA required the repair or replacement of small bell seals any time visible emissions are observed. *Id.* at 23303, JA _____. At the same time, EPA required a work practice limit, based on time or throughput limits, for when a small bell must be replaced. 40 C.F.R. § 63.7821(l). Throughput limit refers to the maximum tonnage of raw materials put through a furnace over the lifetime of a small bell while remaining compliant. Under this work practice limit, if a visible emission is observed, the facility must compare the time or throughput from that emission to the time or throughput since the most recent small bell seal repair or replacement. *Id.* If that new interval is shorter or throughput is lower than the previous one, that shorter period or lower throughput becomes the new work practice limit. *Id.*

The 2024 Rule also established a multi-stage monitoring process for large bells that begins with monthly visible emissions checks and escalates to certified opacity readings if visible emissions are observed, with an action level of 20

percent opacity for large bell leaks. *Id.* Once that action level is triggered, the facility has two opportunities to perform corrective actions to get opacity levels below 20 percent. *Id.* If unsuccessful, the facility must then repair or replace the large bell seals. *Id.*

Regulated entities first pointed out that if a small bell is repaired or replaced but the new seal is faulty, thereby causing a visible emission far sooner than a new seal should, the resulting data point would set an unreasonably short replacement interval. CC Pet. at 27-28, JA \_\_\_\_\_-\_\_\_\_\_. This might immediately trigger the replacement of all existing small bells, as each might exceed this new unduly short limit. And going forward, even properly working small bells would require premature replacements because the limit set was based on an unrepresentative faulty performance. *Id.* This would lead to more frequent interruptions to operations than EPA realized. EPA did not understand this implication when it issued the 2024 Rule. Final Rule RTC at 11, JA \_\_\_\_\_.

In addition, in the 2023 proposal for the 2024 Rule, EPA proposed an action level for large bells based on a 3-minute average, which calculates the average opacity based on 12 consecutive, 15-second observations. 88 Fed. Reg. 49402, 49412 (July 31, 2023), JA \_\_\_\_\_; *see* 40 C.F.R. part 60, App. A-4 (requiring observations at 15-second intervals under EPA Method 9). However, the 2024 Rule sets the action level at 20 percent based on an average of three instantaneous

readings. 89 Fed. Reg. at 23303, 23324, JA _____, _____; *see* 90 Fed. Reg. at 29488, JA _____. Averaging three instantaneous readings (rather than 12) would tend to require facilities to repair or replace large bells more often. Because this was a change between the proposed and final rule, this may end up being more often than EPA anticipated because regulated entities were unsure, even after the 2024 Rule, how to apply the instantaneous approach using Method 9. *See* U.S. Steel Pet. at 12-13, JA _____ (expressing confusion about how to apply the instantaneous approach). And because certain large bells require complete removal to replace the seal, this could result in more frequent interruptions to operations. CC Pet. at 29 (citing Industry Comments at VI-33, JA _____), JA _____; 2024 Rule RTC at 229, JA _____.

In the 2024 Rule, EPA had not realized the interruption to operations posed by this standard. Final Rule RTC at 11, JA _____. Because of the substantive nature of these issues, EPA recognized that revisions would require notice and comment rulemaking. Thus, EPA reasonably concluded that this standard poses compliance challenges that cannot be resolved by the original deadline and that, for all the reasons above, the revised deadline provides for compliance as expeditiously as practicable without exceeding three years.

### 4. Beaching

EPA now understands that, in some cases, the equipment and work practices EPA expected will be insufficient or infeasible to meet the standard for beaching by the original deadlines. EPA thus reasonably determined that the original compliance deadline for this standard was not practicable and that the revised deadline of April 3, 2027, provides for compliance as expeditiously as practicable without exceeding three years.

Beaching occurs on the rare occasion when molten iron from a blast furnace cannot move to the next step because the basic oxygen process furnace cannot accept the molten iron. Operators place the molten iron from the blast furnace onto the ground, in some cases within a three-sided structure. *See* 89 Fed. Reg. at 23298, JA _____.

In the 2024 Rule, EPA required facilities to construct full or partial enclosures for the beaching process or use carbon dioxide to suppress fumes. *Id.* at 23302, JA _____. Regulated entities provided additional clarification on the challenges of constructing partial enclosures at several facilities, which indicated the need to relocate beaching operations to build a partial enclosure or install pipes for carbon dioxide suppression due to space constraints. *See* CC Pet. at 31-33, JA _____-_____; Final Rule RTC at 15, JA _____.

EPA thus reasonably revised this compliance deadline to avoid unnecessary and unanticipated disruption to production and to allow additional time for industry to determine how to comply with this standard. Final Rule RTC at 15, JA _____.

### 5. Blast Furnace Casthouses and Basic Oxygen Process Furnace Shops Work Practices

The 2024 Rule's regulatory text contains an ambiguity as to emissions monitoring at blast furnace casthouses and basic oxygen process furnace shops. Because that ambiguity creates compliance problems, EPA reasonably determined that the original compliance deadline for this standard was not practicable and that the revised deadline of April 3, 2027, provides for compliance as expeditiously as practicable without exceeding three years.

The blast furnace casthouse is the structure that houses the lower portion of the blast furnace where operators "tap" the furnace—opening a tap hole to allow molten iron and slag to flow out. The basic oxygen process furnace shop is the structure that houses the entire basic oxygen process furnace and auxiliary activities, such as the hot iron transfer and slag skimming. *See* 89 Fed. Reg. at 23298, JA _____.

The 2024 Rule updated the frequency and method used to measure opacity for blast furnace casthouses and basic oxygen processing furnace shop emissions. But there is a discrepancy between the preamble of the 2024 Rule and the regulatory text on when and how to measure opacity. The preamble allows

certified opacity observations to be conducted "from the one opening known to have the highest opacity[] for a full steel [or iron] cycle." 89 Fed. Reg. at 23305-06, JA _____-_____. By contrast, the regulatory text requires that "[i]f [a certified reader] is used [to measure opacity], observations should be made separately at each opening." *See* 40 C.F.R. §§ 63.7823(c)(3)(i), (d)(6); 63.7793(f)(8).

EPA reasonably concluded that this discrepancy creates compliance challenges, particularly given the need to arrange for sufficient numbers of certified readers. Final Rule RTC at 12, JA _____. Petitioners argue that this problem can be resolved by using camera imaging. Pet'rs' Suppl. Br. at 15. But as EPA explained, such camera observations would still need to meet the same conditions as certified readings for critical aspects such as light and the position of the camera, and therefore video surveillance would be insufficient to demonstrate compliance with the opacity limits. 89 Fed. Reg. at 23295, JA _____; 2024 Rule RTC at 68, JA _____.

The Agency thus determined that the revised deadlines are appropriate to ensure compliance as expeditiously as practicable for sources to work through how they could meet the standard as written, including "the need for installation of new control equipment, monitors, or measurement equipment." 90 Fed. Reg. at 55685, JA _____. Additionally, EPA was uncertain about the record on this issue to conclude that the discrepancy was merely a typographical or otherwise non-

substantive error appropriate for a correction notice. 90 Fed. Reg. at 14208, JA

_____.

### 6. Slag Handling Processes

The 2024 Rule set standards that apply to all sources of slag handling, processing, and storage. Yet the rule relied on data for only a subset of these processes. In addition, EPA now understands that, in certain circumstances, fogging or water spraying to minimize opacity for slag processing operations can create safety concerns and hinder accurate opacity readings. EPA thus reasonably determined that the original compliance deadline for this standard was not practicable and that the revised deadline of April 3, 2027, provides for compliance as expeditiously as practicable without exceeding three years.

Slag is a by-product released from the blast furnace or basic oxygen process furnace. The slag is less dense than iron and steel and therefore floats on top of molten iron or steel. Operators skim the slag from the top and then transport the slag to open pits to cool and enable later removal. Usually there is one slag pit for every blast furnace or basic oxygen process furnace. *See* 89 Fed. Reg. at 23298, JA

_____.

In the 2024 Rule, EPA imposed an opacity limit of 10 percent for slag processing and handling based on the data it had. *Id.* at 23301, JA _____. EPA believed this dataset captured typical variability. Regulated entities, however,

34

expressed concern about the achievability of this opacity limit for the full range of slag handling processes. They explained that the dataset was incomplete and does not represent the variability of slag emissions under different weather and operating conditions. Regulated entities submitted 14 additional opacity tests that reflected some of the highest readings and were representative of different slag processes. CC Pet., Attach. A at 21, JA _____. This new data showed higher opacity concentrations than previously known by EPA for certain slag processes. 90 Fed. Reg. at 55686, JA _____.

In addition, EPA now understands that fogging or water spraying to minimize opacity for slag processing operations can create safety concerns and hinder accurate opacity readings. CC Pet. at 34-35, JA _____-_____ ("The use of water to control emissions leads to 'the creation of pooled water,' posing serious risks of hazardous conditions when molten slag hits the pooled water, which can create a 'reaction very similar to an explosion, putting operation and the community at risk for serious if not deadly injury.'") (citing Attach. E ¶¶ 13-16), JA _____-_____; U.S. Steel Pet., Attach. B ¶¶ 7-8, JA _____-_____ ("This observation location is unsafe due to moving rail cars on the track as well as steam-reduced visibility generated when the water sprays are used to cool the slag. Another concern in obtaining valid readings is the background contrast of the slag pit walls when the water sprays are on or off.").

Although the 2024 Rule applies to all sources of slag handling, processing, and storage, the data to support this limit only included a subset of these processes. Final Rule RTC at 14, JA _____. Furthermore, because fogging or water spraying can create both safety concerns and difficulties in obtaining accurate opacity readings, EPA now understands that, in certain circumstances, these work practices are insufficient or infeasible to meet the standards by the original deadlines. 90 Fed. Reg. at 29488, JA _____; 90 Fed. Reg. at 55686, JA _____; Final Rule RTC at 14, JA _____. EPA thus reasonably concluded that this standard poses compliance challenges that cannot be resolved by the original deadline and reasonably concluded that the revised deadline was warranted while EPA and stakeholders work through how compliance can be achieved for all processes covered by the 2024 Rule.

Contrary to Petitioners' claims, EPA does not have data to show that the processes it collected data on are the most emissive. Pet'rs' Suppl. Br. at 15-16. Though Petitioners point to EPA's response to comments on the 2024 Rule, that statement explained only EPA's general understanding of process emissions; it said nothing about the data EPA had on these processes. 2024 Rule RTC at 96, JA _____.

### 7. Fenceline Monitoring

Finally, there is fenceline monitoring. Because it is unreasonable to monitor a facility's compliance with standards covered by the Final Rule that are not yet implemented, EPA reasonably revised the compliance deadline for fenceline monitoring for "consistency" with the other revised deadlines. Fenceline monitoring refers to the placement of monitors along a facility's perimeter to measure air-toxics concentrations to "ensur[e] that . . . standards . . . are achieving the anticipated reductions." 90 Fed. Reg. at 29487, JA _____; *see also* 89 Fed. Reg. at 23306-07, JA _____-_____.

EPA originally set a deadline of one year after promulgation of a test method or April 2026, whichever is later. 89 Fed. Reg. at 23306, JA _____. When EPA issued the Interim Final Rule in July 2025, EPA had not promulgated a test method. 90 Fed. Reg. at 29489, JA _____. Nor had EPA promulgated such a test method by December 2025 when EPA issued the Final Rule. 90 Fed. Reg. at 55684 n.22, JA _____. Since it is unreasonable to monitor a facility's compliance with standards not yet implemented, EPA simply shifted the deadline—to one year after promulgation of a test method or April 2027, whichever is later—to maintain alignment with the other standards' revised 2027 compliance deadlines. *Id.* at 55686, JA _____; *see also* Final Rule RTC at 16-17, JA _____-_____.

**B.** **The new compliance deadlines provide for compliance as expeditiously as practicable and hew to the statute's three-year cap.**

The foregoing discussion of the compliance issues for each standard demonstrates that EPA had a reasonable basis to conclude, at the time it issued the Interim Final Rule, that compliance was not "practicable" under the original deadlines in the 2024 Rule. Final Rule RTC at 7-8, JA _____-_____. EPA also reasonably concluded that the record supported the revised compliance deadlines because they "provide[d] for compliance as expeditiously as practicable, but in no event later than 3 years after the effective date of such standard." 42 U.S.C. § 7412(i)(3)(A); Final Rule RTC at 7-8, JA _____-_____.

It is unclear what Petitioners mean when they say that "the Agency still cannot point to any part of the record at which it provides support or explanation for" its claim that the revised deadlines provide for compliance as expeditiously as practicable. Pet'rs' Suppl. Br. at 16; *see also* Pet'rs' Br. at 40-41. The whole point of the Interim Final Rule and Final Rule was precisely that EPA relied on the entire record now before it to set deadlines that provide for compliance as expeditiously as practicable while staying within the Act's three-year cap.

Nor does the Act require EPA to expressly use the phrase "as expeditiously as practicable" or cite section 112(i)(3)(A). *Contra* Pet'rs' Suppl. Br. at 10 ("the Delay Rule does not even mention the Clean Air Act's requirement to 'provide for

compliance as expeditiously as practicable'"). To survive arbitrary-and-capricious review, EPA simply needs to "examine the relevant data and articulate a satisfactory explanation," which, as explained above, EPA did here. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

EPA reasonably determined standard by standard that regulated entities would have difficulty complying with the original deadlines. 90 Fed. Reg. at 29488-89, JA _____; 90 Fed. Reg. at 55684-86, JA _____. Therefore, contrary to Petitioners' argument, EPA rationally and separately considered the compliance challenges for each standard based on the record. Pet'rs' Br. at 44; Pet'rs' Suppl. Br. at 16. In their reconsideration petitions, regulated entities explained that if the standards remained, it would take more than three years to (a) find solutions to comply with the requirements, (b) test those solutions to ensure they are sufficient, and (c) implement them. *See* CC Pet., Attach. C ¶¶ 9-10, JA _____; U.S. Steel Pet., Attach. A ¶¶ 39-40, JA _____-_____. But EPA complied with the Act's requirement and revised compliance deadlines to April 3, 2027, which is "no [] later than 3 years after the effective date" of the 2024 Rule.  42 U.S.C. § 7412(d)(10), (i)(3)(A); 90 Fed. Reg. at 29488, JA _____; 90 Fed. Reg. at 55685-86, JA _____ (stating that for certain standards sources will likely need more than the two years originally given to comply).

**C.** **The challenged rules delayed the 2024 Rule's compliance deadlines, not its effective date.**

*Air Alliance* does not bar EPA's compliance deadline revisions. In *Air Alliance*, this Court vacated EPA's delay of a rule's effective date that was intended to give EPA time to consider petitions for reconsideration. 906 F.3d at 1053. Here, by contrast, the challenged rules did not delay the effectiveness of the 2024 Rule. The 2024 Rule remains in effect; EPA instead revised certain compliance deadlines in the 2024 Rule through rulemaking based on record findings.

Petitioners rely on a single line from the Interim Final Rule to claim that EPA is using reconsideration as a basis for extending compliance deadlines, and they build their entire argument on that single line. Pet'rs' Br. at 42. But Petitioners overread what is, at most, an unartfully drafted sentence. EPA has always been clear that the Interim Final Rule based the revision of the compliance deadlines on compliance challenges it identified after the 2024 Rule's promulgation. 90 Fed. Reg. at 29488, JA _____. The Interim Final Rule concluded that the standards at issue could not be met under the original deadlines in the 2024 Rule and that revised April 3, 2027 compliance deadlines were appropriate. The preamble to the Interim Final Rule referenced reconsideration of the 2024 Rule not as a basis for extending compliance deadlines but to emphasize that the Agency identified

40

deficiencies in the 2024 Rule and was actively working to remedy them in a separate rulemaking. But the 2024 Rule remains in effect.

These facts distinguish this case from *Air Alliance.* At issue there was an EPA rule that delayed a rule's effective date by 20 months to give EPA time to consider petitions for reconsideration. 906 F.3d at 1057. EPA also stated that compliance with the rule was not required during the delay and that EPA was not taking any action on any compliance dates. *Id.* Here, the Interim Final Rule neither repeals nor delays the effective date of the 2024 Rule. In contrast to *Air Alliance,* where EPA, without a word of explanation in the record, delayed the effective date of a final rule and decided not to reset compliance dates, 906 F.3d at 1065, 1067, the Interim Final Rule and Final Rule here revise compliance dates in the 2024 Rule pursuant to EPA's Clean Air Act rulemaking authority and provide reasonable conclusions about the compliance dates based on the record. 42 U.S.C. § 7607(d)(1)(C).

*Air Alliance* does not, and cannot, strip EPA of its ordinary authority to revise its own regulations through rulemaking. *Air Alliance* does not stand for "EPA may never revise compliance deadlines"; it stands for the "narrow" proposition that when EPA relies on Section 307(d)(7)(B) of the Act to stay the effectiveness of a rule for reconsideration, EPA cannot extend the effectiveness of the rule beyond three months. 906 F.3d at 1066; 42 U.S.C. § 7607(d)(7)(B). In this

case, EPA did not extend the effectiveness of the 2024 Rule. In addition, the Interim Final Rule and Final Rule revised the compliance deadlines in the 2024 Rule based upon findings it made in this rulemaking.

## II.     Petitioners' Procedural Arguments Are Moot and, In Any Event, They Are Meritless.

EPA promulgated the Final Rule following notice and comment and all other Clean Air Act procedures. In this way, EPA cured any alleged procedural defects in the disputed deadline revisions and mooted Petitioners' procedural arguments. And even if it did not, EPA had good cause to issue the Interim Final Rule without notice and comment.

### A.     The Interim Final Rule served as notice of the Final Rule and promulgation of the Final Rule cured the alleged procedural defects.

EPA's promulgation of the Final Rule following notice, comment, and other Clean Air Act procedures cured any alleged procedural defect with the compliance deadlines initially revised in the Interim Final Rule and reaffirmed in the Final Rule. Petitioners and the public have thus received all the process they are due. The Court should thus deny Petitioners' procedural arguments as moot. *See Am. Bar Ass'n v. FTC*, 636 F.3d 641, 645-46 (D.C. Cir. 2011) (deriving the mootness doctrine from Article III and holding that federal courts must refrain from deciding controversies if events have ended the ongoing controversy).

That conclusion follows from Supreme Court precedent. *See Little Sisters*, 591 U.S. 657. In *Little Sisters*, two agencies invoked the good-cause exception to waive notice-and-comment procedures when issuing interim final rules that both had immediate effect, and the agencies sought public comment on those rules. *See id.* at 683–84. After considering the comments, the agencies promulgated final rules reaffirming the actions taken in the interim final rules. *See id.* The Supreme Court concluded that the interim final rules functioned as a proposal that satisfied the Administrative Procedure Act's notice and comment requirements for the final rule and, thus, together with the final rules complied with "the maximum procedural requirements [that] Congress was willing to have the courts impose upon agencies in conducting rulemaking procedures." *Id.* at 683-86 (internal quotations marks omitted).

EPA followed the same course here. In the Interim Final Rule, EPA specified the dates of and rationales for the revised compliance deadlines and explicitly requested comment on all aspects of those compliance deadlines, including whether they were appropriate at all or whether different deadlines were required. 90 Fed. Reg. at 29489, JA _____. The Interim Final Rule included an August 1, 2025 deadline for comments, which the Agency extended to October 3, 2025, after receiving Petitioners' request for a public hearing. 90 Fed. Reg. 39333, JA _____-_____; 90 Fed. Reg. 40975, JA _____-_____. EPA convened a public

hearing on September 3, 2025, and EPA held the comment period open for 30 days thereafter. EPA then fully considered and responded to the comments it received and issued the Final Rule, reaffirming that the amendments made in the Interim Final Rule were warranted. Final Rule RTC, JA _____-_____; 90 Fed. Reg. 55681, JA _____-_____.

Petitioners argue that this Court should not apply *Little Sisters* here because that case did not address the legality of prior interim final rules issued without notice or good cause. Pet'rs' Suppl. Br. at 6. The Supreme Court, however, determined that it need not reach arguments that the agencies lacked good cause to promulgate the interim final rules in the first instance precisely because the interim final rules together with the final rules satisfied the Administrative Procedure Act's rulemaking requirements. *Little Sisters*, 591 U.S. 686 n.14. The same is true here. The Interim Final Rule "contained all of the elements of a notice of proposed rulemaking," *id.* at 683, and the Interim Final Rule and Final Rule together, with its request for and response to comments, "fully complied with 'the maximum procedural requirements [that] Congress was willing to have the courts impose.'" *Id.* at 686. Therefore, this Court need not reach Petitioners' arguments that EPA lacked good cause to promulgate the Interim Final Rule in the first instance. *Id.* at 686 n.14.

Moreover, Petitioners "do not come close to demonstrating that they experienced any harm" from EPA's alleged procedural errors. They commented and testified on the Interim Final Rule and the revision to the compliance deadlines at issue here, and EPA fully considered and responded to those comments. *Id.* at 684. Thus, even if the Interim Final Rule were procedurally defective, which it is not, the Interim Final Rule and Final Rule together satisfied the full slate of Clean Air Act notice-and-comment procedures that Petitioners argue were necessary. Petitioners' suggestion that EPA must re-promulgate its rule through notice-and-comment rulemaking to revise compliance deadlines—revisions Petitioners have already been notified of and commented on—is nonsensical. *See* Pet'rs' Suppl. Br. at 8. And in any event, EPA considered and responded to Petitioners' comments and made no changes between the Interim Final Rule and Final Rule so, Petitioners cannot possibly meet the Act's high bar of showing that their alleged procedural error was "so serious and related to matters of such central relevance to the rule that there is a substantial likelihood that the rule would have been *significantly changed*." 42 U.S.C. § 7607(d)(8) (emphasis added).

**B.     EPA lawfully invoked the good-cause exception because notice and comment was impracticable.**

Because the revised deadlines underwent notice and comment, this Court need not consider whether EPA had good cause to forgo notice and comment in the Interim Final Rule. But if it does reach this issue, the record shows that good cause

existed: EPA acted promptly when it identified issues with the 2024 Rule and continuously evaluated the highly technical issues before it. The Agency then acted when, after determining the extent of the problems, it lacked time to undergo notice-and-comment rulemaking before regulated entities would be subject to compliance deadlines that were infeasible and implicated operational-safety and national security concerns.

EPA supported its good cause argument by highlighting the implication of operational-safety and national security concerns that was discussed in industry petitions for reconsideration, which included a bipartisan congressional letter urging EPA to set feasible standards to not "dramatically undermine the domestic steel industry and national security." *See* Resp't Opp'n at 12-17; CC Pet. at 3, 39, 41-43, JA \_\_\_\_\_, \_\_\_\_\_, \_\_\_\_\_-\_\_\_\_\_, Attach. G, \_\_\_\_\_-\_\_\_\_\_. These were not made-up concerns; the issues identified with the standards impacted the integrated iron and steel industry. Accordingly, in the Interim Final Rule EPA made clear that based on thorough and continuous "consideration of all the reconsideration issues, *the parties' petitions for reconsideration*, and further discussion with stakeholders," EPA lawfully invoked the good cause exception in the Interim Final Rule. 90 Fed. Reg. at 29488, JA \_\_\_\_\_ (emphasis added).

In *Tri-County Telephone Association, Inc. v. FCC*, this Court held that an agency did not unjustifiably delay its invocation of the good-cause exception

where it acted promptly upon identifying an emergency and invoked the exception once it determined that additional action was required to fully redress the emergency. 999 F.3d 714, 720 (D.C. Cir. 2021). The agency had issued a relief order on October 4, 2017, following a hurricane in September 2017. *Id.* Persistent power outages and other logistical challenges, however, made restoration of service slower and more expensive than expected. *Id.* As a result, by May 2018 the agency reasonably determined that an emergency continued to exist and that it needed to act again but that notice and comment would be impracticable and contrary to the public interest, given that the next hurricane season was set to begin less than a month away.

Contrary to Petitioners' characterization of the timeline, EPA did not wait until the eve of an administrative deadline to raise the good cause banner. Pet'rs' Br. at 31. After promulgating the 2024 Rule on April 3, 2024, EPA received petitions for reconsideration from Cleveland-Cliffs, Inc. and United States Steel Corporation on June 3, 2024, totaling over 1,500 pages of technical comments and data. *See* CC Pet., JA _____-_____, and U.S. Steel Pet., JA _____-_____. EPA promptly granted discretionary reconsideration on August 14, 2024, upon initially reviewing the reconsideration petitions, believing that a notice correction would be sufficient to address several issues. August 2024 Reconsideration Letter, JA _____-_____; 90 Fed. Reg. at 29487, JA _____.

But upon continued evaluation of the petitions and after meeting with regulated entities in September, November, and December 2024, and after receiving additional information and data, EPA determined that fixing the identified issues would require rulemaking rather than a simple correction notice. March 2025 Reconsideration Letter, JA _____-_____. But considering that certain standards in the 2024 Rule had impending compliance deadlines one month away, EPA issued a 90-day administrative stay of those deadlines. 90 Fed. Reg. at 14208, JA _____; *see* 42 U.S.C. § 7607(d)(7)(B).

EPA then faced a choice: Allow infeasible compliance deadlines to pass, creating disruptive noncompliance across the U.S. integrated iron and steel industry, or revise compliance dates based on identified feasibility concerns under a statutorily recognized procedural exception while soliciting comments on that action. EPA choose the latter, acting under the APA's good cause authority to prevent disruptions across the U.S. integrated iron and steel industry that implicated operational-safety and national security concerns.

Contrary to Petitioners' argument, EPA did not have more than a year to address the compliance concerns. Pet'rs' Br. at 33. As *Tri-County* makes clear, the relevant question is not how much time passed on the calendar, but when the agency reasonably determined that additional action was required. 999 F.3d at 720.

48

EPA made this determination when it issued its mandatory reconsideration in March 2025, meaning at most it had four months before July 2025.

The Interim Final Rule was also narrowly tailored. It revised deadlines only for the standards discussed above. That was the minimum necessary to avert an approaching industry-wide disruptive compliance cliff. 90 Fed. Reg. at 29489, JA _____. EPA requested comments on the Interim Final Rule and made clear that the rule was interim in nature. *Id.*; *see Mid-Tex Elec. Coop., Inc. v. FERC*, 822 F.2d 1123, 1131-32 (D.C. Cir. 1987) (finding good cause where the agency's order was interim in nature and would prevent irremediable financial consequences and regulatory confusion). EPA also proceeded expeditiously after receiving comments on the Interim Final Rule, responding to comments and publishing the Final Rule on December 3, 2025—just two months after the close of the comment period on the Interim Final Rule. *See Mid-Tex Elec. Coop.*, 822 F.2d at 1132 (holding that the agency's interim action was bolstered where the agency was "not engaging in dilatory tactics during the interim period.").

Separately, prior notice and opportunity for comment were not required for EPA's revision of the compliance deadline for fenceline monitoring. This was a clerical adjustment that realigned the fenceline monitoring deadline by the same interval of time as in the 2024 Rule. *See* 90 Fed. Reg. at 29489, JA _____ (realigning this deadline with other extended deadlines for "consistency");

49

*Appalachian Power Co. v. EPA*, 251 F.3d 1026, 1039 (D.C. Cir. 2001) (holding

that notice and comment were not required for "fixes to technical errors" that do

not "evince a change in policy or methodology" because petitioners had the

opportunity to comment on the original policy or methodology). EPA originally set

a deadline of one year after promulgation of a test method or April 2026,

whichever is later. 89 Fed. Reg. at 23306, JA _____. Because EPA preserved the

coordinated timeframe for fenceline monitoring, on which Petitioners had ample

opportunity to comment, notice-and-comment rulemaking was not required to

revise this deadline. *See Appalachian Power*, 251 F.3d at 1039.

Petitioners' comparison to *Environmental Defense Fund* is readily

distinguishable. Pet'rs' Br. at 32. There, EPA forwent notice and comment solely

to develop new requirements, and the agency did not want the regulated

community to expend resources complying with the current ones. *Env't Def. Fund,*

*Inc. v. EPA*, 716 F.2d 915, 917 (D.C. Cir. 1983). That is nothing like this case,

where the agency acted promptly and later relied on good cause to address

compliance deadlines that were infeasible and implicated operational-safety and

national security concerns. Lastly, Petitioners' reference to *Nat'l Ass'n of*

*Farmworkers Organizations v. Marshall*, 628 F.2d 604 (D.C. Cir. 1980), is

inapposite. Pet'rs' Br. at 33-34. In *Farmworkers*, this Court held that the agency's

time constraints were due in large part to its own delays, as evidenced by the time

the agency had to consult with interested parties. *Farmworkers*, 628 F.2d at 622. Here, by contrast, EPA acted promptly to acknowledge issues with the 2024 Rule and met with regulated entities to better understand their concerns and determine if further action was necessary—not to avoid process.

Finally, EPA accurately described the role of safety and national security concerns. *Contra* Pet'rs' Suppl. Br. at 10. Petitioners' contrary argument confuses EPA's arguments for good cause with its merits arguments for revising the compliance deadlines. EPA's rationales for the deadline revisions generally turn on the standards' infeasibility. *See supra* Arg. I.A. Aside from the safety issues identified in Arg. I.A. above, EPA is not using safety and national security concerns as justification for revising compliance deadlines.

## III. The Court Should Not Vacate Either Rule.

The Court should deny Petitioners' request to vacate the Interim Final Rule and Final Rule. Whether to vacate an inadequately supported rule turns on (1) the "seriousness of the … deficiencies" and (2) the "disruptive consequences of an interim change that may itself be changed." *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993). Where alleged deficiencies are curable, and vacatur would cause disruptive consequences, this Court routinely remands without vacatur. *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 198 (D.C. Cir. 2009); *Black Oak Energy, LLC v. FERC*, 725 F.3d

230, 244 (D.C. Cir. 2013) (remanding without vacatur where the Court found it "plausible that FERC can redress its failure of explanation on remand while reaching the same result."). Neither *Allied-Signal* factor favors vacatur.

First, Petitioners' merits arguments—the only ones that remain live—come down to complaints about the adequacy of EPA's explanations for revising certain compliance deadlines and the length of the deadline revisions. Pet'rs' Br. at 40-41, 43-47; Pet'rs' Suppl. Br. at 8-16. As EPA has shown, those revisions are reasonable and properly explained. But even if the Court were to disagree, EPA could readily correct such errors on remand with a more comprehensive explanation. So, "there is at least a serious possibility that the [EPA] will be able to substantiate its decision on remand." *Allied-Signal*, 988 F.2d at 151; *see also Black Oak Energy*, 725 F.3d at 244.

Second, vacatur would have disruptive consequences. Vacatur would resurrect the April 3, 2025, and April 3, 2026 compliance deadlines for standards that EPA determined could not practicably be met. As explained above, this would cause disruptive noncompliance across the domestic integrated iron and steel industry. Indeed, one of the original deadlines has already been passed for nearly a year, and the other—April 3, 2026—is now only a little over a month away. Vacatur of the extensions would thus almost immediately force the nation's integrated iron and steel industry into noncompliance. The disruptiveness of that

outcome is all the harder to justify when Petitioners have identified only five members who allege health harms from only five out of the eight facilities affected. *See* Pet'rs' Br., Decls. 6-10.

The Court should thus deny Petitioners' request for vacatur. And at the very least, because each standard is severable, any vacatur should be limited to standards that the Court determines to require additional explanation. 90 Fed. Reg. at 55683-84, JA _____-_____; 89 Fed. Reg. at 23314, JA _____.

## CONCLUSION

EPA respectfully asks that the Court deny the petitions.

Submitted on March 2, 2026

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*
ROBERT N. STANDER
*Deputy Assistant Attorney General*

<u>/s/ Mario A. Luna</u>
MARIO A. LUNA
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044
(202) 532-3357
Mario.Luna@usdoj.gov

*Of Counsel*:

STEVE ANDERSON
U.S. Environmental Protection Agency
Office of General Counsel
Washington, D.C.

## CERTIFICATES OF COMPLIANCE AND SERVICE

I certify that this brief complies with Fed. R. App. P. 32(a)(5) and (6) because it uses 14-point Times New Roman, a proportionally spaced font.

I also certify that this brief complies with Fed. R. App. P. 32(a)(7)(B) because by Microsoft Word's count, it has 11,868 words, excluding the parts of the brief exempted under Rule 32(f).

Finally, I certify that on March 2, 2026, I electronically filed this brief with the Court's CM/ECF system, which will serve each party.

/s/ Mario A. Luna
MARIO A. LUNA